## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

———————————————— x

OKLAHOMA FIREFIGHTERS PENSION
AND RETIREMENT SYSTEM, Individually
and on Behalf of All Others Similarly Situated,

              Plaintiff,

    vs.

LEXMARK INTERNATIONAL, INC., PAUL
A. ROOKE, DAVID REEDER, GARY
STROMQUIST, and MARTIN S. CANNING,

              Defendants.

———————————————— x

Case No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Lexmark International, Inc. ("Lexmark" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This is a class action brought on behalf of all persons or entities who purchased or otherwise acquired the publicly traded securities of Lexmark between August 1, 2014 and July 20, 2015, both dates inclusive (the "Class Period").  The action is brought against Lexmark and certain of the Company's senior executives (collectively, "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder.

2.     Defendant Lexmark is a manufacturer of printers and related supplies, primarily ink cartridges.  Lexmark sells its products to wholesale distributors and large retail chains in more than 90 countries around the world.  Based on its 2014 financial results, 37 percent of Lexmark's total revenues were generated within its Europe, Middle East and Africa ("EMEA") segment.  Supplies sales in Europe are especially critical to the EMEA segment.

3.     Throughout the Class Period, Lexmark made false and misleading statements regarding its end-user demand, channel inventory, and growth prospects for its high-margin supplies business.  The Company also failed to disclose deterioration in end-user demand and

excessive inventory levels at its European wholesale distributors.  Lexmark ultimately acknowledged that its supplies growth was not attributable to end-user demand but rather the result of its European customers buying ahead of customary price increases which produced excessive inventory.

4.     The truth was finally revealed on July 21, 2015, when the Company reported poor results for its second quarter ending June 30, 2015 and lowered its 2015 sales guidance. Lexmark blamed these disappointing results on lower-than-expected supplies revenue from its European wholesale distributors.  Lexmark explained that the Company had increased supplies prices for its European distributors three times between October 2014 and June 2015.  In reaction to these price increases, European distributors immediately stocked up on supplies prior to the expiration of their fixed-price contracts while slowing down their purchases from Lexmark.

5.     On this news, Lexmark stock dropped $9.57 per share, or 20.2 percent, wiping out approximately $550 million in market capitalization.

6.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as Defendants conduct business in this District, and a significant portion of the Defendant's actions, and the subsequent damages, took place within this District.  In addition, Lexmark's stock traded on the New York Stock Exchange ("NYSE"), located within this District.

10.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

<u>**PARTIES**</u>

11.      Plaintiff Oklahoma Firefighters, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased the common stock of Lexmark during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

12.      Defendant Lexmark is a global manufacturer of printers and related supplies. The Company's stock was listed on the NYSE under the ticker symbol "LXK" during the Class Period.  In November 2016, the Company was acquired for $2.5 billion by a consortium of private investors led by Apex Technology Co., Ltd. and PAG Asia Capital (the "Private Equity Purchasers") and is no longer listed for trading.

13.      Defendant Paul A. Rooke ("Rooke") was throughout the Class Period, Chairman and Chief Executive Officer ("CEO") of Lexmark.

14.      Defendant David Reeder  ("Reeder") was throughout the Class Period, Vice President and Chief Financial Officer ("CFO") of Lexmark.  Reeder was named President and CEO of Lexmark in November 2016.

15.     Defendant Gary Stromquist ("Stromquist") was Lexmark's interim CFO from May 20, 2014 through January 9, 2015.

16.     Martin S. Canning ("Canning") was throughout the Class Period, Executive Vice President and President of Lexmark's Imaging Solutions and Services ("ISS") division.

17.     Defendants Rooke, Reeder, Stromquist, and Canning are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lexmark's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.     Lexmark and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Lexmark is a manufacturer of printers and related supplies.  The Company also provides customers with related software and services.  Lexmark sells its products and services to wholesale distributors and large retail chains in more than 90 countries around the world.

20.     The Company is managed along two operating segments: (1) Imaging Solutions and Services ("ISS"); and (2) Enterprise Software.  The ISS segment accounted for 92 percent of Lexmark's total 2014 revenues.  Within the ISS segment, sales of printing supplies, which includes laser, inkjet, and dot matrix cartridges, accounted for 66 percent of the Company's 2014 total revenues.

