UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>LEXMARK INTERNATIONAL, INC., PAUL A. ROOKE, DAVID REEDER, GARY STROMQUIST, and MARTIN S. CANNING,<br><br>Defendants. | Civil Action No. 1:17-cv-05543-WHP<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**


I. NATURE OF THE ACTION ....................1

II. JURISDICTION AND VENUE ....................9

III. PARTIES ....................9

IV. SUBSTANTIVE ALLEGATIONS ....................12

A. Background on Lexmark....................12

B. During the Class Period, Lexmark Sold Excess Laser Supplies into the Channel Causing the Company to Pull-Forward Supplies Revenue and Conceal Weakening Demand for Lexmark's Laser Supplies ....................15

C. Throughout the Class Period, Defendants Made Materially False and Misleading Statements and Omissions About Lexmark's Laser Supplies Channel Inventory....................18

D. Lexmark Stuns Investors by Reporting Poor 2Q15 Results, Reducing 3Q15 and FY15 Guidance, and Disclosing that It Will Be Forced to Drawdown the Company's Laser Supplies Channel Inventory by Approximately $70 Million ....................20

E. After the Class Period, Lexmark Sells itself to a Consortium of Chinese Investors....................23

V. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD....................25

A. Second Quarter 2014 Financial Results....................25

B. September 3, 2014 Statements....................26

C. Third Quarter 2014 Financial Results....................26

D. December 9, 2014 Statements....................30

E. Fourth Quarter and Full Year 2014 Financial Results....................30

F. March 5, 2015 Statements....................34

G. First Quarter 2015 Financial Results ....................35

H. May 5, 2015 Statements....40

I. May 8, 2015 Statements....41

VI. THE TRUTH EMERGES....42

VII. POST-CLASS PERIOD REVELATIONS....45

VIII. BY FAILING TO DISCLOSE THE IMPACT OF INCREASED CHANNEL INVENTORY ON LEXMARK'S REPORTED AND FUTURE REVENUES, DEFENDANTS VIOLATED SEC DISCLOSURE RULES....47

A. The Impact of Lexmark's Elevated Laser Supplies Channel Inventory on the Company's Reported Revenue....47

B. The Impact of Elevated Laser Supplies Channel Inventory on Lexmark's Future Results....50

IX. ADDITIONAL SCIENTER ALLEGATIONS....51

X. LOSS CAUSATION/ECONOMIC LOSS....55

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE....57

XII. NO SAFE HARBOR....58

XIII. CLASS ACTION ALLEGATIONS....59

COUNT I: VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS....61

COUNT II: VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS....62

By and through its undersigned counsel, Lead Plaintiff District No. 9, I.A. of M & A.W. Pension Trust ("Plaintiff") alleges the following against Lexmark International, Inc. ("Lexmark" or the "Company"), Paul A. Rooke ("Rooke"), David Reeder ("Reeder"), and Gary Stromquist ("Stromquist") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Lexmark with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain Defendants and other related non-parties; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning Defendants; and (e) information readily obtainable on the Internet. Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. Plaintiff brings this federal securities class action on behalf of itself and all other similarly situated persons or entities (the "Class") who purchased or otherwise acquired the publicly traded common stock of Lexmark between August 1, 2014 and July 20, 2015, inclusive (the "Class Period"), seeking to pursue remedies for Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a).

2. Lexmark, a longtime manufacturer of printers and related supplies, primarily ink and toner cartridges, was undergoing a transition prior to and during the Class Period. In the face of a maturing printing industry and a secular downtrend in the printer hardware market, Lexmark sought to establish itself as both a printing company, focusing on higher-end laser printers following its exit

from the manufacture and sale of inkjet printers,[1] and as a software company. To that end, Lexmark acquired more than a dozen software companies prior to and during the Class Period, including Perceptive Software, Inc. ("Perceptive Software") in June 2010; Pallas Athena in October 2011; Brainware in February 2012; ISYS and Nolij in March 2012; Acuo Technologies, Inc. in December 2012; AccessVia, Inc. and Twistgate, Inc. in March 2013; Saperion AG ("Saperion") in September 2013; PACSGEAR, Inc. in October 2013; ReadSoft AB ("ReadSoft") in August 2014; GNAX Healthcare LLC in October 2014; and Claron Technology, Inc. in January 2015.

3. Lexmark's strategy during the Class Period was, therefore, to utilize both printing and software technology to develop and sell printing and imaging solutions, such as printers and multifunction devices (*i.e.*, all-in-one print, copy, scan, and facsimile machines), as well as software solutions that could help maintain and create sales to customers seeking to print less and manage an increasing amount of digitized content spread across many electronic devices. Thus, Lexmark was primarily managed in two segments: Imaging Solutions and Services ("ISS") and Perceptive Software.

4. Defendants billed the Company's Perceptive Software segment as a fast-growing business opportunity that could, among other things, help offset the loss of revenue resulting from the declining printing hardware market and the Company's exit from the inkjet printing market. At all times during the Class Period, however, Lexmark remained highly dependent on the high-margin revenue stream generated by its traditional laser printer business, specifically the sale of laser printer supplies, such as toner cartridges. In 2014 and 2015, more than half of Lexmark's revenue was

---

[1] In August 2012, the Company announced it was exiting the development and manufacturing of inkjet technology. During the Class Period, the Company continued to provide service, support, and aftermarket supplies for its installed base of inkjet printers.

derived from the sale of supplies. In September 2015, *Forbes* reported that Lexmark's printer hardware and supplies business made up 83% of Lexmark's estimated value.

5. During the Class Period, Lexmark sold its laser printer supplies to distributors and retailers in more than 90 countries around the world. Based on its 2014 financial results, 37% of Lexmark's total revenues were generated from its Europe, Middle East, and Africa ("EMEA") segment. Laser supplies sales in Europe were especially critical to the EMEA segment, and were significant enough to impact the Company's overall financial performance, including its ability to hit earnings per share ("EPS") and revenue targets.

6. Lexmark booked revenue once it shipped its supplies to distributors and retailers, at which time Lexmark considered the supplies to be "channel inventory," meaning that the supplies had not yet been sold to the end customer. "Sell-in" is the transaction whereby a manufacturer like Lexmark sells its product to the distributor or retailer. "Sell-through" is the transaction whereby the distributor or retailer sells the product to the end customer. When sell-in is higher than sell-through, channel inventory levels go up. Channel inventory was a key metric that Lexmark measured in terms of weeks. In general, weeks of inventory in the channel refers to the number of weeks it would take to sell that amount of inventory to end customers. Lexmark did not publicly report its weeks of supplies channel inventory during the Class Period. As Defendants would later disclose, however, Lexmark sought to maintain between six to ten weeks of laser supplies channel inventory, with eight weeks of inventory representing a targeted "sweet spot" and ten weeks representing a level that the Company was not comfortable maintaining. The chart below depicts Lexmark's channel inventory:




7. During the Class Period, Defendants knew that the Company's laser supplies channel inventory levels were a hot topic among analysts and investors, as Defendants were frequently and directly asked to comment on Lexmark's laser supplies channel inventory levels, including whether Lexmark was experiencing elevated supplies channel levels. Analysts wanted to know about channel inventory levels to assess whether the Company's reported revenues were impacted by the pulling in of future sales into the channel and, if so, to what extent such sales would impact future revenues. Throughout the Class Period, Defendants systematically denied that elevated laser supplies channel inventory was a concern.

8. For example, on a conference call discussing the Company's second quarter 2014 ("2Q14") financial results, interim Chief Financial Officer ("CFO") Stromquist described laser supplies channel inventory as "flat," reflecting "no change." The following quarter, Defendant Stromquist said laser supplies inventory change was "minimal" and had grown only by "about 1 percentage point." Chief Executive Officer ("CEO") Rooke told investors, "[t]hat's right. [The laser supplies c]hannel is neutral." Investors heard the same explanation in the fourth quarter 2014 ("4Q14"), where Vice President and CFO Reeder pointed to "minimal" changes to channel inventory. Defendant Reeder echoed those sentiments in the first quarter 2015 ("1Q15"), telling investors that laser supplies channel inventory had increased only "slightly."

9. Defendants' false statements and omissions had their intended effect, as the price of Lexmark stock was artificially inflated during the Class Period, reaching as high as $51.17 on August 14, 2014.

10. In truth, Defendants knew, or recklessly disregarded, but concealed from investors that the Company had been knowingly selling laser supplies to its distributors and channel partners far in excess of end-user demand, particularly in EMEA, resulting in massively elevated laser supplies channel inventory levels during the Class Period. Specifically, beginning in the third quarter of 2014 ("3Q14") and continuing into the second quarter of 2015 ("2Q15"), as the Euro rapidly declined against the U.S. Dollar, Lexmark's distributors and channel partners stocked up on laser supplies in anticipation of price increases that the Company enacted to offset losses from foreign currency fluctuations. As the Company's distributors and channel partners "bought ahead" of consecutive price increases in 3Q14, 4Q14, and 1Q15, Defendants knew, or recklessly disregarded, that Lexmark was overselling laser supplies into the channel that otherwise would have been sold in later periods and that the Company was receiving the benefit of extra revenue during the Class Period at the expense of later quarters as a result. Thus, rather than experiencing "flat," "minimal," or "slight" increases, Lexmark's deliberate sale of laser supplies into an already saturated channel caused its weeks of inventory to skyrocket to as much as ***50% above*** the Company's target levels, which Defendants knew was both abnormal and unsustainable.

11. By selling excess laser supplies inventory into the channel, Lexmark "pulled forward" or "borrowed" laser supplies sales from future periods, enabling the Company to report revenue and EPS that met or exceeded guidance for every quarter during the Class Period. However, Defendants knew, or recklessly disregarded, that the elevated levels of laser supplies channel inventory were unsustainable and would eventually need to normalize, causing the Company to experience a marked

reduction in sales that would negatively and materially impact its reported EPS, revenues, guidance, and financial outlook. Indeed, Defendants, who admitted that they used "complex" models and channel reporting to track laser supplies channel inventory levels during the Class Period, knew, or recklessly disregarded, that Lexmark had more than ***$70 million*** in excess laser supplies channel inventory in EMEA.

12. Without the artificial boost from selling beyond demand and increasing its laser supplies channel inventory to unsustainable levels, Lexmark's reported financial results would have been materially different, as evidenced by the negative impact to the Company's financial results and future prospects disclosed at the end of the Class Period. Further, Lexmark's Class Period financial statements failed to disclose the impact of increased laser supplies channel inventory on the Company's reported and future financial results in violation of SEC disclosure rules, rendering Lexmark's financial statements materially false and misleading.

13. Lexmark's massively elevated laser supplies channel inventory also obfuscated declining end-user demand for the Company's laser supplies. Faced with excess inventory ***and*** declining demand, Defendants knew, or recklessly disregarded, that any correction in supplies channel inventory levels would be exacerbated by the inability of Lexmark and its channel partners to sell inventory, which would further harm the Company's financial condition.

14. The truth behind Defendants' misrepresentations and omissions was revealed to investors before the market opened on July 21, 2015. On that day, the Company reported a loss for its 2Q15 financial results and forecasted third quarter 2015 ("3Q15") and full year 2015 ("FY15") revenue and EPS that missed analysts' estimates. During an earnings conference call the same day, Defendants explained the reason for the Company's dismal 2Q15 results and reduced 3Q15 and FY15 guidance: "laser supplies channel optimization, particularly in EMEA." In other words,

Lexmark's massively elevated laser supplies channel inventory and Class Period "pulling forward" or "borrowing" of laser supplies sales from future periods had finally caught up to Lexmark.

15. On the call, Defendants revealed that they had begun "targeted efforts" to reduce excess laser supplies channel inventory and subsequently revealed that they had drawn down approximately ***$20 million*** in laser supplies channel inventory in 2Q15 alone. Defendants also disclosed that the negative effects of Lexmark's massively elevated laser supplies channel inventory would continue to be felt for the rest of the year, as the Company was expected to drawdown another ***$50 million*** in inventory during the second half of 2015.[2] Defendants then admitted what they had concealed from investors all along: "The EMEA channel's reaction to three consecutive quarters of price action, including a price increase in the second quarter, resulted in inventory levels above expectation."