21.     Based on its 2014 results, 43 percent of total 2014 revenues were generated in the United States, and 37 percent of total 2014 revenues were generated within Europe, Africa, and the Middle East ("EMEA").  Supplies sales in Europe are especially critical to the EMEA geographic area.

22.     Lexmark relies on fixed-price supplies contracts to lock in prices charged to its customers for a set period, typically between one and five years.  These contracts allow Lexmark's customers to place unlimited orders for supplies during the contract term.  Accordingly, Lexmark often protects its margins by "harmonizing" or "aligning" its product prices across all markets via price increases.

23.     As early as 2009, Lexmark explained that whenever the Company announces price increases pursuant to harmonization strategies, Lexmark's customers in the affected markets immediately "buy ahead" of price increases to secure more favorable pricing before their fixed-price contracts expire.  This "buy-ahead" allows Lexmark's customers to take

5

advantage of their lower, fixed price rate before they will be forced into the higher prices upon expiration of their contracts.

**Materially False and Misleading Statements Issued During the Class Period**

24.     The Class Period begins August 1, 2014, when Lexmark filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarterly period ended June 30, 2014 and fiscal year ("2014 2Q 10-Q"), and reaffirming the financial results announced in the press release issued on July 22, 2014.  The 2014 2Q 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Rooke and Stromquist, stating that the financial information contained in the 2014 2Q 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25.     On October 21, 2014, Lexmark reported better-than-expected profit for its Third Quarter 2014 Financial Results and stated that the Company's "Laser supplies revenue of $533 million grew 2 percent year to year."

26.     On October 31, 2014, Lexmark filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarterly period ended September 30, 2014 and fiscal year ("2014 3Q 10-Q"), and reaffirming the financial results announced in the press release issued on October 21, 2014.  The 2014 3Q 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Rooke and Stromquist, stating that the financial information contained in the 2014 3Q 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

27.      On January 27, 2015, Lexmark issued a press release in which it announced its Fourth Quarter 2014 and Full Year 2014 Financial Results.  Lexmark's 2015 outlook forecasted earnings per share ("EPS") of $1.81 to $2.01, or 45 to 60 percent growth over 2014 EPS first-

quarter 2015 financial results.  The Company also forecasted 2015 sales "to decline in the range of 3 to 5 percent year to year" due to Lexmark's exit from its Inkjet business and additional currency headwinds.

28.     During the related earnings call, CEO Rooke stated that to "offset these headwinds, we expect continued strong operational performance, as well as improvement in laser profitability as we drive [Managed Print Services or MPS], supplies price harmonization as needed, and ongoing cost and expense reductions."  In addition, in anticipation of investors' concerns that the supplies channel was growing beyond optimal levels, CEO Rooke stated, "we're going to try to hold the channel flat whereas . . . we had some growth last year."

29.     On the same earnings call, CFO Reeder's prepared remarks focused on Lexmark's high-margin supplies business and included the following: "Reflecting robust end-user demand, laser supplies revenue was quite strong . . . . Laser supplies revenue grew 5% year-to-year, and we continued to see good end-user demand for laser supplies, highlighting the continued growth in the quality of our MPS and large workgroup installed base."

30.     On February 10, 2015, the Company participated in the Goldman Sachs Technology & Internet Conference.  Responding to questions concerning the growth of the Company's supplies channel, Canning asserted that supplies growth was spurred by end-user demand, stating the following in pertinent part:

> [Our] strategy has been extremely successful . . . .  Our sellout pages that we're seeing now have been moving at a consistent mid to high single-digit level . . . . So we're displacing competitors, we're consolidating pages and putting more pages per device . . . .  So we feel very good about this shift that we've been driving with our high-end versus low-end workgroup and the pages that are resulting from it."
>
> We see competition sometimes waiting to see which way the customer is going to do it.  We're full-out driving it.  We've had 29 consecutive quarters of growth in Managed Print Services, 15 consecutive years and 8 consecutive quarters of

double-digit growth in Managed Print Services . . . .   So we think we're on the right path."