16. Defendants also disclosed, for the first time, that Lexmark's "acceptable range" for laser supplies channel inventory was six to ten weeks and that Europe and EMEA remained "***above 10***" weeks even ***after*** the "targeted efforts" Defendants had taken during the quarter to reduce laser supplies channel inventory levels. Incredibly, Defendants' comments revealed that Lexmark's weeks of laser supplies channel inventory was as much as ***50%*** higher than targeted levels. Analysts estimated that the drawdown in inventory suggested that Lexmark's supplies growth may have been inflated ***by as much as 5%*** in 2014.

17. The result of Defendants' disclosures was significant and immediate, with the price of Lexmark stock tumbling 20%, the most in almost five years, to close at $37.75 on abnormally high

---

[2] "Drawing down" its inventory meant that Lexmark was forced to wait until the laser supplies inventory that had built up in the channel was "sold through" to the end-user. Because Lexmark was forced to "draw down" its excess laser supplies inventory, the Company was not selling new laser supplies into the channel and, therefore, was not generating additional revenue. Analysts estimated that every week of inventory drawdown impacted Lexmark's EPS by approximately $0.23.

trading volume. Reacting to Defendants' disclosures, a Sanford C. Bernstein & Co., LLC ("Bernstein") analyst stated that "management credibility has been undermined" and that it was "difficult to gain confidence on exactly how much further supplies inventory could decline going forward."

18. Post-Class Period statements revealed more. In the Company's 2015 annual report on Form 10-K filed with the SEC on February 29, 2016, Defendants admitted that weakness in demand had resulted in intense price competition and excess inventory for the Company and its reseller channel, "***as the Company experienced in Europe in 2015***," which adversely affected sales, pricing, risk of obsolescence, and other elements of the Company's operating results. Defendants further disclosed that the Company's laser supplies channel inventory had become elevated in part "***because of decreased consumption of supplies***" and that the Company's efforts to reduce laser supplies inventory "adversely impacted laser supplies revenue for 2015."

19. The previously concealed and/or omitted facts about the Company's laser supplies channel inventory, and related demand, were clearly material to investors, as they concerned one of the Company's largest and most lucrative sources of revenue and had been a topic of direct questioning by analysts throughout the Class Period. Acknowledging the materiality of the information they omitted from investors, after the Class Period, Defendants told investors that they would begin providing more "transparency around the reporting of our channel inventory." By that time, however, Defendants were already exploring a potential sale of the Company and, in November 2016, Lexmark was sold to a consortium of Chinese investors, making Defendants eligible to receive millions in golden parachute payments. At that time, Lexmark's common stock ceased trading on the New York Stock Exchange ("NYSE").

20. As a result of Defendants' wrongful acts and omissions, and the declines in the price of Lexmark common stock detailed herein, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

21. This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

22. This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

23. Venue is proper in this District under Section 27(c) of the Exchange Act, 15 U.S.C. §78aa(c), and 28 U.S.C. §1391(b)-(d) as Defendants conducted business in this District and subsequent damages took place within this District. In addition, Lexmark stock traded on the NYSE, which is located within this District.

24. In connection with the acts and transactions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mail, interstate telephone and other electronic communications, and the facilities of a national securities exchange.

## III. PARTIES

25. Plaintiff, as set forth in the certification on file [Dkt. No. 20-2] and incorporated by reference herein, purchased Lexmark shares at artificially inflated prices during the Class Period and was damaged when the truth was revealed, as detailed herein.

26. Defendant Lexmark is a global manufacturer of printers and related supplies. The Company's stock was listed on the NYSE under the ticker symbol "LXK" during the Class Period. In November 2016, the Company was acquired for $3.6 billion by a consortium of private investors

led by Apex Technology Co., Ltd. ("Apex Technology") and PAG Asia Capital, and its stock is no longer listed for trading.

27. Defendant Rooke served as Chairman and CEO of Lexmark from April 2011 until November 2016, when the sale of the Company to Apex Technology was completed. Defendant Rooke became a director of the Company in 2010. Defendant Rooke was Executive Vice President of the Company and President of the Company's former Imaging Solutions Division from July 2007 to October 2010. He also served as Executive Vice President of the Company's former Printing Solutions and Services Division from November 2002 to July 2007 and worked in various senior management positions since the Company's formation in 1991. According to Lexmark, Defendant Rooke was appointed to the Board of Directors based on his significant executive management experience and financial expertise. Defendant Rooke received his bachelor's degree in Mechanical Engineering from the University of Michigan and a MBA from the University of Kentucky, and has more than 20 years of experience as an engineer in the computer peripherals industry.

28. Defendant Reeder was appointed Vice President and CFO of Lexmark effective January 9, 2015. Defendant Reeder was named President and CEO of Lexmark in November 2016, following completion of the sale of the Company to Apex Technology. Defendant Reeder resigned on June 14, 2017, effective immediately. Prior to his employment with Lexmark, Defendant Reeder served as CFO of Electronics for Imaging, Inc.

29. Defendant Stromquist was Lexmark's interim CFO from May 20, 2014 through January 8, 2015. Defendant Stromquist worked for Lexmark since its formation in 1991 and served in a number of leadership positions, including Vice President and Corporate Controller and Vice President of Finance for ISS and the Corporate Finance Group.

30. Defendants Rooke, Reeder, and Stromquist are collectively referred to herein as the "Individual Defendants."

31. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Lexmark, were privy to confidential and proprietary information concerning Lexmark's financials and laser supplies business. The Individual Defendants also had access to material, adverse, non-public information concerning Lexmark, as discussed in detail below. Because of their positions with Lexmark, the Individual Defendants had access to non-public information about the Company's business and growth prospects through access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

32. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Lexmark's business.

33. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lexmark's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, and, through them, to the investing public. The Individual Defendants were provided with copies of the

Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein and are liable for the false statements pleaded herein.

34. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was registered with the SEC, traded on the NYSE, and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Lexmark's business, including its laser supplies channel inventory levels, and Lexmark's future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Lexmark securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background on Lexmark

35. Lexmark is a developer, manufacturer, and supplier of printing, imaging, device management, management print services ("MPS"), document workflow, and business process and content management solutions. During the Class Period, the Company operated in the office printing and imaging, enterprise content management, business process management, document output management, intelligent data capture, and search software markets. Lexmark's products included laser printers and multifunction devices and the associated supplies, solutions, and services.

Lexmark served both the distributed printing and imaging, and content and process management markets with a focus on business customers.

36. During the Class Period, the Company was primarily managed along two segments: ISS and Perceptive Software.[3] ISS offered Lexmark's customers a portfolio of monochrome and color laser printers and laser multifunction printers ("MFP"), as well as supplies, software applications, software solutions, and MPS to help businesses capture, manage, and access information. ISS also designed, manufactured, and distributed a variety of cartridges, service parts, and other supplies for use in Lexmark's installed base of laser, inkjet, and dot matrix printers. According to the Company, revenue and profit growth from the ISS supplies business was directly linked to Lexmark's ability to increase the installed base of ISS laser products and the usage rates of those products. In 2014 and 2015, most of ISS' commercially sold laser supplies products, which generated significant revenue for Lexmark, were sold into the Company's channel of Lexmark-authorized supplies distributors and resellers, who sold directly to end-users, or to independent office supply dealers.

37. Revenue from Lexmark's supplies was the "primary profit engine" of its business model and critical to the Company's operations, as Lexmark used the profit from the sale of high-margin supplies to help fund new technology investments in products, solutions, services, and software. In 2014, nearly two-thirds of the Company's revenue was derived from the sale of supplies and, in 2015, approximately 60% of the Company's revenue was derived from the sale of supplies. Unlike the profit margins on printers and MFP, which had been negatively affected by competitive pricing pressure, Lexmark's supplies sales were higher margin and recurring. Laser

---

[3] In April 2015, the Company underwent a "rebranding" and renamed the Perceptive Software segment "Enterprise Software."

printer toner was one of Lexmark's biggest, most profitable products in its high-margin supplies business.

38. Beginning in 2010, in light of domestic and foreign challenges facing the industry in which the ISS segment operated, including increasing competition from other hardware and supplies manufacturers, Lexmark embarked on an effort to rebrand itself as a software solutions company as it shifted away from its legacy printer activities to focus more on enterprise software and related IT services. To that end, Lexmark undertook more than a dozen acquisitions to expand its product and service offerings into software and solutions, beginning with the acquisition of Perceptive Software, a leading provider of enterprise content management software and document workflow solutions, in June 2010. Additionally, in August 2012, the Company announced that it was exiting the development and manufacturing of inkjet technology and, in 2013, completed the sale of its inkjet-related technology and assets to Funai Electric Co., Ltd. Following the sale, Lexmark continued to provide service, support, and aftermarket supplies for its inkjet-installed base as it completed the transition away from the inkjet portion of its business.

39. As Lexmark transitioned from a hardware-centric company to a broader-based solutions company, analysts and investors questioned whether Lexmark could meet the aggressive software growth and profitability targets it had set. As an example, on May 6, 2014, prior to the Class Period, Lexmark announced the acquisition of ReadSoft, a Swedish software company that offered document automation software. Analysts commented that the deal was a positive step for Lexmark in advancing its transition to software and solution sales, and would add more than $100 million in annual sales while being accretive to 2014 non-Generally Accepted Accounting Principles ("GAAP") net income, but acknowledged that the profitability targets laid out by the Company would need time to achieve. During the Class Period, analysts observed that Lexmark's strategy

centered around the transition from printing to higher value software and services, but continued to question whether Lexmark would be able to deliver on the potential synergies between its hardware and software businesses and commented that it would likely take time before Perceptive Software meaningfully contributed to the bottom line. On March 24, 2015, Lexmark announced the $1 billion acquisition of Kofax, which delivered technology products and services to streamline people and information-intensive business processes. As with the ReadSoft acquisition, analysts viewed the Kofax deal as a positive, but continued to comment on Lexmark's weak organic growth in software.

40. Given investors' concerns prior to and during the Class Period about the profitability and growth of the Perceptive Software segment, it was critically important for Defendants to portray strength and stability in Lexmark's core business, particularly the laser hardware and lucrative supplies business. As set forth below, to reassure investors that Lexmark's core business was stable and generating strong revenues, throughout the Class Period, Defendants made materially false and misleading statements and omitted material facts regarding the state of the Company's laser supplies channel inventory and its impact on Lexmark's current and future financial results.

### B. During the Class Period, Lexmark Sold Excess Laser Supplies into the Channel Causing the Company to Pull-Forward Supplies Revenue and Conceal Weakening Demand for Lexmark's Laser Supplies

41. During the Class Period, Lexmark sold its products around the world, and, as a result, a majority of the Company's revenue was generated from its operations outside of the United States. In 2014, revenue derived from international sales accounted for approximately 57% of the Company's consolidated revenue, with EMEA accounting for 37% of worldwide sales. In 2015, revenue derived from international sales accounted for approximately 54% of the Company's consolidated revenue, with EMEA accounting for 35% of worldwide sales. Because a large portion of the Company's revenue derived from international sales, Lexmark's financial results could be impacted by fluctuations in foreign currency exchange rates.

42. Specifically, Lexmark's foreign currency exposure arose from transactions denominated in a currency other than the functional currency of the Company or the respective foreign currency of each of the Company's subsidiaries, as well as foreign currency denominated revenue and profit that had to be translated into the functional currency of the Company. During the Class Period, the Euro was one of the primary currencies to which Lexmark was exposed. In 2014, of the approximately 37% of revenue Lexmark derived from the EMEA region, 80-85% was from Euro denominated areas.