31.     In addition, Canning further stated the following when asked about supplies performance, its connection with increased channel inventory, and that conversely, competitors' channel inventory has decreased:

> When I see channel movement on this side -- and I have to admit, I don't see it all . . . . [T]he channel dynamics that we're seeing make sense to me . . . . Ultimately, these channel partners are going to do what's best for their business, and they just continue to move forward in a way that's consistent . . . with the fundamentals that I see."

32.     On March 2, 2015, the Company filed its annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2014 ("2014 10-K").  The 2014 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Rooke and Reeder, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33.     On March 5, 2015, the Company participated in the Morgan Stanley Technology, Media & Telecom Conference.  During the Company's presentation, Reeder confirmed that Lexmark was in fact "doing price harmonization so there's no cross border arbitrage . . . ." CFO Reeder further confirmed that Lexmark "took one [price harmonization] action in Europe in the fourth quarter[,]" but with respect to the prospect for subsequent price actions, CFO Reeder only stated, "stay tuned, we'll see what happens here this year."

34.     Then, on April 28, 2015, Lexmark announced its Q1 2015 Financial Results and maintained its 2015 sales growth forecast of a 3.0 to 5.0 percent decline from 2014.  During the relating earnings call, Reeder attributed the growth of Lexmark's supplies business to end-user demand, and not to channel buy-ahead in response to the price harmonization strategy.

8

Specifically, Reeder stated "[s]trong end-user demand was the primary driver of year-to-year growth, but we estimate that the Laser supplies channel inventory increased slightly.  As experienced in the first quarter, channel inventory often increases ahead of price harmonization. We expect inventory to decline in the second quarter as the harmonization activity works its way through the channel.  Geographically, we saw . . . a 2% decline in EMEA . . . ."

35.     On the same call, in response to a question regarding the decline in supplies revenue growth and build-up in channel inventory, Rooke responded by touting the growth of Lexmark's supplies business, stating "we remain encouraged about the activity we see, particularly in our core geographies in the US or North America and Europe . . . . [W]hen you factor in the currency and the slight channel movement there, we feel very good about the trajectory of our supplies business."

36.     On April 30, 2015, Lexmark filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarterly period ended March 31, 2015 and fiscal year ("2015 1Q 10-Q"), and reaffirming the financial results announced in the press release issued on April 28, 2015.  The 2015 1Q 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Rooke and Reeder, stating that the financial information contained in the 2015 1Q 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37.     The statements contained in ¶¶ 24-36 were materially false and/or misleading when made because Defendants failed to disclose that: (1) end-user demand and growth for the Company's supplies business was deteriorating; (2) pricing increases were the primary driver of supplies revenue growth, not end-user demand; (3) customers in the supplies channel reacted by

buying ahead of anticipated pricing increases; and as a result, (4) there was excessive inventory levels at it European wholesale distributors.

## The Truth Emerges

38.    The truth about Defendants' misrepresentations was finally revealed on July 21, 2015, when Lexmark reported poor results for its second quarter ending June 30, 2015 and lowered its 2015 sales guidance.  Lexmark blamed these disappointing results on lower-than-expected supplies revenue from its European wholesale distributors explaining that the Company was enduring "ongoing headwinds from the strong U.S. dollar and near-term laser supplies channel optimization particularly in EMEA . . . ."

39.    On a related earnings call, analysts had trouble making sense of the supplies channel inventory.  In response, Defendant Rooke acknowledged the inventory build-up and explained that the Company had increased supplies prices, stating in pertinent part:

> Now with the 2015 guidance, we're factoring in a number of assumptions for the second half, including . . . a reduction in laser supply sell in to draw down channel inventory for laser supplies.  ***We are focused on reducing laser supplies channel inventory, particularly in EMEA where our models and channel reporting show a buildup in channel inventory from the multiple cost actions we've taken worldwide as the US dollar strengthens.***
>
> \* \* \*
>
> ***This has come from a lot of the price actions we've taken in Europe over the last several quarters*** . . . . We saw a little bit of a sell out softness in the second quarter more than expected.  As so as we drew down our supply sell in [sic] we didn't see the reduction of channel inventory . . . .

40.    On this news, shares of Lexmark dropped $9.57 per share, or 20.2 percent, to close at $37.75 per share on July 21, 2015.