43. In the summer of 2014, as the Euro began to decline against the U.S. Dollar, Defendants realized they would need to take action in order to reduce the negative impact of the declining Euro on the Company's financial results and operations. Beginning in 3Q14, the Company began engaging in price harmonization of its laser supplies, raising prices on supplies around the world, including in the EMEA region. Lexmark used price harmonization as a tool to prevent cross-border arbitrage and to maintain the Company's margins by ensuring that Lexmark's laser supplies sold for roughly the same price, regardless of where in the world the Company's distributors and channel partners were purchasing supplies and the currency in which they were purchased.

44. Although Lexmark typically adjusted prices only once a year, as the Euro continued to rapidly decline in the second half of 2014 and into the beginning of 2015, Lexmark took the unusual step of implementing consecutive pricing actions in 3Q14, 4Q14, and 1Q15. Defendants knew the Company's distributors and channel partners would stock up on laser supplies prior to each price increase in order to take advantage of the lower prices. Despite this, Defendants permitted the sale of laser supplies channel inventory far in excess of end-user demand, which caused Lexmark's weeks of channel inventory to rise to elevated and unsustainable levels, and pulled forward sales that otherwise would have been made in future periods. Thus, Defendants knew, or recklessly

disregarded, that Lexmark was receiving the benefit of extra revenue during the Class Period at the expense of future quarters. Although the Company did not report its weeks of laser supplies channel inventory during the Class Period, Defendants also knew, or recklessly disregarded, that the elevated laser supplies channel inventory was unsustainable and would eventually require the Company to drawdown approximately $70 million in inventory, which would negatively and materially impact Lexmark's reported and future revenue and EPS. Without the artificial boost from Lexmark's inflated laser supplies channel inventory, Defendants would have been forced to disclose significantly lower revenues from Lexmark's lucrative laser supplies business. As Defendants would admit after the Class Period, "those price actions . . . caused elevated levels of inventory in the channel specific to Europe."

45. At the same time that the Euro was declining in the summer of 2014, Lexmark was reporting year-over-year increases in supplies revenue due to "increased end-user demand." Contrary to Defendants' statements, however, laser printer toner, one of Lexmark's biggest, most profitable products, was experiencing softer demand. Indeed, Lexmark's main competitor, HP, Inc. ("HP"), was warning of "softer toner sales in Europe," "weak toner sales," and "lower toner sales." By 2Q14, HP began actively taking steps to reduce its supplies channel inventory levels due to softening demand for toner in Europe. Throughout 2Q14 and into 2015, HP worked diligently to bring channel inventory levels within its targeted range in response to expectations that toner would "remain under pressure" for the remainder of the year. Like Lexmark, HP was closely monitoring the status of its channel inventory. Unlike Lexmark, however, HP was actively managing down its supplies channel inventory levels due to weak toner demand. Defendants, meanwhile, were falsely reassuring investors that the Company was experiencing "increased end-user demand."

### C. Throughout the Class Period, Defendants Made Materially False and Misleading Statements and Omissions About Lexmark's Laser Supplies Channel Inventory

46. In order to conceal the fact that Lexmark's laser supplies channel inventory had reached massively elevated levels, that the Company was pulling in revenue from the sale of its laser supplies from future quarters, and that the Company was selling laser supplies in excess of demand, throughout the Class Period, Defendants made materially false and misleading statements and omissions about Lexmark's laser supplies channel inventory. Defendants sought to minimize the changes in Lexmark's laser supplies channel inventory levels, offering false reassurances to investors that any impact from changes to laser supplies channel inventory on the Company's financial results and operations was negligible. As an example, Defendants made the following statements during conference calls with investors and analysts during the Class Period:

| | |
|---|---|
| **3Q14 Earnings Call**<br>Gary Stromquist, CFO | ***We believe laser supplies channel inventory grew in the third quarter of 2014. Based on our estimates, relative year-to-year channel movements positively impacted third quarter 2014 laser supplies growth by about 1 percentage point***.<br><br>***The estimated change in laser supplies channel inventory is expected to have a minimal impact on year-to-year growth rates in the fourth quarter***.<br><br>***We don't expect in the fourth quarter to have an impact from channels***. |
| Paul Rooke, CEO | That's right. ***Channel is neutral***. |

| | |
|---|---|
| **4Q14 Earnings Call**<br>David Reeder, VP & CFO | Reflecting robust end-user demand, ***laser supplies revenue was quite strong and as expected, the change in channel inventory had a minimal impact on year-to-year laser supplies revenue growth***.<br><br>Fourth quarter estimated laser supplies channel inventory was roughly as expected, and ***the relative year-to-year channel movements minimally impacted supplies revenue growth***.<br><br>***The estimated change in laser supplies channel inventory is expected to have a slight negative impact on year-to-year growth rates in first quarter***. |
| **1Q15 Earnings Call**<br>David Reeder, VP & CFO | ***Strong end-user demand was the primary driver of year-to-year growth, but we estimate that the laser supplies channel inventory increased slightly***.<br><br>Sequentially, ***our outlook assumes that the absolute dollars of channel inventory declines slightly in the second quarter. This is expected to have a slightly negative impact on year-to-year supplies revenue growth***. |
| **5/28/15 Sanford C. Bernstein Strategic Decisions Conference**<br>Paul Rooke | As we mentioned, ***we had a bit of a supplies channel build in the first quarter. It was worth about a point year to year in our growth***. |

47. As set forth in more detail below, however, these statements were materially false and misleading and/or omitted material facts concerning the Company's true laser supplies channel inventory levels which, unbeknownst to investors, had become more and more elevated with each quarter and each successive price increase during the Class Period. Rather than experiencing "flat," "minimal," or "slight" changes in supplies channel inventory and related revenues, the Company was experiencing rapidly increasing weeks of laser supplies channel inventory. In general, weeks of inventory in the channel refers to the number of weeks it would take to sell that amount of inventory to end-users. As Defendants would disclose for the first time at the end of the Class Period, Lexmark aimed for an average of eight weeks of supplies inventory in the channel in EMEA.

During the Class Period, however, that number swelled as high as 12 weeks of inventory, or ***50% above*** Lexmark's target level. With each week of inventory impacting Lexmark's EPS by an estimated $0.23, the Class Period increases in inventory levels were anything but "flat," "minimal," or "slight."

### D. Lexmark Stuns Investors by Reporting Poor 2Q15 Results, Reducing 3Q15 and FY15 Guidance, and Disclosing that It Will Be Forced to Drawdown the Company's Laser Supplies Channel Inventory by Approximately $70 Million

48. Before the market opened on July 21, 2015, Lexmark surprised investors by reporting poor 2Q15 results and a reduced 2015 forecast that fell short of expectations, with the Company attributing the poor results to "near-term laser supplies channel optimization particularly in EMEA." In other words, Defendants admitted that laser supplies channel levels had become so elevated that they were negatively impacting the Company's current financial performance and outlook. Specifically, the Company reported a 2Q15 ***loss*** of $36.3 million, or ***negative*** $0.59 per share, down from a profit of $37.5 million, or $0.59 per share, a year earlier. The Company's surprising 2Q15 loss was well below street consensus EPS estimates of $0.81 and the Company's prior EPS guidance of $0.75 to $0.85. The July 21, 2015 earnings release also stated that revenue declined 1.4% to $879.3 million, missing analysts' estimates of $901 million. The Company further disclosed that it would cut 500 jobs as part of a 2015 restructuring.

49. Importantly, cash flow for the quarter was ***negative*** $37 million, and the Company guided free cash flow to be 20% to 30% of net income in 2015, dramatically below its previous guidance of 90% to 100%. For 3Q15, Lexmark projected non-GAAP earnings, which excluded some items, of $0.51 to $0.61 per share, falling well short of analysts' average estimate of $0.92 per share. Lexmark also reduced FY15 non-GAAP EPS guidance to a range of $3.55 to $3.75 per share, down from $3.60 to $3.80 and below analysts' average estimate of $3.78 per share and GAAP EPS

of -$0.49 to -$0.29, down from previous GAAP EPS estimates of $1.42 to $1.62. While Lexmark's FY15 guidance reduction did not appear overly significant at first blush, excluding the full year impact of recent acquisitions ($0.39) and a gain from a legal settlement ($0.23), the Company actually lowered guidance on Lexmark's organic business by approximately $0.67.

50. During the earnings conference call held that morning, Defendants expanded on the 2Q15 results, disclosing, for the first time, that the Company would be forced to make a "reduction in laser supplies sell-in to draw down channel inventory for laser supplies." In contrast to Defendants' prior statements, Defendant Rooke disclosed that Lexmark was "focused on reducing laser supplies channel inventory, particularly in EMEA, where our models and channel reporting show a buildup in channel inventory from the multiple cost actions we've taken worldwide as the U.S. dollar strengthen[s]." Defendant Rooke reiterated that the Company's 3Q15 guidance had been changed to reflect the impact of the laser supplies channel drawdown.

51. Discussing the Company's 2Q15 financial results in more detail, Defendant Reeder revealed that laser supplies revenue declined 10% year-to-year and 3% in constant currency, which was "primarily the result of targeted efforts to reduce laser supplies channel inventory." Defendant Reeder revealed what had previously been concealed from investors: the "EMEA channel's reaction to three consecutive quarters of price action, including a price increase in the second quarter, resulted in inventory levels above expectation" and that the EMEA channel's inventory "remained elevated and outside the acceptable range" of "six to 10 weeks of channel inventory." Defendant Reeder also stated that "[o]ur third quarter and second half 2015 guidance includes about ***$50 million*** of revenue impact from reduced laser supplies, specifically in EMEA," bringing the total inventory drawdown to approximately $70 million.

52. Analysts were surprised by the Company's revelations, as this was the first time Defendants had revealed any problem with the Company's laser supplies channel inventory. The 2Q15 earnings conference call also marked the first time Defendants had disclosed that Lexmark typically sought to have six to ten weeks of channel inventory – with the Company preferring to have less than ten weeks – and that the EMEA region was inflated ***above ten weeks***. By contrast, HP, one of Lexmark's competitors, characterized normal supplies channel inventory at five to seven weeks. Analysts were also skeptical that Lexmark's laser supplies channel inventory had reached such excessive levels seemingly overnight, pointing out during the question and answer portion of the 2Q15 earnings conference call that "there's been lots of concerns about your channel inventories over the last few years." To that end, Bernstein analyst Toni Sacconaghi ("Sacconaghi") specifically questioned the veracity of Defendants' prior channel inventory statements, stating:

> Last quarter, you talked about a channel inventory build only adding about 1% to reported supplies inventory. That's about $5 million. Now you're talking about a $50 million to $75 million drawdown in supplies inventory for the year . . . your comments last quarter implied that channel inventory was fine to slightly elevated. ***Today, you're talking about massively elevated channel inventories that still need to come down to the tune of $50 million to $75 million***.

53. In response, Defendant Rooke failed to muster an explanation for the glut of laser supplies channel inventory, only stating that the Company did "mention an elevated level of inventory last quarter and indicated that our sell in was likely to be down in [2Q15]."

54. Stunned by Defendants' disclosures, Wall Street analysts reacted negatively to the news about Lexmark's excessive laser supplies channel inventory, the fact that laser supplies channel inventory in EMEA remained elevated above ten weeks, that the Company would be forced to drawdown approximately $50 to $70 million in inventory, and the adverse impact of Lexmark's excessive laser supplies channel inventory on the Company's 2Q15 results and 3Q15 and FY15 guidance. For example, in a report dated July 21, 2015, Bernstein commented that "[t]he magnitude

of the total expected [laser supplies channel inventory] drawdown is ***staggering*** (potentially 2+ weeks)," and given that it came with limited warning, "***management credibility has been undermined***." The Bernstein report also estimated that "***every week of supplies channel inventory drawdown impacts EPS by $0.23***" and that "the drawdown in inventory suggests that LXK's supplies growth" in 2014 may have been inflated "***by as much as 5%***." Bernstein lowered its FY15 and full year 2016 revenue and EPS estimates and its price target from $40 to $35 per share.