41.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the securities of Lexmark between August 1, 2014 and July 20, 2015, both dates inclusive (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Lexmark, and the directors and officers of Lexmark and their families and affiliates at all relevant times.

43.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lexmark common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Lexmark and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

11

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of Lexmark; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

48.     The market for Lexmark's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Lexmark's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Lexmark's securities relying upon the integrity of the market price of the Company's securities and market information relating to Lexmark, and have been damaged thereby.

49.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Lexmark's securities, by publicly issuing false and/or misleading

statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  These statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Lexmark's business, operations, and prospects as alleged herein.

50.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Lexmark's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

51.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Lexmark securities, and operated as a fraud or deceit on Class Period purchasers of Lexmark securities by misrepresenting the value and prospects for the Company's business, growth prospects, and accounting compliance.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Lexmark securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Lexmark securities during the Class Period, Plaintiff and

13

other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## ADDITIONAL SCIENTER ALLEGATIONS

52.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

53.     The Individual Defendants permitted Lexmark to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

54.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Lexmark, their control over, receipt, and/or modification of Lexmark's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Lexmark, participated in the fraudulent scheme alleged herein.

55.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Lexmark securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding Lexmark's business, operations, and management and the intrinsic value of Lexmark securities and caused Plaintiff and members of the Class to purchase Lexmark securities at artificially inflated prices.

14

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

56.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Lexmark who knew that the statement was false when made.

## PRESUMPTION OF RELIANCE

57.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

15

(e)    Plaintiff and other members of the Class purchased Lexmark securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

58.    At all relevant times, the markets for Lexmark securities were efficient for the following reasons, among others:

(a)    as a regulated issuer, Lexmark filed periodic public reports with the SEC;

(b)    Lexmark regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)    Lexmark was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)    Lexmark common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "LXK."

59.    As a result of the foregoing, the market for Lexmark securities promptly digested current information regarding Lexmark from all publicly available sources and reflected such information in Lexmark's stock price.  Under these circumstances, all purchasers of Lexmark securities during the Class Period suffered similar injury through their purchase of Lexmark's securities at artificially inflated prices and the presumption of reliance applies.

60.     Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## COUNT  I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

61.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

> (a)     Employed devices, schemes, and artifices to defraud;

> (b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

> (c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Lexmark securities during the Class Period.

64.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lexmark securities.  Plaintiff and the Class would not have purchased Lexmark securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

65.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Lexmark securities during the Class Period.

## COUNT  II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

66.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

67.     The Individual Defendants acted as controlling persons of Lexmark within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Lexmark, the Individual Defendants had the power and ability to control the actions of Lexmark and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  July 20, 2017                                  Respectfully submitted,

                                                              */s/ Christopher J. Keller*
                                                              Christopher J. Keller
                                                              Eric J. Belfi
                                                              Francis P. McConville
                                                              **LABATON SUCHAROW LLP**
                                                              140 Broadway
                                                              New York, New York 10005
                                                              Telephone: (212) 907-0700
                                                              Facsimile:  (212) 818-0477
                                                              ckeller@labaton.com
                                                              ebelfi@labaton.com
                                                              fmcconville@labaton.com

                                                              *Counsel for Oklahoma Firefighters Pension
                                                              and Retirement System*

## CERTIFICATION

I, Robert E. Jones, as Executive Director of Oklahoma Firefighters Pension and Retirement System ("Oklahoma Fire"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Oklahoma Fire.  I have reviewed a complaint filed against Lexmark International, Inc. ("Lexmark") alleging violations of the federal securities laws;

2.      Oklahoma Fire did not purchase securities of Lexmark at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Oklahoma Fire is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.      Oklahoma Fire's transactions in Lexmark securities stock during the Class Period are reflected in Exhibit A, attached hereto;

5.      Oklahoma Fire sought to serve as a lead plaintiff in the following class actions under the federal securities laws filed during the last three years:

> *In re Rocket Fuel, Inc. Securities Litigation*, No. 4:14-cv-3998 (N.D. Cal.)
> *Rihn v. ACADIA Pharmaceuticals Inc.*, No. 3:15-cv-0575 (S.D. Cal.)
> *Glore v. SanDisk Corp.*, No. 3:15-cv-1455 (N.D. Cal.)
> *Oklahoma Firefighters Pension & Retirement System v. Rayonier Advanced Materials*, No. 3:15-cv-0546 (M.D. Fla.)
> *City of St. Clair Shores Police & Fire Retirement System v. Nationstar Mortgage Holdings, Inc.*, No. 0:15-cv-61170 (S.D. Fla.)
> *Avila v. LifeLock, Inc.*, No. 2:15-cv-1398 (D. Ariz.)
> *Markman v. Whole Foods Market Inc.*, No. 1:15-cv-0681 (W.D. Tex.)
> *In re Broadcom Corp. Stockholder Litigation*, No. 8:15-cv-00979 (C.D. Cal.)
> *Ho v. Flotek Industries, Inc.*, No. 4:15-cv-3327 (S.D. Tex.)
> *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521 (D. Or.)
> *Hall v. Rent-A-Center, Inc.*, No. 4:16-cv-0978 (E.D. Tex.)
> *In re Novo Nordisk Securities Litigation*, No. 3:17-cv-0209 (D.N.J.)

6.      Oklahoma Fire sought to serve as a representative party, but not as a lead plaintiff, in the following class action under the federal securities laws filed during the last three years:

> *Oklahoma Firefighters Pension & Retirement System v. Xerox Corporation*, No. 1:16-cv-8260 (S.D.N.Y.)

7.     Oklahoma Fire is currently serving as a lead plaintiff in the following class actions

filed under the federal securities laws during the last three years:

> *In re Rocket Fuel, Inc. Securities Litigation*, No. 4:14-cv-3998 (N.D. Cal.)
> *Avila v. LifeLock, Inc.*, No. 2:15-cv-1398 (D. Ariz.)
> *In re Broadcom Corp. Stockholder Litigation*, No. 8:15-cv-0979 (C.D. Cal.)
> *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-0521 (D. Or.)
> *Hall v. Rent-A-Center, Inc.*, No. 4:16-cv-0978 (E.D. Tex.)
> *In re Novo Nordisk Securities Litigation*, No. 3:17-cv-0209 (D.N.J.)

8.     Beyond its pro rata share of any recovery, Oklahoma Fire will not accept payment

for serving as a lead plaintiff and representative party on behalf of the Class, except the

reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved

by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is

true and correct this 20ᵗʰ day of July, 2017.

Robert E. Jones
*Executive Director*
*Oklahoma Firefighters Pension and Retirement System*

2

EXHIBIT A

TRANSACTIONS IN LEXMARK INTERNATIONAL, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 08/01/14 | 1,270.00 | $47.59 | ($60,433.97) |
| Purchase | 08/04/14 | 340.00 | $48.10 | ($16,354.34) |
| Purchase | 08/05/14 | 760.00 | $48.23 | ($36,654.19) |
| Purchase | 08/06/14 | 250.00 | $48.43 | ($12,107.55) |
| Purchase | 08/08/14 | 270.00 | $49.13 | ($13,266.05) |
| Purchase | 08/07/14 | 240.00 | $48.48 | ($11,634.10) |
| Purchase | 08/11/14 | 4,840.00 | $50.19 | ($242,906.53) |
| Purchase | 08/12/14 | 520.00 | $50.33 | ($26,174.04) |
| Purchase | 08/13/14 | 270.00 | $50.89 | ($13,741.60) |
| Purchase | 08/13/14 | 730.00 | $50.91 | ($37,160.65) |
| Purchase | 08/14/14 | 220.00 | $51.46 | ($11,321.11) |
| Purchase | 08/14/14 | 360.00 | $51.48 | ($18,533.34) |
| Purchase | 08/18/14 | 280.00 | $50.96 | ($14,269.86) |
| Purchase | 08/15/14 | 510.00 | $50.89 | ($25,955.43) |
| Purchase | 08/19/14 | 140.00 | $51.01 | ($7,141.47) |
| Sale | 02/18/15 | -1,500.00 | $44.48 | $66,717.00 |
| Sale | 02/18/15 | -2,300.00 | $44.48 | $102,299.40 |