55. Also on July 21, 2015, Morgan Stanley lowered its 2015 revenue and EPS estimates "to account for the inventory adjustment in the channel," observing that Lexmark's reported 2Q15 laser supplies revenue of 3% in constant currency was a sharp decline from the 9% and 5% growth reported in 4Q14 and 1Q15, respectively. The Morgan Stanley report noted that it expected Lexmark's laser supplies "declines to continue in the next two quarters."

56. The negative analyst commentary continued the next day. In a report dated July 22, 2015, Credit Suisse commented, "[w]hat we find surprising is the rate of this deterioration and why it has come as a surprise to management given the continuous concern around the possible build-up in the channel of supplies." Credit Suisse also lowered its price target and reiterated its underperform rating.

57. It would take Lexmark until 3Q15 to bring its laser supplies channel inventory levels back within the six to ten week range. By that time, however, the writing about Lexmark's future prospects was on the wall, and Defendants had begun exploring a potential sale of the Company.

### E. After the Class Period, Lexmark Sells itself to a Consortium of Chinese Investors

58. In July 2015, before investors learned the truth about Lexmark's excessive sales of laser supplies into the channel and the attendant impact on the Company's financial results and future performance, Lexmark's Board of Directors held a meeting at which they discussed the

continuing industry challenges facing the Company, continuing declines in the Company's ISS segment, and other issues with Lexmark's businesses. The Board directed Lexmark's senior management, which included Defendants Rooke and Reeder, to explore the Company's "strategic alternatives" to enhance shareholder value including business combinations, dispositions, or acquisitions.

59. After the Class Period, at a Board meeting on October 22, 2015, Lexmark's Board determined that it was in the best interests of the Company and its shareholders to undertake an exploration of "strategic alternatives," including a potential sale of the Company; a spin-off, sale, or other disposition of the Company's ISS segment or Perceptive Software segment; or whether to remain a stand-alone public company. Later that day, news of the Company's decision to explore strategic alternatives, including the sale of the Company, leaked to the public via an article published by *The Wall Street Journal*. The next day, on October 23, 2015, Lexmark issued a press release confirming that the Board had authorized the exploration of strategic alternatives to enhance shareholder value.

60. On April 19, 2016, Lexmark issued a press release announcing that it had agreed to be acquired by a consortium of investors led by Apex Technology and PAG Asia Capital, two Chinese firms, for $40.50 per share in an all-cash transaction. The acquisition was completed on November 29, 2016, at which time Lexmark common stock ceased trading on the NYSE. Following the merger, Defendant Rooke stepped down from the Company and Defendant Reeder was reappointed as the Company's President and CEO. In connection with the closing of the merger, the Individual Defendants stood to receive significant amounts of "golden parachute compensation." Specifically, Defendant Rooke stood to receive up to $7 million in cash and $6.7 million in equity, Defendant Reeder up to $2.3 million in cash and $7.8 million in equity, and Defendant Stromquist up to $2.7

million in cash and $5.8 million in equity. In addition, Lexmark fully abandoned its foray into software, jettisoning the Perceptive Software business line to focus solely on the traditional printing business.

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

### A. Second Quarter 2014 Financial Results

61. The Class Period begins on August 1, 2014. On that day, Lexmark filed its Form 10-Q ("2Q14 10-Q") with the SEC, which was signed by Defendant Stromquist and confirmed the Company's previously announced financial results and financial position. The 2Q14 10-Q also contained materially false and misleading statements about the Company's supplies revenue and end-user demand, stating:

> ***Supplies revenue for the three months ended June 30, 2014 was down 1% compared to the same period in 2013 with laser supplies revenue increasing 5% YTY primarily due to increased end-user demand attributed to growth in in the segment's MPS business and large workgroup installed base***.
>
> * * *
>
> ***Supplies revenue for the six months ended June 30, 2014 was down 1% compared to the same period in 2013 with laser supplies revenue increasing 7% YTY primarily due to increased end-user demand***.

62. The statements Defendants made on August 1, 2014, as set forth in ¶61 above, were materially false and misleading because Defendants failed to disclose that the market demand for toner, Lexmark's largest, most profitable laser supply, was decreasing, contrary to Defendants' statements that the Company was experiencing "increased end-user demand." In fact, at the same time Lexmark was falsely assuring investors that the Company was experiencing "increased end-user demand," Lexmark's competitor, HP, was warning of declining toner demand and taking action to drawdown its supplies channel inventory.

**B. September 3, 2014 Statements**

63. On September 3, 2014, Lexmark participated in the Citi Global Technology Conference. When asked for an update on the Company's laser business, Defendant Rooke responded, in relevant part:

> The laser business, we are very encouraged by what we've been seeing here, particularly in the first half, and even into last year where ***we've had good, steady supplies growth***. In the printer business it's all about supplies. ***And if you look at our supply stream, it has been very, very solid, our laser supplies***.

64. Defendant Rooke's statements on September 3, 2014, as set forth in ¶63 above, were materially false and misleading because Defendant Rooke failed to disclose that as a result of price harmonization actions in 3Q14, Lexmark sold laser supplies inventory to its distributors and channel partners in excess of normal levels, causing Lexmark's weeks of laser supplies channel inventory to become massively elevated. Thus, Lexmark's "solid" supply stream and "steady supplies growth" were the result of Lexmark selling laser supplies that otherwise would have been sold in later periods, at the expense of future quarters, materially impacting Lexmark's current period and future financial results.

**C. Third Quarter 2014 Financial Results**

65. On October 21, 2014, before the market opened, Lexmark issued a press release announcing its financial results for the third quarter ended September 30, 2014. The press release announced "strong results" with revenue growth and EPS exceeding guidance. For 3Q14, the release reported GAAP revenue of $918 million, including acquisition-related adjustments of $3 million and EPS of $0.60. The Company reported supplies revenue of $593 million, a 2% decline compared to 2013, and ***laser supplies revenue of $533 million, a 2% increase year to year***.

66. Also before the market opened, Lexmark hosted a conference call with analysts and investors to discuss the Company's earnings release and business operations. During the call,

Defendants Rooke and Stromquist spoke positively about the Company's financials and laser supplies business. For example, Defendant Rooke cited to "***revenue growth in*** [MPS], laser hardware and ***laser supplies***" as a sign that Lexmark's strategy was "working."

67. In his prepared remarks, Defendant Stromquist commented on the performance of the laser business, stating it "***performed about as expected, despite currency headwinds and was aided by laser supplies growth, which included an increase in laser supplies channel inventory that was not anticipated in our July guidance***." He continued, "***laser supplies revenue grew 2% year-to-year***." While Defendant Stromquist disclosed that "***laser supplies channel inventory grew in the third quarter of 2014***," he downplayed the impact of the increase in laser supplies channel inventory, stating that "***relative year-to-year channel movements positively impacted third quarter 2014 laser supplies growth by about 1 percentage point***."

68. Importantly, to alleviate analyst concerns about the Company's laser supplies channel inventory levels, Defendant Stromquist reported that Lexmark "***continue[s] to see good end-user demand for laser supplies***."

69. Turning to 4Q14, Defendant Stromquist stated that "[w]e expect fourth quarter revenue to be down 2% to 4% year-to-year" with "[l]aser supplies revenue [] expected to be down about 2% year-to-year." However, Defendant Stromquist falsely stated that "***[t]he estimated change in laser supplies channel inventory is expected to have a minimal impact on year-to-year growth rates in the fourth quarter***."

70. During the October 21, 2014 call, analysts specifically questioned Defendants about the Company's laser supplies channel inventory and the potential for a negative impact in the fourth quarter. In response, Defendant Rooke falsely reassured analysts and investors that laser supplies

channel inventory growth had only a minimal impact on 3Q14 results and would have no impact on the Company's 4Q14 results:

> ***The third quarter overall had about a 1% impact. That would have been true for supplies as well. In the fourth quarter, we have a 3% impact. So, when I give a growth rate as an example, the laser supplies growth rate in the third quarter was 2%. That 2% benefited by 1% from channel inventory growth***. So, let's say adjusted, that is one. Then it was impacted by currency by one, so that brings it back to two.
>
> ***So effectively the channel inventory growth was offset by the currency impact***. Now, in the fourth quarter as I mentioned, laser supplies year-on-year, which still has a sequential increase, was down 2%, but it's affected by 3% currency, so normalized it would be 1%. ***So the normalized third quarter is 2% growth year-to-year. The normalized fourth quarter is 1% growth year-to-year, but we still have a sequential increase year-to-year, which is contributing to our improvement in earnings per share***.

71. Defendant Stromquist confirmed that "***[w]e don't expect in the fourth quarter to have an impact from channels***," and Defendant Rooke added, "***[t]hat's right. Channel is neutral***."

72. Also, in response to a request for 2015 guidance and the impact of currency fluctuations, Defendant Rooke discussed the Company's laser business, stating, in relevant part:

> ***[I]n the laser business, we will continue to drive MPS and supplies growth there***. We've continued cost and expense reductions even in 2014 here, which we will get full benefit of -- full year benefit of in 2015. ***We always look to harmonize supplies prices, particularly with the volatility and the currency here. We will do that as needed***.

73. On October 31, 2014, Lexmark filed its Form 10-Q ("3Q14 10-Q") with the SEC, which was signed by Defendant Stromquist and confirmed the Company's previously announced financial results and financial position. Expanding on Lexmark's results, the 3Q14 10-Q also stated:

> ***Supplies revenue for the three months ended September 30, 2014 was down 2% compared to the same period in 2013 with laser supplies revenue increasing 2% YTY primarily due to end-user demand and sales through the Company's channel partners. Strong end-user demand was attributed to growth in the segment's MPS business and large workgroup installed base***. . .

* * *

> ***Supplies revenue for the nine months ended September 30, 2014 was down 1% compared to the same period in 2013 with laser supplies revenue increasing 5% YTY primarily due to strong end-user demand, attributed to growth in the segment's MPS business and the large workgroup installed base*.**
>
> * * *
>
> ***For the three months ended September 30, 2014, laser supplies revenue increased in EMEA and other international regions compared with the same period in the prior year*.**
>
> * * *
>
> ***Revenues in EMEA increased compared to the same period in 2013 primarily due to increased laser supplies revenue*** and growth in Perceptive Software in the region attributed to the acquisitions of ReadSoft and Saperion, partially offset by the impact of the Company's planned exit from inkjet technologies.

74. The statements Defendants made on October 21 and October 31, 2014, as set forth in ¶¶65-73 above, were materially false and misleading and omitted material facts. Specifically:

(a) Defendants failed to disclose that as a result of price harmonization actions in 3Q14, Lexmark's distributors and channel partners had stocked up on laser supplies inventory ahead of anticipated price increases. As a result, Lexmark sold laser supplies into the channel that otherwise would have been sold in later periods, causing Lexmark's laser supplies channel inventory to become massively elevated;

(b) Defendants failed to disclose that Lexmark's reported 3Q14 revenue and EPS were materially impacted by excess laser supplies channel inventory, which pulled revenue forward from future quarters. Without the artificial boost from elevated laser supplies channel inventory, which had grown to outsized and unsustainable levels, Lexmark would have been forced to disclose significantly lower revenue and EPS; and

(c) Lexmark's 3Q14 10-Q was false and misleading for the additional reason that it failed to disclose the impact of elevated laser supplies channel inventory on Lexmark's current

period results and future financial results in violation of SEC disclosure rules, as set forth below in ¶¶124-132.

**D. December 9, 2014 Statements**

75. On December 9, 2014, Lexmark participated in the Barclays Global Tech Conference. During his introductory remarks, Defendant Stromquist discussed the Company's plans to offset headwinds with "***continued strong operational performance, as well as improvements in laser profitability as we drive MPS and laser supplies page growth, [supply] price harmonization as needed, and ongoing cost and expense reductions***." When asked for additional clarity on Lexmark's mitigation efforts for unfavorable currency through price harmonization and other behind-the-scenes methods, Defendant Stromquist responded, "***we've already begun the work . . . And some of the things we have in our toolkit to go work on that would be, on the pricing side, we have the ability to harmonize prices on supplies and maintenance on the hardware side***."

76. The statements Defendant Stromquist made on December 9, 2014, as set forth in ¶75 above, were materially false and misleading because Defendant Stromquist failed to disclose that as a result of price harmonization actions in 3Q14 and 4Q14, Lexmark's distributors and channel partners had stocked up on laser supplies inventory ahead of anticipated price increases. As a result, Lexmark sold laser supplies into the channel that otherwise would have been sold in later periods, causing Lexmark's laser supplies channel to become massively elevated, and materially impacting Lexmark's current period and future financial results.

**E. Fourth Quarter and Full Year 2014 Financial Results**

77. On January 27, 2015, before the market opened, Lexmark issued a press release announcing its financial results for the fourth quarter and full year 2014 ("FY14"), ended December 31, 2014. The press release announced "revenue growth that exceeded October guidance." For 4Q14, the release reported GAAP revenue of $1.023 billion, including an acquisition related

adjustment of $9 million and EPS of -$0.42. The Company reported ISS revenue of $933 million, a decline of less than 1% year-to-year, or a 4% increase excluding inkjet exit revenue. The Company also reported supplies revenue of $646 million, a 2% year-to-year decline, and ***laser supplies revenue of $589 million, a 5% increase year-to-year***. The press release also provided the Company's FY14 financial results, reporting GAAP revenue of $3.710 billion and EPS of $1.25. ISS revenue for the year was $3.415 billion, a 1% decline year-to-year, and a 4% increase excluding inkjet exit revenue. The Company also reported supplies revenue of $2.446 billion, a 2% year-to-year decline, and ***laser supplies revenue of $2.189 billion, a 5% increase year-to-year***.

78. Also on January 27, 2015, before the market opened, Lexmark hosted a conference call with analysts and investors to discuss the Company's earnings release and business operations, wherein Defendants Rooke and Reeder spoke positively about Lexmark's financials and laser supplies business. For example, Defendant Reeder commented on laser supplies, stating, "***[r]eflecting robust end-user demand, laser supplies revenue was quite strong and as expected, the change in channel inventory had a minimal impact on year-to-year laser supplies revenue growth***." He continued, "***estimated change in laser supplies channel inventory is expected to have a slight negative impact on year-to-year growth rates in first quarter***." Defendant Reeder also stated, "***[f]ourth quarter estimated laser supplies channel inventory was roughly as expected, and the relative year-to-year channel movements minimally impacted supplies revenue growth***."

79. When asked specifically by an analyst why guidance was down so significantly for 1Q15, for comment on supplies expectations, and whether Defendants felt like they "pulled forward anything from Q1 into Q4," Defendant Rooke attributed the change to currency instead of bloated inventory levels or softening end-user demand, stating, in relevant part:

> ***Supplies we do think will be down probably low single digits. Some of that is because of the currency impact, and some of it is our assumption that we're going***

> ***to try to hold the channel flat whereas where we had some growth last year. So that's a negative headwind. So if you normalized for FX and some channel change, then you would be up low single digit, but on the surface.***
>
> ***We are expecting supplies to be down low single-digit. MPS, we're expecting continued growth, perceptive software continued expected growth.***

80. In response to an analyst's question about the cause of the 10% decline in the laser business, aside from currency, Defendant Rooke again attributed the decline to currency instead of excess sales or softening end-user demand, stating, in relevant part:

> So when you look at the imaging business, obviously we had currency weighing heavily on us there. So as we were just talking there about some of the supply strength, hardware trends, supplies is obviously a big factor there.
>
> ***We're assuming that it's down low single digits mainly because of FX and some of the channel holding the channel flat versus some growth last year. So you have a year-to-year headwind there.***
>
> So all of those things together, ex FX, we do think that imaging solutions and perceptive software business would be up low single digit. But when you take FX and some of those channel effects, then it takes it more negative.
>
> ***Laser income, the supplies, the steady improvement in the quality of our install base continues.*** As you saw, we posted some very, very strong MPS and large workgroup, which as you've heard me say before, all units are not created equal.

81. As the January 27, 2015 call continued, Defendants were specifically asked about an apparent shift in the supply channel. In response, Defendant Reeder emphasized the strength of the supplies business and was adamant that there were no structural changes pointing to a negative shift in the supplies channel, stating:

> ***No. No. In fact, the fundamentals of our laser business are quite strong as you saw, 5% laser supplies growth in the quarter, that's against four points of negative currency. So constant currency, we're high single-digit supplies growth.***
>
> ***So those are all very good indicators, and even in the fourth quarter, really there wasn't any substantial contribution from channel in that. That was good page demand.***

82. Defendant Rooke further discussed 4Q14, stating "[y]es, we had an exceptional quarter in fourth quarter. ***I mean the low inventory and the demand in the . . . market was quite strong, which drove the low inventory in ISS which certainly helped***."

83. Later in the January 27, 2015 call, an analyst questioned Defendants on the "higher usage" driver for laser supplies, which came in 7% better than anticipated for the quarter. Defendant Rooke responded, in relevant part:

> ***I think when you look at the strength of the MPS growth, 16%, against like you say a record quarter last year, it was just some of the deals, the execution of those deals, the rollouts, all were running very good. And so it helped to drive some of that supplies growth that we saw, and like I say, there wasn't really any channel contribution of that. It was good, solid page demand***.

84. On March 2, 2015, Lexmark filed its annual report for the year ended December 31, 2014 with the SEC on Form 10-K (the "2014 10-K"), which was signed by Defendants Rooke and Reeder and reiterated the Company's previously announced financial results. The 2014 10-K contained materially false and misleading statements about the Company's ISS segment revenue, supplies revenue, and end-user demand, stating:

> ***Supplies revenue for the year ended December 31, 2014 was down 2% compared to the same period in 2013. Laser supplies revenue increased 5% YTY primarily due to strong end-user demand, attributed to growth in the segment's MPS business and the large workgroup installed base***.
>
> * * *
>
> ***Supplies revenue for the year ended December 31, 2013 was down 6% compared to the same period in 2012. Laser supplies revenue increased 2% YTY***.
>
> * * *
>
> ***Revenues in EMEA increased compared to the same period in 2013 primarily due to increased laser supplies revenue*** and growth in Perceptive Software in the region attributed to the acquisitions of ReadSoft and Saperion, partially offset by unfavorable inkjet exit impact and unfavorable currency impacts, particularly in the fourth quarter. Revenues in other international regions were relatively unchanged YTY, reflecting increased laser supplies revenue in Asia and Latin America, offset by unfavorable inkjet exit impact. ***For the year ended December 31, 2014, laser***

> ***supplies revenue increased in all geographies compared with the same period in the prior year. For 2014, currency exchange rates had a 1% unfavorable YTY impact on revenue*.**

85. The statements Defendants made on January 27 and March 2, 2015, as set forth in ¶¶77-84 above, were materially false and misleading and omitted material facts. Specifically:

(a) Defendants failed to disclose that as a result of price harmonization actions in 3Q14 and 4Q14, Lexmark's distributors and channel partners had stocked up on laser supplies inventory ahead of anticipated price increases. As a result, Lexmark sold laser supplies into the channel that otherwise would have been sold in later periods, causing Lexmark's laser supplies channel inventory to become massively elevated;

(b) Defendants failed to disclose that Lexmark's reported 4Q14 and FY14 revenue and EPS were materially impacted by excess laser supplies channel inventory, which pulled revenue forward from future quarters. Without the artificial boost from elevated laser supplies channel inventory, which had grown to outsized and unsustainable levels, Lexmark would have been forced to disclose significantly lower revenue and EPS; and

(c) Lexmark's 2014 10-K was false and misleading for the additional reason that it failed to disclose the impact of elevated laser supplies channel inventory on Lexmark's current period and future financial results in violation of SEC disclosure rules, as set forth below in ¶¶124-132.

## F. March 5, 2015 Statements

86. On March 5, 2015, Lexmark participated in the Morgan Stanley Technology, Media & Telecom Conference, with Defendants Rooke and Reeder attending on behalf of Lexmark. During the conference, Defendant Rooke discussed the impact of currency on the Company's supplies channel and once again failed to disclose a build-up of channel inventory, stating, in relevant part:

> ***Our supply channel, there was a little bit of growth last year; we're assuming it's going to be flattish this year. So there's a little bit of a negative headwind from the growth that happened last year, versus an assumption of flat*.**

87. In response to a question on the speed and frequency of repricing, Defendant Reeder downplayed concerns stating, "***[i]t's not something you do every week, obviously. But, certainly we're looking at it more aggressively here, given the volatility and the FX rates. We look at it regularly. We took one action in Europe in the fourth quarter and stay tuned, we'll see what happens here this year***."

88. The statements Defendants Rooke and Reeder made on March 5, 2015, as set forth in ¶¶86-87 above, were materially false and misleading because they failed to disclose that as a result of price harmonization actions in 3Q14, 4Q14, and 1Q15, Lexmark's distributors and channel partners had stocked up on laser supplies inventory ahead of anticipated price increases. As a result, Lexmark sold laser supplies into the channel that otherwise would have been sold in later periods, causing Lexmark's laser supplies inventory channel to become massively elevated and materially impacting Lexmark's current period and future financial results. Additionally, Lexmark was experiencing weakness in demand for, and decreased consumption of, its laser supplies, which contributed to the massively elevated laser supplies channel inventory because Lexmark's laser supplies were not "selling through" to the end-user.

**G. First Quarter 2015 Financial Results**

89. On April 28, 2015, before the market opened, Lexmark issued a press release announcing its financial results for the first quarter ended March 31, 2015. Defendant Rooke boasted that "[d]espite a strong currency headwind, ***Lexmark delivered revenue and EPS at the top of our January guidance range***." Defendant Rooke confirmed that "[d]ouble-digit revenue growth in Higher Value Solutions [wa]s another clear indication that our transformation strategy is working." The press release reported 1Q15 GAAP revenue of $852 million and EPS of $0.32. The

Company further reported ISS revenue of $766 million, a 6% decline year-to-year. Instead of providing product revenue for supplies and laser supplies, the release contained a new metric that the Company called "Annuity revenue." The release stated, in part: "***Lexmark's Annuity revenue of $2.419 billion for the trailing four quarters grew 5 percent compared to the same period a year ago, and comprised 70[%] of Core revenue***."[4]

90. Also on April 28, 2015, before the market opened, Defendants held a conference call with analysts and investors to discuss the Company's earnings release and business operations. In a presentation that accompanied the conference call, Lexmark reported 1Q15 laser supplies revenue of $520 million. During the call, Defendants Rooke and Reeder spoke positively about Lexmark's financials and laser supplies business. For example, Defendant Reeder stated, "***[t]otal laser revenue declined 4% year-to-year but grew 3% in constant currency***" and "***at constant currency. . . Laser supplies revenue grew 5% year-to-year***."

91. Discussing the supplies channel, Defendant Reeder indicated, "***[s]trong end-user demand was the primary driver of year-to-year growth, but we estimate that the laser supplies channel inventory increased slightly***." He continued, "***[a]s experienced in the first quarter, channel inventory often increases ahead of price harmonization. We expect inventory to decline in the second quarter as the harmonization activity works its way through the channel***." With regard to the geography of revenue, Defendant Reeder reported "***year-to-year revenue growth of 1% in the United States, a 2% decline in EMEA, and a 12% decline in the rest of the world. Excluding the Inkjet exit and currency impacts, US revenue growth was 7% and EMEA growth was 12%, while the rest of the world declined 2%***."

---

[4] Annuity revenue included laser supplies, extended warranties, software maintenance, and software subscriptions.

92. Providing 2Q15 guidance, Defendant Reeder stated that they expected "total second quarter revenue to be down 2% to 4% year-over-year. But on a constant currency basis it is expected to grow approximately 4% to 6%." Defendant Reeder hinted at a small drawdown of supplies channel inventory in the second quarter, stating that "[s]equentially, our outlook assumes that the absolute dollars of channel inventory decreases ***slightly*** in the second quarter," but continued to conceal that Lexmark's laser supplies channel inventory was massively elevated, reassuring analysts and investors that any decrease in supplies channel inventory was expected to have only a "***slightly*** negative impact on year-to-year supplies revenue growth."

93. During the question and answer portion of the conference call, Bernstein analyst Sacconaghi asked Defendants to comment "on the health of the overall laser business," pointing out that Lexmark's laser supplies "declined 12% sequentially" and that Defendants had "also mentioned that there was a build in channel inventory, so your true sell through was probably down like 16%, again like dramatically different than what we would normally seasonally see." Defendant Rooke denied that the Company was experiencing any issues with its laser supplies business, stating that "what we see in our laser business, we remain encouraged about the activity we see, particularly in our core geographies in the U.S. or North America and Europe." Defendant Rooke continued with his evasive response, stating, in relevant part:

> ***On the supplies, when you normalize our supplies decline for the currency as well as normalization for the channel, it lands pretty much in the low-single-digits increased positive, low-single-digit growth, which is where we've been targeting. So when you factor in the currency and the slight channel movement there, we feel very good about the trajectory of our supplies business***.

94. Defendant Reeder added, "***if you look at supplies sequentially for first quarter 2014, it declined about 5.5%; in first quarter 2015, it declined about 11.5%. There's about 6 points of currency impact. And then on the hardware, you see sequentially down about 27% at first quarter***

***2014; and in first quarter 2015, you see down about 36%. Again, you've got 6 points of impact from currency there. I think once you normalized for currency, the trends look pretty similar***."

95. Dissatisfied with Defendants' responses, Sacconaghi stated, "[a]ctually, I'm not sure that's quite true because you added year-over-year currency declines rather than sequential currency declines. Currency was not down 6% sequentially I believe." Defendant Reeder retorted, "***[i]t's just about half of that sequentially***."

96. When asked to discuss the acceleration of core growth in the second quarter, especially in light of supplies inventory decreases, Defendant Rooke represented, "***[o]ur supplies growth, while as reported or as guided would be down, with constant currency and adjustment channel, it's up. We expect the low-single-digit trend to continue***."

97. Defendant Rooke commented on improved ISS laser profitability, stating, "***we've got a long list of actions we're taking to improve laser profitability. One, pricing. So we've taken some price actions on supplies***."

98. On April 30, 2015, Lexmark filed its quarterly report for the period ended March 31, 2015 with the SEC on Form 10-Q (the "1Q15 10-Q"), which was signed by Defendant Reeder and reiterated the Company's previously announced financial results. The 1Q15 10-Q contained materially false and misleading statements about the Company's supplies revenue and end-user demand, stating:

> These headwinds were partially offset by growth in the Company's annuity revenue streams during the quarter, particularly maintenance and support revenue in Enterprise Software and ***higher laser supplies sales volumes, driven by growth and favorable mix in the segment's MPS business and large workgroup installed base***. Management expects that the currency and inkjet exit headwinds will continue throughout the year, leading to lower YTY revenue, partially offset by continued growth in Enterprise Software and ***strong demand for laser supplies***.

* * *

> Supplies revenue for the three months ended March 31, 2015 was down 6% compared to the same period in 2014, reflecting unfavorable currency and inkjet exit impacts of 6% and 4%, respectively. ***Laser supplies revenue decreased 2% YTY primarily due to unfavorable currency impact of 7% offset by higher sales volumes, driven by strong end-user demand and sales through the Company's channel partners. Strong end-user demand was attributed to growth and favorable mix in the segment's MPS business and large workgroup installed base***.

99. The statements Defendants made on April 28 and April 30, 2015, as set forth in ¶¶89-98 above, were materially false and misleading and omitted material facts. Specifically:

(a) Defendants failed to disclose that as a result of price harmonization actions in 3Q14, 4Q14, and 1Q15, Lexmark's distributors and channel partners had stocked up on laser supplies inventory ahead of anticipated price increases. As a result, Lexmark sold laser supplies into the channel that otherwise would have been sold in later periods, causing Lexmark's laser supplies channel inventory to become massively elevated;

(b) Defendants failed to disclose that Lexmark's reported 1Q15 revenue and EPS were materially impacted by excess laser supplies channel inventory, which pulled revenue forward from future quarters. Without the artificial boost from elevated laser supplies channel inventory, which had grown to outsized and unsustainable levels, Lexmark would have been forced to disclose significantly lower revenue and EPS;

(c) Lexmark was experiencing weakness in demand for, and decreased consumption of, its laser supplies, which contributed to the massively elevated laser supplies channel inventory because Lexmark's laser supplies were not "selling through" to the end-user; and

(d) Lexmark's 1Q15 10-Q was false and misleading for the additional reason that it failed to disclose the impact of elevated laser supplies channel inventory on Lexmark's current period and future financial results in violation of SEC disclosure rules, as set forth below in ¶¶124-132.

**H. May 5, 2015 Statements**

100. On May 5, 2015, Lexmark held a Securities Analyst Meeting, with Defendants Rooke and Reeder participating on behalf of the Company. Defendant Reeder spoke about price harmonization of laser supplies, stating, in relevant part:

> Now, what have we done to be able to not only position us for 2015 but also to make sure that we can address the headwind that we believe, and I think many other companies believe, is going to come in 2016? It's a long laundry list, and then let me start with pricing. ***So, one, we've done lots of price harmonization specifically on supplies around the world. Now, that's something that we've done with the market, so it's not just Lexmark going out and changing prices. The market itself has moved across EMEA and AP and LatAm and rest of world to increase prices, and we've certainly been a part of that***.

101. During the question and answer portion of the conference, an audience member explicitly asked whether supplies revenue "might be down a little bit" in light of the "channel fill" Defendants had alluded to during the 1Q15 earnings conference call. Defendant Rooke responded that "***it should still be good, solid, low-single-digit supplies growth***."

102. The statements on May 5, 2015, as set forth in ¶¶100-101 above, were materially false and misleading because Defendants failed to disclose that the price harmonization actions Defendants took in 3Q14, 4Q14, and 1Q15 caused Lexmark's distributors and channel partners to stock up on laser supplies inventory ahead of anticipated price increases. As a result, Lexmark sold laser supplies inventory into the channel that otherwise would have been sold in later periods, causing Lexmark's laser supplies channel inventory to become massively elevated. Additionally, as Defendants knew, but failed to disclose to investors, the "targeted efforts" Defendants had taken in 2Q15 to reduce laser supplies channel inventory in the EMEA region were unsuccessful, and Lexmark's laser supplies channel inventory levels were as much as ***50% higher*** than the Company's targeted weeks of inventory. Defendants also failed to disclose that Lexmark was experiencing weakness in demand for, and decreased consumption of, its laser supplies, which contributed to the

massively elevated laser supplies channel inventory because Lexmark's laser supplies were not "selling through" to end-users.

**I. May 8, 2015 Statements**

103. On May 28, 2015, Lexmark participated in the Sanford C. Bernstein Strategic Decisions Conference, with Defendant Rooke attending on behalf of the Company. During the conference, Defendant Rooke was asked about the supplies channel inventory build in 1Q15. In response, Defendant Rooke once again downplayed the impact of any laser supplies channel inventory build-up, responding that Lexmark had "***a bit***" of supplies channel build in the first quarter worth only "***about a point year to year in our growth***." Defendant Rooke also stated, in part:

> ***But again, what we look at is our supplies growth in constant currency and kind of constant channel, if you will. So, we look at the real growth, supplies growth. And that's been running low single digit for some time now. So, we feel confident that that will continue, because of the quality install base that we're building, even though you'll have this fluctuation due to currency and channel movements from time to time.***

104. The statements Defendant Rooke made on May 28, 2015, as set forth in ¶103 above, were materially false and misleading because Defendant Rooke failed to disclose that the price harmonization actions Defendants took in 3Q14, 4Q14, and 1Q15 caused Lexmark's distributors and channel partners to stock up on laser supplies inventory ahead of anticipated price increases. As a result, Lexmark sold laser supplies inventory into the channel that otherwise would have been sold in later periods, causing Lexmark's laser supplies channel inventory to become massively elevated. Additionally, as Defendant Rooke knew, but failed to disclose to investors, the "targeted efforts" Defendants had taken in 2Q15 to reduce laser supplies channel inventory in the EMEA region were unsuccessful, and Lexmark's laser supplies channel inventory levels were as much as ***50% higher*** than the Company's targeted weeks of inventory. Defendant Rooke also failed to disclose that Lexmark was experiencing weakness in demand for, and decreased consumption of, its laser

supplies, which contributed to the massively elevated laser supplies channel inventory because Lexmark's laser supplies were not "selling through" to end-users.

## VI. THE TRUTH EMERGES

105. The truth about Lexmark's massively elevated laser supplies channel inventory and its material impact on the Company's current and future financial results was finally revealed to investors on July 21, 2015. On that day, before the market opened, Lexmark issued a press release announcing its financial results for 2Q15. Lexmark shocked investors by reporting GAAP revenue of $879 million and a ***negative*** EPS of $0.59. The Company also reported non-GAAP laser revenue of $718 million, down 4% year-over-year and ***18%*** sequentially. Defendants attributed the disappointing results to "near-term laser supplies channel optimization particularly in EMEA."

106. The press release also provided revised guidance for 3Q15 and FY15. For 3Q15, Lexmark expected total revenue to be in the range of -1 to +1 percent year-to-year, EPS to be around -$0.48 to -$0.38 and non-GAAP EPS of around $0.51 to $0.61. For FY15, Lexmark expected total revenue to be in the range of -1% to +1% year-to-year and non-GAAP EPS to be around $3.55 to $3.75.

107. During the earnings conference call held before the market opened that day, Defendants revealed, for the first time, that Lexmark's laser supplies channel inventory had become massively bloated, reaching weeks of inventory as much as ***50% higher*** than what the Company typically targeted. Specifically, Defendant Rooke disclosed that the Company's reported 2Q15 results were negatively impacted by "laser supplies channel optimization, particularly in EMEA." Defendant Rooke also revealed that the negative effects from Lexmark's bloated laser supplies channel inventory would continue to be felt in 3Q15 and for the remainder of 2015, disclosing that 3Q15 and FY15 would be adversely impacted by "the reduction in laser supplies sell in to draw down channel inventory for laser supplies." Defendant Rooke further disclosed that Lexmark was

"focused on reducing laser supplies channel inventory, particularly in EMEA, where our models and channel reporting show a buildup in channel inventory from the multiple cost actions we've taken worldwide as the U.S. dollar strengthen[s]."

108. Defendant Reeder provided additional information on the impact of Lexmark's massively elevated laser supplies channel inventory to the Company's reported and future financial results, disclosing that "laser supplies revenue declined 10% year-to-year and 3% in constant currency," the latter of which was "primarily the result of targeted efforts to reduce laser supplies channel inventory." Defendant Reeder further disclosed that, despite Lexmark's efforts to reduce the number of inventory weeks, "EMEA channel inventory remained elevated and outside the acceptable range." Defendant Reeder then disclosed that Lexmark's "acceptable range" for laser supplies channel inventory was six to ten weeks – a figure the Company had never previously reported. Defendant Reeder then finally admitted what Defendants had concealed from investors all along: "[t]he EMEA channel's reaction to three consecutive quarters of price action, including a price increase in the second quarter, resulted in inventory levels above expectation." Quantifying the revenue impact of Lexmark's "channel optimization" actions, Defendant Reeder told investors that "[o]ur third quarter and second half 2015 guidance includes about $50 million of revenue impact from reduced laser supplies, specifically in EMEA. This reduction is expected to optimize channel inventory, bringing it solidly within the modeled range by year end."

109. Analysts were dumbfounded by Defendants' revelations in light of their repeated reassurances throughout the Class Period that any impact from Lexmark's laser supplies channel inventory was "slight" or "minimal." For example, Bernstein analyst Sacconaghi commented:

> Last quarter, you talked about a channel inventory build only adding about 1% to reported supplies inventory. That's about $5 million. Now you're talking about a $50 million to $75 million drawdown in supplies inventory for the year because it was elevated, and you're talking about the actions this quarter being targeted. ***So to me,***

> ***your comments last quarter implied that channel inventory was fine to slightly elevated. Today, you're talking about massively elevated channel inventories that still need to come down to the tune of $50 million to $75 million***.

110. In response, Defendant Rooke again admitted what Defendants had known, or recklessly disregarded, all along: "this has come from a lot of the price actions we've taken in Europe over the last several quarters." Revealing weak end-user demand, Defendant Rooke further explained that the previously undisclosed "targeted efforts" to drawdown "our supplies sell in" did not result in "the reduction in channel inventory like we had thought." As a result, Defendant Rooke said, "we're going to get more focused on it here in the third quarter. And since we didn't see the improvement in the second quarter, we're going to make a difference here in the third quarter."

111. Later in the call, Defendant Reeder provided more detail on the never-before-disclosed weeks of channel inventory, revealing that Lexmark's "model range was six to 10 weeks of channel inventory" and that Europe and EMEA remained "***above 10***" weeks. Defendant Reeder admitted that "we're not really comfortable with 10 weeks, which is why we said we wanted to bring it down solidly within the six-to-10 week range with the actions that we're taking in the second half. . . . And so the actions that we've outlined again, kind of $50 million of channel inventory takedown in the second half, that's to drive us solidly within that six-to-10-week range." Incredibly, Defendant Reeder's comments implied that Lexmark's weeks of laser supplies channel inventory was as much as ***50% higher*** than normal.

112. On this news, shares of Lexmark common stock tumbled, falling $9.57, or 20.2 % per share, to close at $37.75 per share on July 21, 2015, on unusually heavy trading volume.

113. Investors and analysts were shocked by the news. For example, on July 21, 2015, Bernstein issued a report commenting that "Q2 weakness was due to a big drawdown in supplies channel inventory, which is expected to continue." The report continued, "***[t]he magnitude of the total expected drawdown is staggering*** (potentially 2+ weeks)," and "given that it came with limited

warning, ***[it] is likely to undermine management's credibility***." The report further noted that Lexmark "carries 6 – 10 weeks of channel inventory (egad! This was the first time they had specified its target levels)" and that EMEA "remained above these level" at the end of 2Q15. The report also estimated that "every week of supplies channel inventory drawdown impacts EPS by $0.23" and that "***the drawdown in inventory suggests that LXK's supplies growth" in 2014 may have been inflated "by as much as 5%***."

114. On July 22, 2015, Credit Suisse issued a report commenting that "underlying deterioration in LXK fundamentals is clear and concerning." In the report, Credit Suisse found, "surprising . . . the rate of this deterioration" and questioned "why it has come as a surprise to management given the continuous concern around the possible build-up in the channel of supplies." Credit Suisse also lowered its price target and reiterated its underperform rating.

115. Additionally, in a report on July 21, 2015, Morgan Stanley lowered its 2015 revenue and EPS estimates "to account for the inventory adjustment in the channel," observing that Lexmark's reported 2Q15 laser supplies revenue of 3% in constant currency was a sharp decline from the 9% and 5% growth reported in 4Q14 and 1Q15, respectively. The Morgan Stanley report noted that it expected Lexmark's laser supplies "declines to continue in the next two quarters."

116. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Lexmark stock as the artificial inflation was removed, Plaintiff and other Class members suffered significant losses and damages.

## VII. POST-CLASS PERIOD REVELATIONS

117. Following the Class Period, Lexmark's financial downturn continued and additional revelations came out, which shed light on the severity of the EMEA supplies channel inventory level and end-user demand problems experienced by the Company during the Class Period.

118. For example, on July 31, 2015, the Company filed its 2Q15 Form 10-Q, disclosing, a "negative impact on laser supplies revenues of the Company's targeted effort to reduce laser supplies inventory in its partner sales channel."

119. During the September 10, 2015 Citi Global Technology Conference, Defendant Reeder stated, "we realized that because of the three price actions we had taken due to the decline of the Euro in third quarter, fourth quarter, and first quarter – because of those price actions, that it had caused elevated levels of inventory in the channel specific to Europe." He continued, "so because of that action, we decided that we were going to consciously bring down that level of channel inventory so it could position us better for the future."

120. Defendant Reeder also stated that inventory levels in the EMEA channel "were out of bounds" because "[a]ll the other regions were actually at six or below." Defendant Reeder added that the approximately $20 million in inventory drawdown Lexmark took in 2Q15 "and the $50 million-ish that we'd like to take in the second half – that that will get the channel inventory rightsized and will put us firmly in that 6 to 10 week range."

121. Defendant Reeder added that the Company has "added some transparency around the reporting of our channel inventory," confirming that investors previously had a lack of insight into Lexmark's outsized inventory levels. Additionally, Defendant Reeder provided additional commentary on the actions the Company had taken with respect to Lexmark's elevated laser supplies inventory levels, stating:

> With respect to what specific actions are we taking: we look at our distributors and our partners in the channel, and we're having dialogues with them around how much inventory they have; how much inventory they think they need; why they think they need to have that level of inventory or not. ***And again, if you think about the impetus or the catalyst of what kind of caused this, there was this rapid movement of the euro and the chasing of the harmonization and the price increases behind that***.

122. Then, on November 9, 2015, the Company filed its 3Q15 Form 10-Q with the SEC, disclosing not only a "negative impact on laser supplies revenues of the Company's targeted effort to reduce laser supplies inventory in its partner sales channel," but also, "a decline in laser hardware due to competitive pressures."

123. On February 29, 2016, Lexmark filed its annual report for the year ended December 31, 2015 with the SEC on Form 10-K (the "2015 10-K"), which further revealed that in the second half of 2015, Lexmark "announced efforts to reduce laser supplies inventory in its partner sales channel ***which were elevated in part because of decreased consumption of supplies***." The 2015 Form 10-K confirmed that "[t]hese efforts adversely impacted laser supplies revenue for 2015." In the 2015 10-K, Defendants also admitted that "weakness in demand" had "resulted in intense price competition" and "excessive inventory for the Company and/or its reseller channel, ***as the Company experienced in Europe in 2015***."

## VIII. BY FAILING TO DISCLOSE THE IMPACT OF INCREASED CHANNEL INVENTORY ON LEXMARK'S REPORTED AND FUTURE REVENUES, DEFENDANTS VIOLATED SEC DISCLOSURE RULES

### A. The Impact of Lexmark's Elevated Laser Supplies Channel Inventory on the Company's Reported Revenue

124. During the Class Period, Lexmark disclosed the quarterly revenue of its most profitable business – supplies – and more specifically, its quarterly laser supplies revenue. For example, Lexmark reported:

| **Quarter** | **Reported Laser Supplies Revenue** |
|---|---|
| 2Q14 | $535 million |
| 3Q14 | $533 million |
| 4Q14 | $589 million |
| 1Q15 | $520 million |

125. As discussed above, unbeknownst to investors, beginning in 3Q14, Lexmark's laser supplies revenue was artificially inflated as a result of Lexmark increasing the amount of laser supplies inventory in the EMEA channel. Lexmark, like other companies in its industry, measured its channel inventory in terms of the number of weeks of sales held by its distributors and channel partners. At the end of the Class Period, Defendants revealed, for the first time, that they preferred to have six to ten weeks of channel inventory, with eight weeks representing a preferred level. Analysts estimated that each week of laser supplies inventory Lexmark sold into the channel was worth approximately $40 million in revenue. Thus, by increasing the number of weeks of EMEA channel inventory, which occurred when Lexmark sold excess laser supplies into the channel, Lexmark realized an increase in revenue during the current quarter and could reasonably expect a decrease in revenue in the subsequent quarters when the inventory would have otherwise been sold into the channel. Without the artificial boost from increasing its EMEA laser supplies channel inventory, Lexmark's reported revenues would have been materially different. For example, following Defendants' revelations regarding the Company's true laser supplies channel inventory levels, in a report dated July 21, 2015, Bernstein analyst Sacconaghi estimated that Lexmark's 2014 supplies growth may have been inflated by as much as 5%.

126. In addition to artificially inflating its quarterly revenue, Defendants also used elevated laser supplies channel inventory to conceal softening end-user demand and decreased consumption of Lexmark's supplies. Indeed, at the end of the Class Period, Defendants disclosed that they "saw a little bit of a sellout softness" and "sell-out decline," meaning that end-users were not purchasing Lexmark's laser supplies from the Company's distributors and channel partners. After the Class Period, Defendants also admitted that "[w]eakness in demand" and "decreased consumption of

supplies" had contributed to elevated laser supplies inventory in the Company's partner sales channel.

127. Lexmark was explicitly required to disclose the impact of increased channel inventory on its reported revenues. Item 303 of SEC Regulation S-K, 17 C.F.R. §229.30 ("Item 303") required Lexmark's quarterly and annual filings with the SEC to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii). Similarly, the regulation required Lexmark's Form 10-K and Forms 10-Q to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii). Within SEC Staff Accounting Bulletin No. 104 ("SAB 104"), the SEC Staff provided specific guidance on required MD&A disclosures pertaining to a Company's revenue and changes in revenue:

> Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease.

128. The SEC has provided a relevant example of a required MD&A disclosure in light of a changing sales trend:

> For example, if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should ***not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the reasons are also material and determinable***. The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the

> manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.[5]

129. Item 303 and analogous SEC guidance are clear: Lexmark was required to disclose the underlying reasons behind its change in quarterly revenue. Instead, Defendants concealed the extent to which Lexmark relied on elevated channel inventory (*i.e.*, the pulling forward of future sales) to artificially inflate revenue.

### B. The Impact of Elevated Laser Supplies Channel Inventory on Lexmark's Future Results

130. In addition to the impact on reported quarterly revenues, Lexmark was also explicitly required to disclose the impact of increasing channel inventory on its future financial results. As described above, by increasing the amount of inventory sold into the laser supplies channel, Defendants could reasonably expect a decrease in revenue in subsequent quarters when the inventory would have otherwise been sold into the channel. Within SAB 104, the SEC Staff also provided the following specific examples of required disclosures pertaining to the Company's recognition of revenue*:*

> "Shipments of product at the end of a reporting period that significantly reduce customer backlog and that ***reasonably might be expected to result in lower shipments and revenue in the next period***."[6]

131. The significant financial impact of Lexmark's elevated laser supplies channel inventory on the Company's future financial results is precisely the type of information required to be disclosed under the SEC's MD&A rules. For example:

> MD&A must specifically focus on known material events and uncertainties that would cause reported financial information ***not to be necessarily indicative of future operating performance*** or of future financial condition.

---

5 SEC Release Nos. 33-8350; 34-48960; FR-72.

6 SAB 104, Topic 13.B.

* * *

> One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain the ***likelihood that past performance is indicative of future performance***.[7]

132. By "pulling-in" or "borrowing" revenue from future quarters, Defendants were aware that Lexmark's revenue in subsequent quarters, including its laser supplies revenue, would be adversely impacted.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

133. Defendants' misstatements concerned one of Lexmark's core businesses and one of its largest sources of revenue. As set forth above in Section IV.A, "[t]he profit in [Lexmark's] model [came] from supplies," which were the "primary profit engine" of the Company's business model, as "[s]upplies profit has helped fund new technology investments in products, solutions, services and software." In 2014 and 2015, more than ***half*** of the Company's revenue was derived from the sale of supplies. The Company's laser supplies revenue, in particular, was of utmost importance, as Lexmark was in the process of exiting the inkjet business and the Company's inkjet supplies revenue was rapidly declining as a result. In 2015, *Forbes* estimated that Lexmark's laser printer and cartridge division comprised 83% of Lexmark's estimated value. The importance of laser supplies revenue was further compounded by the Company's ongoing transition into software, with laser supplies representing a stable, lucrative, and recurring revenue stream. Given the importance of the Company's laser supplies revenue to Lexmark's overall operations and financial performance, it is reasonable to infer that Defendants were well aware of the performance of one of the Company's key revenue drivers.

---

[7] SEC Release Nos. 33-8350; 34-48960; FR-72.

134. In fact, Defendants admitted that they employed "very complex models that [they] use[d] to forecast the supplies business" along with models and channel reporting to track laser supplies channel inventory, which Defendants used to identify model ranges of weeks of channel inventory. That Defendants had the ability to track laser supplies channel inventory, and specifically commented on the changes – or lack thereof – to supplies channel inventory levels during the Class Period, indicated their clear understanding of the issue. This is further evidenced by Defendants' disclosures on July 21, 2015 that laser supplies channel inventory in EMEA, and Europe in particular, was well outside "our modeled range of 6 to 10 weeks of channel inventory." Defendants also admitted after the Class Period that they "look at our distributors and our partners in the channel, and we're having dialogues with them around how much inventory they have; how much inventory they think they need; [and] why they think they need to have that level of inventory or not."

135. Given the importance of supplies revenue to the Company's overall performance, it is reasonable to infer that Defendants knew, or recklessly disregarded, that excessive levels of laser supplies channel inventory had accumulated throughout the Class Period that were unsustainable and would eventually need to be drawn down, particularly in light of the weakness in demand, materially impacting the Company's current and future revenue and performance. Indeed, Defendants knew that the Company's distributors and channel partners would stock up on laser supplies ahead of price increases, as Defendants admitted this was a common occurrence given the channel's desire to capitalize on lower prices.

136. Lexmark's laser supplies channel inventory level was a key metric that the Company, its management, analysts, and the market followed, and was a topic on which Defendants made numerous public statements during the Class Period. Defendants knew that analysts and the market

considered the Company's laser supplies channel inventory levels to be an important indicator of the Company's health and current and future prospects because many analysts were focused on and expressed concern about the Company's laser supplies channel inventory during the Class Period. Indeed, analysts later estimated that ***every week*** of supplies channel inventory drawdown impacted Lexmark's EPS by approximately ***$0.23***.

137. For example, in a report on July 22, 2014, just prior to the start of the Class Period, Bernstein commented on the Company's purportedly "flat" channel inventory, observing that "it is difficult to know how elevated or precarious LXK's supplies channel inventory situation may really be." The July 22, 2014 Bernstein report also noted that Lexmark competitors HP and Xerox had been decreasing channel inventory. In a report dated October 21, 2014, Bernstein raised concerns about a "potential for a correction" in Lexmark's laser supplies channel inventory. In a report dated January 27, 2015, Bernstein commented that it was worried about a "possible drawdown in supplies channel inventory." In reports dated April 29 and May 6, 2015, Credit Suisse similarly commented that it "remain[ed] concerned about the possible build-up in the channel of supplies." Facing questions from analysts and investors about the Company's laser supplies channel inventory, Defendants went to great lengths to assure analysts and the market that the impact from laser supplies channel inventory was "minimal" and "slight." *See* Section IV.C. Because Defendants did not publicly report channel inventory levels during the Class Period – a practice they subsequently abandoned – analysts had to take Defendants at their word. Once the truth about Lexmark's laser supplies channel inventory was revealed, however, analysts were shocked and commented that management's credibility had been undermined.

138. Further, while Defendants were assuring investors that the impact from Lexmark's laser supplies channel inventory was "minimal" and "slight," one of the Company's main

competitors, HP, was warning of declining toner demand and taking action to drawdown its supplies channel inventory. For example, in May 2014, prior to the start of the Class Period, HP reported "weak toner sales," "lower toner sales," and "softer toner sales ***in Europe***," and disclosed that it was "reducing overall toner channel inventory in the quarter." HP also warned that it "expect[ed] that toner will remain under pressure for the rest of the year." HP continued to bring supplies channel inventory levels back down within its targeted range during the second half of 2014 and managed supplies channel inventory closely into the beginning of 2015. Toner was one of Lexmark's biggest and most profitable products.

139. The timing and size of Lexmark's drawdown of laser supplies channel inventory is also indicative of scienter, as less than two months earlier, on May 28, 2015, Defendants had assured investors that there was only "a bit" of supplies channel build in the first quarter, worth only "about a point" year-to-year in the Company's growth. Yet just two months later, Defendants would reveal that the Company's laser supplies channel inventory in the EMEA region was above ten weeks of channel inventory (closer to 12 weeks), or ***50% above targeted levels***, and that the Company would be drawing down approximately ***$70 million*** in inventory. As set forth in Section IV.D above, analysts were incredulous about the sudden change in Lexmark's laser supplies channel inventory.

140. The Company's laser supplies channel inventory did not become massively elevated overnight, but had grown to unsustainable heights throughout the Class Period, despite Defendants' statements to the contrary. Indeed, in a July 22, 2015 report, Credit Suisse commented, "we find surprising . . . why it has come as a surprise to management given the continuous concern around the possible build-up in the channel of supplies." Defendants later admitted that even ***after*** drawing down approximately $20 million of inventory during 2Q15, the Company's laser supplies channel inventory remained elevated above ten weeks of inventory, requiring the Company to drawdown

another ***$50 million*** of laser supplies inventory during 3Q15 and the second half of 2015. In fact, it took the Company an additional three months to bring Lexmark's laser supplies channel inventory back within the targeted range of six to ten weeks. As Defendant Rooke implicitly conceded, laser supplies channel inventory was elevated well before the Company engaged in price harmonization, which drove inventory beyond the six to ten week range: "So the big thing really was the elevated position in Europe, and these price actions had driven it ***beyond the range where we like it to be***."

141. Defendants' scienter is also supported by their post-Class Period admissions, as the Company admitted that Lexmark's pricing actions in 3Q14, 4Q14, and 1Q15 "caused elevated levels of inventory in the channel specific to Europe" and later disclosed that "decreased consumption of supplies" and "weakness in demand" had also contributed to the elevated laser supplies channel inventory, which "adversely impacted laser supplies revenue for 2015."

142. These facts collectively support a strong inference that Defendants knowingly made materially false and misleading statements and omissions, or acted recklessly in doing so, during the Class Period.

## X. LOSS CAUSATION/ECONOMIC LOSS

143. As detailed herein, Defendants' fraudulent scheme artificially inflated the Company's stock price by misrepresenting and concealing the true nature of the Company's laser supplies business, in particular, the fact that Lexmark's supplies channel inventory levels had swollen to abnormally high and unsustainable levels. Defendants' false and misleading statements and omissions, individually and collectively, concealed that Lexmark had been selling laser supplies to distributors and channel partners in excess of demand as they stocked up on laser supplies in anticipation of price increases that Lexmark put into place to offset currency impacts in EMEA caused by the strengthening U.S. Dollar and declining Euro, resulting in the Company's stock being artificially inflated until, as indicated herein, the relevant truth about Lexmark's laser supplies

channel and softening demand was revealed. While each of Defendants' misrepresentations and omissions was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate the Company's stock price and give the market the false notion that Lexmark's supplies channel inventory levels were not elevated and end-user demand for laser supplies was not softening thus putting at risk the Company's financials, including its EPS, revenues, and financial outlook. Defendants' false and misleading statements and omissions had the intended effect and caused, or were a substantial contributing cause of, the Company's stock trading at artificially inflated levels, reaching as high as $51.17 during the Class Period, on August 14, 2014.

144. The truth emerged before the market opened on July 21, 2015, when, as detailed in ¶¶105-116 above, the Company shocked investors by issuing disappointing financial results for 2Q15 and forecasting earnings that missed analysts' estimates. Defendants attributed the negative financial impact to a significant decline in laser supplies revenue in 2Q15 as the Company used "targeted efforts" to "reduc[e] laser supplies channel inventory, particularly in EMEA."

145. As a result of the information revealed to the market, the Company's stock dropped approximately 20%, or -$9.57, falling from a close of $47.32 per share on July 20, 2015, to a close of $37.75 per share on July 21, 2015. This decline in the Company's stock price was the direct result of the nature and extent of the revelations made to the market regarding the laser supplies revenue decline in 2Q15 that resulted from a bloated supplies channel and the need to drawdown laser supplies inventory by an additional $50 million that had been concealed or misrepresented by Defendants.

146. The timing and magnitude of the Company's stock price decline on July 21, 2015 negates any inference that the losses suffered by Plaintiff were caused by changed market conditions,

macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

147. In sum, the rapid decline in the Company's stock price on July 21, 2015 was the direct and foreseeable consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market. Thus, the revelations of truth as well as the resulting clear market reaction support a reasonable inference that the market understood Defendants' prior statements were false and misleading. In short, as the truth about Defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiff was damaged, suffering true economic losses.

148. Accordingly, the economic losses, *i.e.*, damages, suffered by Plaintiff on July 21, 2015, were the direct and proximate result of Defendants' misrepresentations and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the value of the Company's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

149. At all relevant times, the market for Lexmark stock was an efficient market for the following reasons, among others:

(a) Lexmark common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b) as a regulated issuer, Lexmark filed periodic public reports with the SEC and the NYSE;

(c) Lexmark regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the

national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Lexmark was followed by numerous securities analysts employed by major brokerage firms, including Bernstein, Goldman Sachs, Brean Capital, LLC, Barclays Capital, Citigroup, Credit Suisse, and Morgan Stanley, who wrote reports which were distributed to those brokerage firms' sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

150. As a result of the foregoing, the market for Lexmark stock promptly digested current information regarding Lexmark from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Lexmark stock during the Class Period suffered similar injury through their purchase of Lexmark stock at artificially inflated prices, and a presumption of reliance applies.

151. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material, adverse information regarding Lexmark's business and operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII. NO SAFE HARBOR

152. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein. Many of the statements

alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

153. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Lexmark who knew that the statement was false when made. Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material, adverse facts undermining such disclosures.

## XIII. CLASS ACTION ALLEGATIONS

154. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased Lexmark stock between August 1, 2014 and July 20, 2015, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

155. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lexmark stock was actively traded on the NYSE. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that the number of Class members is at least in the thousands and that they are

geographically dispersed. Record owners and other members of the Class may be identified from records maintained by Lexmark or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

156. Plaintiff's claims are typical of the claims of the other members of the Class because all Class members are and were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

157. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

158. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

159. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c) whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d) whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e) whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(f) whether the market prices of Lexmark stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

**COUNT I:**
**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT**
**AND RULE 10b-5 PROMULGATED THEREUNDER**
**AGAINST ALL DEFENDANTS**

160. Plaintiff repeats and realleges the allegations in ¶¶1-159 above, as if fully set forth herein.

161. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or deliberately disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

162. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company’s stock during the Class Period.

163. In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, Defendants had a duty to promptly disseminate truthful information with respect to Lexmark's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of Lexmark stock would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

164. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lexmark stock. Plaintiff and the Class would not have purchased Lexmark stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

165. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Lexmark stock during the Class Period.

**COUNT II:**
**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**
**AGAINST THE INDIVIDUAL DEFENDANTS**

166. Plaintiff repeats and realleges the allegations set forth in ¶¶1-159 above, as if fully set forth herein.

167. The Individual Defendants acted as controlling persons of Lexmark within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions as officers and/or directors of Lexmark, and their ownership of Lexmark securities, the Individual Defendants had the power and authority to, and did, cause Lexmark to engage in the wrongful conduct alleged.

168. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Lexmark stock during the Class Period.

169. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: November 21, 2017

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

*s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
JACK REISE
ROBERT J. ROBBINS
MAUREEN E. MUELLER
BAILIE L. HEIKKINEN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
rrobbins@rgrdlaw.com
mmueller@rgrdlaw.com
bheikkinen@rgrdlaw.com

*Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I, David A. Rosenfeld, hereby certify that on November 21, 2017, I authorized a true and correct copy of the Amended Class Action Complaint in Violations of Federal Securities Laws, to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*s/ David A. Rosenfeld*
DAVID A. ROSENFELD