**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

OKLAHOMA FIREFIGHTERS PENSION
    AND RETIREMENT SYSTEM,
Individually and on Behalf of All Others
Similarly Situated,

      Plaintiff,

v.

LEXMARK INTERNATIONAL, INC., ET AL.

      Defendants.

Civil Action No. 1:17-cv-05543-WHP

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
DISMISS THE COMPLAINT WITH PREJUDICE**

O'MELVENY & MYERS LLP
7 Times Square
New York, New York  10036
(212) 326-2000

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

FACTS ..................................................................................................................... 4

     A.    Lexmark Is a Market Leader in Printing Supplies. .................................. 4

     B.    Lexmark Has Limited Visibility into Channel Inventory. ........................ 5

     C.    The Complaint's Allegations ................................................................. 6

     D.    This Action ........................................................................................... 7

ARGUMENT ........................................................................................................... 8

    I.    THE COMPLAINT MUST PLEAD ITS CLAIMS WITH
        PARTICULARITY. ................................................................................. 8

    II.   THE COMPLAINT FAILS TO PLEAD AN ACTIONABLE
        MISLEADING STATEMENT. ................................................................. 9

     A.    The Complaint Pleads No Actionable Affirmative
           Misrepresentation. .............................................................................. 9

          1.   The Monthly Reports Support Defendants' Opinions. ................ 11

          2.   Other Companies' Slackening Demand Does Not
              Undermine Defendants' Opinion that Lexmark Was
              Experiencing Growing End-User Demand. ............................... 12

     B.    The Complaint Pleads No Actionable Omissions. .................................. 13

          1.   None of the Alleged Omissions Rendered Any of
              Defendants' Challenged Statements Misleading. ....................... 13

              a.   Market Demand ............................................................. 15

              b.   Effects of EMEA Price Harmonization ........................... 15

              c.   EMEA Laser Supplies Channel Inventories
                  Exceeded Ten Weeks. ..................................................... 16

              d.   Ineffective Efforts to Reduce Laser Supplies
                  Channel Inventory .......................................................... 17

          2.   Defendants Had No Statutory or Regulatory Disclosure
              Duty. ......................................................................................... 18

              a.   No trend ....................................................................... 18

              b.   No knowledge ............................................................... 19

              c.   No reasonable expectation of a material adverse
                  effect ............................................................................. 19

    III.  THE COMPLAINT FAILS ADEQUATELY TO PLEAD SCIENTER. ............. 21

     A.    The Complaint Alleges No Motive to Defraud. ..................................... 21

## TABLE OF CONTENTS
### (continued)

Page

B.   The Complaint Does Not Allege an Extreme Departure from the
Standards of Ordinary Care. ................................................................. 22

IV.   THERE IS NO CONTROL PERSON LIABILITY. .......................................... 23

V.   THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE. ............. 23

CONCLUSION ...................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007).................................................................................................8

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013)...............................................................13, 16, 20, 21

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)........................................................................................................13

*Billhofer v. Flamel Techs., S.A.*,
   No. 07 Civ 9920, 2012 WL 3079186 (S.D.N.Y. July 30, 2012) ...........................................14

*Blackmoss Inv. Inc. v. ACA Capital Holdings, Inc.*,
   No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010)...........................................19

*In re Carter-Wallace, Inc., Sec. Litig.*,
   220 F.3d 36 (2d Cir. 2000)...............................................................................................22

*In re CIT Group, Inc. Sec. Litig.*,
   349 F. Supp. 2d 685 (S.D.N.Y. 2004)................................................................................15

*City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
   No. 10 Civ. 2835, 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011)..........................................15

*In re Coty Inc. Sec. Litig.*,
   No. 14-CV-919, 2016 WL 1271065 (S.D.N.Y. March 29, 2016) ..........................................19

*Denny v. Barber*,
   576 F.2d 465 (2d Cir. 1978)...................................................................................4, 17, 23

*In re Duane Reade Inc. Sec. Litig.*,
   No. 02 CIV. 6478, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ...................................8, 11

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)..........................................................................................8, 9, 21

*In re Express Scripts Holding Co. Sec. Litig.*,
   No. 16 CIV. 3338, 2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) .............................................4

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
   No. 14 Civ. 0950, 2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015) ....................................10, 12

*In re Focus Media Holding Ltd. Litig.*,
   701 F. Supp. 2d 534 (S.D.N.Y. 2010)................................................................................19

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*In re Francesca's Holdings Corp. Sec. Litig.*,
   No. 13-CV-6882, 2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) .....................................20, 21

*Gillis v. QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016)..................................................................................22

*In re Hardinge*,
   696 F. Supp. 2d 309 (W.D.N.Y. 2010) ................................................................................17

*In re Jumei Int'l Holding Ltd. Sec. Litig.*,
   No. 14CV9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) ...................................................8

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)..........................................................................................22, 23

*Kapps v. Torch Offshore, Inc.*,
   379 F.3d 207 (5th Cir. 2004) ..............................................................................................19

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991)..................................................................................................4

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
   724 F. Supp. 2d 447 (S.D.N.Y. 2010)...................................................................................8

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014)......................................................................................9

*Medina v. Tremor Video, Inc.*,
   No. 13-cv-8364, 2015 WL 3540809 (S.D.N.Y. June 5, 2015) ..............................................10

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010)..............................................................................................................7

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015)...................................................................................................10, 11

*Pearlstein v. BlackBerry Ltd.*,
   93 F. Supp. 3d 233 (S.D.N.Y. 2015).....................................................................................19

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of*
   *Commerce*,
   694 F. Supp. 2d 287 (S.D.N.Y. 2010)...................................................................................22

*Pollio v. MF Glob., Ltd.*,
   608 F. Supp. 2d 564 (S.D.N.Y. 2009)...................................................................................10

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004).............................................................................13, 22

*S.E.C. v. First Jersey Sec., Inc.*,
101 F.3d 1450 (2d Cir. 1996)...................................................................................23

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801 (2d Cir. 1996) ..................................................................................9

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)..........................................................................................11

*Scibelli v. Roth*,
No. 98 CIV. 7228, 2000 WL 122193 (S.D.N.Y. Jan. 31, 2000)..............................15

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994).....................................................................................21

*In re Sierra Wireless, Inc. Sec. Litig.*,
482 F. Supp. 2d 365 (S.D.N.Y. 2007).........................................................17, 18, 23

*Silsby v. Icahn*,
17 F. Supp. 3d 348 (S.D.N.Y. 2014).....................................................................4, 16

*Steinberg v. Ericsson LM Tel. Co.*,
No. 07 CV. 9615, 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008)............................12

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008).....................................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).................................................................................................21

*Thesling v. Bioenvision, Inc.*,
374 F. App'x 141 (2d Cir. 2010) .............................................................................13

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016).....................................................................................12

*Vogel v. Sands Bros. & Co.*,
126 F. Supp. 2d 730 (S.D.N.Y. 2001).........................................................................9

*In re WEBMD Health Corp. Sec. Litig.*,
No. 11 Civ. 5382, 2013 WL 64511 (S.D.N.Y. Jan. 2, 2013)...................................22

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**Statutes**

15 U.S.C. § 78u-4 ..........................................................................................................1, 9, 21

28 U.S.C. § 1658(b) ...............................................................................................................7

**Other Authorities**

H.R. Rep. No. 104-369 (1995)...............................................................................................8

Management's Discussion and Analysis of Financial Condition and Results of
    Operations, Exchange Act Release No. 6835, 43 S.E.C. Docket 1330, 1989
    WL 1092885 (May 18, 1989) ..................................................................................18, 19, 20

**Regulations**

17 C.F.R. § 229.303 ............................................................................................................18

## PRELIMINARY STATEMENT[1]

Fraud claims require a knowing misrepresentation or omission of material fact.  Here, Plaintiff contends that the Defendants misled investors by (i) failing to disclose that Lexmark's steadily increasing laser-supplies revenues were attributable to growth in inventory held by Lexmark's distributors, and instead (ii) attributing the increase to end-user demand.  But the sole basis for the Complaint's allegations—the Monthly Reports that tracked this distributor, or "channel," inventory—demonstrate that Defendants' challenged statements were all accurate when made.  The Complaint also lacks any credible suggestion that Defendants knew their statements were false.  After three tries at pleading a claim, these defects mandate dismissal with prejudice.

This case concerns Lexmark's laser-supplies "channel inventory," product held by Lexmark's intermediate distributors and end-users.  Lexmark cannot measure channel inventory directly but instead estimates product movement using sophisticated models and limited information from its distributors.  Consequently, Lexmark did not report channel inventory in its public filings but occasionally discussed that information in response to analysts' and investors' inquiries.

---

[1] This brief refers to the terms Lexmark International, Inc. as "Lexmark" or the "Company," defendants Paul Rooke, David Reeder, and Gary Stromquist together as "Individual Defendants" and together with Lexmark as "Defendants," Plaintiff's Second Amended Complaint as "SAC" (cited as "SAC ¶ _"), the region covering Europe, the Middle East, and Africa as "EMEA," the Private Securities Litigation Act, codified at 15 U.S.C. § 78u-4 as the "PSLRA," and a series of monthly reports presented during monthly CEO calls referenced in paragraph 18 of the SAC as the "Monthly Reports."  All references to exhibits are to the accompanying April 2, 2018 declaration of William J. Sushon (the "Sushon Declaration," cited as "Sushon Decl.").  Unless otherwise specified, all quotations and citations are omitted and all emphasis is added.

The Complaint alleges that between August 2014 and July 2015 Lexmark executives intentionally concealed dramatic channel inventory increases and instead told investors that the Company's growing laser-supplies revenues stemmed from strong end-user demand. The Complaint also suggests that the Defendants knowingly "pulled forward" sales from other quarters by "channel-stuffing," a practice in which a company artificially inflates its revenues by engaging in sham sales at period-end to meet sales goals.

But the Complaint here does not allege any sham sales. Instead, it presents a textbook example of why Congress has required, since passing the PSRLA in 1995, that securities fraud plaintiffs plead particularized facts that (i) demonstrate that defendants' statements were false when made and (ii) give rise to a strong inference of fraudulent intent. Unlike most other securities-fraud plaintiffs trying to satisfy these stringent pleading requirements, Plaintiff does not rely on confidential witnesses who describe particularized facts that would show the material misstatement or omissions, Defendants' motive to commit fraud (such as suspicious insider stock sales), or a financial restatement that revealed a misrepresentation. Instead, the Complaint rests on a set of monthly internal management reports that, Plaintiff contends, indicate that Lexmark's channel inventory in its Europe, Middle East, and Africa, or EMEA, region had risen beyond Lexmark's internal target levels. Plaintiff does not explain how it allegedly came into possession of these reports, but based solely on them, the Complaint levels the serious charge of fraud against Lexmark and its former top executives. This effort fails to plead a misleading statement or omission, or scienter.

*No Misrepresentation or Omission.* The Complaint's flaw is evident from the face of the Monthly Reports on which it relies: Lexmark's *worldwide* channel inventory—the only channel inventory on which the Defendants commented during the class period—rose only slightly

during the putative class period (as Defendants readily disclosed) and never once exceeded Lexmark's alleged target range of six to ten weeks' laser supplies.  Thus, Defendants' statements about Lexmark's channel inventory were accurate.  Nor were Defendants' opinions about the reasons for Lexmark's increasing laser-supplies revenues actionably misleading.  Understanding that worldwide channel inventory was relatively flat, and knowing that laser-supplies revenues were outpacing channel inventory, Defendants reasonably believed that the Company's revenue growth was due to increased end-user demand.

The Complaint also fails to plead an actionable omission.  While the Complaint alleges that Defendants should have disclosed rising channel inventory in EMEA (which was just one subcomponent of worldwide inventory), Defendants' accurate statements about a different metric—worldwide channel inventory—gave rise to no duty to disclose information about EMEA channel inventory.

Nor was there any "trend" in EMEA channel inventory that could independently have required disclosure.  Item 303 of Regulation S-K requires disclosure only of *known* trends that are *reasonably* expected to have a *material* effect on a company's overall financial results.  But as the Monthly Reports show, there was no:

- *Trend*:  Lexmark's EMEA channel inventory routinely rose and fell from month to month.

- *Knowledge*:  since there was no trend, there was nothing for Defendants to know.

- *Reasonable expectation of a material effect*:  because increases in EMEA channel inventory were almost completely offset by decreases in inventory in its other regions, and Defendants expected that EMEA channel inventory would be drawn down by EMEA sell-out, it was not apparent to Defendants until July 2015 that EMEA channel inventory posed a potential issue for the Company.  And as soon as Defendants recognized that potential issue, they promptly disclosed it to the market and took the unusual step of adjusting analyst guidance mid-quarter.

*No Scienter*:  The Complaint makes no attempt to allege a motive to commit fraud.  Nor could it.  The Individual Defendants (all former Lexmark executives) all *lost* significant sums because they held their Lexmark stock alongside other investors as the price declined.  As such, the Complaint must accomplish the more difficult task of pleading facts giving rise to a strong inference of conscious misbehavior or recklessness.  But again, the Complaint's only alleged source is the Monthly Reports, which demonstrate that Defendants' statements were accurate.

At bottom, the Complaint simply alleges that Defendants should have recognized and disclosed before July 2015 that EMEA channel inventory would ultimately spike to an unsustainable level and materially impair Lexmark's financial results.  But this tactic—known as "fraud by hindsight"—has been condemned in the Second Circuit for nearly half a century. *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).  It should not be resurrected.

## FACTS[2]

### A.     Lexmark Is a Market Leader in Printing Supplies.

Lexmark is a leading developer, manufacturer, and supplier of printing, imaging, device management, and managed print services.  (*See* SAC ¶ 43.)  Lexmark's products include laser printers and associated services and supplies.  (*See id.*; *see also* Ex. B at 4.)

---

[2]     This section is drawn from (i) the Complaint's allegations, which are accepted as true solely for purposes of this motion, (ii) documents incorporated by reference or integral to the Complaint, and (iii) publicly available documents such as SEC filings.  *See, e.g., Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014).  These documents are also judicially noticeable because they are public filings or otherwise widely available documents, the authenticity of which is not in question.  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (taking judicial notice of SEC filings); *In re Express Scripts Holding Co. Sec. Litig.*, No. 16 CIV. 3338, 2017 WL 3278930, at *1 n.1 (S.D.N.Y. Aug. 1, 2017) (courts may judicially notice publicly-available information, such as earnings call transcripts).

**B.    Lexmark has limited visibility into channel inventory.**

Lexmark does not sell laser printer supplies directly to end users, but to distributors and intermediaries (sometimes called "channel partners") that in turn sell to end-users.  (*See* SAC ¶ 44.)  In many instances, there is more than one intermediary between Lexmark and its end-users.  (*See* SAC ¶¶ 8, 44.)  Lexmark refers to intermediaries' and end-users' inventory as "channel inventory."  (*See* SAC ¶ 8.)  Because this is not inventory on Lexmark's own shelves, the Company cannot directly measure it.  (*See* SAC ¶ 150 (acknowledging that Defendants used "very complex models" to estimate channel inventory).)  Instead, Lexmark relies on proprietary models, combined with information its direct purchasers provide, to estimate its channel inventory at any given time.  (*See* SAC ¶¶ 19, 63, 150.)  Notably, the Complaint does not allege either that these models were unreliable or that a better means of measuring channel inventory was available to the Company.

Lexmark repeatedly explained to investors that it could only estimate its channel inventory at any given time and that, unlike Lexmark's own inventories, the Company had no control over the amounts of Lexmark products its customers stockpiled.  (*See* SAC ¶ 89 ("the channel decides how much they want to hold."); Ex. G at 14 ("We don't control the channel.  We do our best to make these judgments."); Ex. A at 16 (warning about effects of excess inventory in the "reseller channel").)

One metric Lexmark used to gauge channel inventory was the estimated number of weeks it would take to sell that amount of inventory to customers.  (*See* SAC ¶ 8.)  Plaintiff alleges that Lexmark maintained an internal target range of 6 to 10 weeks' worth of worldwide laser supply channel inventory.  (*See id*.)  Plaintiff further alleges that Lexmark tracked its estimated channel inventory in the Monthly Reports  (*see* SAC ¶ 18), which show, for 2014 and the first half of 2015, worldwide channel inventory remaining generally flat until (as Defendants

5

disclosed)[3] posting a slight rise in the first half of 2015.[4]  Throughout the putative Class Period, worldwide channel inventory *never* rose above Lexmark's alleged 6-to-10 week target range. (*See* Ex. L at 16.)

### C.    The Complaint's Allegations

Notwithstanding the information to the contrary in the Monthly Reports, the Complaint nevertheless alleges that, beginning in August 2014, Lexmark started to experience steady increases in its channel inventory, yet falsely told investors that increased laser supplies sales stemmed from growing end-user demand.  (*See, e.g.* SAC ¶ 75 ("Defendants failed to disclose that the market demand for toner, . . . was decreasing, contrary to Defendants' statements that the Company was experiencing 'increased end-user demand.'").)  The Complaint further alleges that Defendants knew from the Monthly Reports that Lexmark's channel inventory was increasing to unsustainable levels.  (*See* SAC ¶ 18.)

The Complaint alleges that the so-called "truth" was disclosed on July 21, 2015, when Defendants told investors that "targeted efforts to reduce laser supplies channel inventory" (SAC ¶ 121) had been successful in North America, Latin America, and Asia Pacific (*see* Ex. I at 8), but that EMEA channel inventory remained "above expectation" (SAC ¶ 121).  Defendants therefore reduced Lexmark's revenue guidance for the remainder of 2015.  (*Id.*)

As the Monthly Reports show, however, the Complaint erroneously conflates worldwide channel inventory with channel inventory in the single EMEA region.  Specifically, Defendants' challenged statements—to the extent they discuss channel inventory at all—addressed

---

[3]  *See* SAC ¶¶ 93 ("[W]e're going to try to hold the channel flat"); 105 (quoting Defendants' April 28, 2015 disclosure that "we estimate that the laser supplies channel inventory increased slightly").

[4]  *See* Ex. L at 16.

Lexmark's worldwide channel inventory, whereas the Complaint's allegations all concern only EMEA, which was but one sub-component of worldwide channel inventory.  (*Compare* SAC ¶¶ 12–14, 16, 55–56, 139 *with* Ex. L at 16.)  As the reports show, worldwide channel inventories at all relevant times remained within the Company's alleged target zone until the end of the second quarter of 2015, when finalized data for the first time indicated that inventory levels had reached unsustainable levels, and Defendants promptly disclosed that fact.  (*See* Ex. L at 16.)

The Complaint is also devoid of any credible allegation that Defendants acted with the requisite scienter—i.e., that they were motivated to commit fraud or enjoyed any concrete benefit from their alleged fraud.  In fact, as substantial shareholders, the Individual Defendants suffered significant losses alongside the putative class following Lexmark's stock price decline.  (*See* Ex. D at 56; Ex. E at 64; Ex. F at 68.)

### D.    This Action

The Complaint represents the third attempt to state a viable securities fraud claim against the Defendants.  Oklahoma Firefighters Pension and Retirement System filed the original complaint on July 20, 2017 (ECF No. 1), only one day before the second anniversary of the alleged corrective disclosure, when even Plaintiff would have to acknowledge the claims would have been time-barred.  *See Merck & Co. v. Reynolds*, 559 U.S. 633, 638 (2010) (holding that two-year limitations period in 28 U.S.C. § 1658(b) runs from date of "discovery of the facts constituting the violation").  After winning lead plaintiff appointment (ECF No. 28), District No. 9, I.A. of M. & A.W. Pension Trust filed a consolidated amended complaint on November 28, 2017 (ECF No. 40).  After the parties filed pre-motion letters concerning Lexmark's proposed motion to dismiss (ECF Nos. 49, 53), Plaintiff availed itself of one last opportunity to amend (*see* ECF No. 63).

7

**ARGUMENT**

## I.   THE COMPLAINT MUST PLEAD ITS CLAIMS WITH PARTICULARITY.

A complaint does not state a claim for securities fraud unless it sufficiently alleges that defendants "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007); *see Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 458 (S.D.N.Y. 2010).  A securities fraud plaintiff must do more than simply satisfy Fed. R. Civ. P. 8's plausibility requirement.  *ATSI Commc'ns, Inc.*, 493 F.3d at 99.  Plaintiffs must also clear two additional hurdles—Fed. R. Civ. P. 9(b) and the PSLRA.  *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14CV9826, 2017 WL 95176, at *5 (S.D.N.Y. Jan. 10, 2017).

Rule 9(b) requires that "the circumstances constituting fraud" be pleaded "with particularity."  *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund*, 724 F. Supp. 2d at 458.  And in the PSLRA, Congress imposed further "stringent pleading requirements" to "curtail the filing of meritless lawsuits" by plaintiffs pursuing private securities fraud actions.  H.R. Rep. No. 104-369, at 41 (1995) (Conf. Rep.); *see also In re Duane Reade Inc. Sec. Litig.*, No. 02 CIV. 6478, 2003 WL 22801416, at *8 (S.D.N.Y. Nov. 25, 2003) ("[T]the PSLRA imposes new and more stringent requirements on plaintiffs alleging securities fraud.").  Thus, a securities fraud complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.  *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

The PSLRA also adopted a stringent pleading standard for scienter, requiring a complaint to "state with particularity facts giving rise to a strong inference" that the defendant intended to deceive, manipulate, or defraud. *See* 15 U.S.C. § 78u-4; *ECA & Local 134 IBEW Joint Pension Trust of Chi.*, 553 F.3d at 196. The Complaint fails to satisfy these stringent standards.

## II.   THE COMPLAINT FAILS TO PLEAD AN ACTIONABLE MISLEADING STATEMENT.

To plead an actionable misleading statement, Plaintiff must allege particularized facts showing that defendants (i) made a material misrepresentation that was false when made, or (ii) failed to disclose material information in dereliction of a legal duty. *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812–13 (2d Cir. 1996); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570–71 (S.D.N.Y. 2014). The Complaint does not do so.

### A.   The Complaint Pleads No Actionable Affirmative Misrepresentation.

The Complaint alleges affirmative misrepresentations concerning only one subject— Defendants' opinions for why Lexmark's laser supplies revenue was growing. (*See* SAC ¶¶ 74, 76, 95.) The Complaint simply quotes Defendants' statements on this score and then hypothesizes that laser supplies revenues were increasing not because of end-user demand, but because of inflated channel inventories. (*See, e.g.*, SAC ¶¶ 75 (alleging that statements about revenue were "materially false and misleading because Defendants failed to disclose that the market demand for toner, Lexmark's largest, most profitable laser supply, was decreasing"). But "coupl[ing] each statement with a conclusory allegation that it was false" is the type of "circular, speculatory and conclusory allegation[]" that is "inadequate to satisfy the PSLRA's and Rule 9(b)'s requirement of particularized pleading." *Vogel v. Sands Bros. & Co.*, 126 F. Supp. 2d 730, 738–39 (S.D.N.Y. 2001) (dismissing complaint for failure to "set forth sufficient reasons

explain[ing] why the statements were fraudulent"); *accord Pollio v. MF Glob., Ltd.*, 608 F. Supp. 2d 564, 570 (S.D.N.Y. 2009) (conclusory allegations that statements were misleading because company had "insufficient capital" and that its business "was weaker than represented" fell "woefully short" of PSLRA's particularity requirement).  For this reason alone, the Complaint fails to state a claim for an affirmative misrepresentation.

The Complaint's affirmative misrepresentation allegations fail for another, independent reason.  Where (as here) an alleged misrepresentation rests on an opinion or estimate, courts apply the framework in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015).  Under that construction, "a sincere statement of pure opinion is not an untrue statement of material fact, regardless whether an investor can ultimately prove the belief wrong."  *Id.* at 1327.  Statements of belief are therefore not false or misleading "just because external facts show the opinion to be incorrect."  *Id.* at 1328.  Instead, to allege adequately that an opinion was false, Plaintiff must plead (i) particularized facts that show that the belief was not honestly held, *id.* at 1327, or (ii) "facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Id.* at 1332. "That is no small task for an investor."  *Id.*  Satisfying this requirement requires Plaintiff to "(1) 'identify[] [in its complaint] one or more facts left out of [the] statement'; (2) show that the 'omitted fact would have been material to a reasonable investor'; (3) show that the omission renders the opinion misleading to a reasonable investor; and (4) consider the 'statement's context,' taking account of 'any [] hedges, disclaimers, or qualifications [the issuer] included in its registration statement.'"  *Medina v. Tremor Video, Inc.*, No. 13-cv-8364, 2015 WL 3540809, at *2 (S.D.N.Y. June 5, 2015) (quoting *Omnicare*, 135 S. Ct. at 1333) (alterations in original); *In*

*re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 Civ. 0950, 2015 WL 4931357, at *20 (S.D.N.Y. Aug. 19, 2015).  Plaintiff cannot satisfy this burden.

1.     The Monthly Reports Support Defendants' Opinions.

The very Monthly Reports on which Plaintiff relies demonstrate that Defendants' opinions concerning the reasons behind Lexmark's increasing laser supplies revenues both were subjectively believed and had a reasonable basis.  *See Omnicare, Inc.*, 135 S. Ct. at 1327.  In fact, Plaintiff does not even attempt to plead that the Defendants subjectively disbelieved any of the allegedly false statements.

Thus, under the *Omnicare* framework, the only way Plaintiff can demonstrate that Defendants' opinions constituted affirmative misrepresentations is if it can establish that Defendants' statements lacked a reasonable basis.  Plaintiff cannot.  To the contrary, the Monthly Reports provided a reasonable basis for Defendants' opinions, showing that Lexmark's worldwide laser supplies channel inventories were flat or only slightly increasing throughout virtually the entire putative class period,[5] while its laser supplies revenues remained strong.[6]  As the Complaint concedes, the models Lexmark used to estimate its laser supplies channel inventories were sophisticated tools that provided reasonably accurate results.  (*See* SAC ¶ 150 (discussing "very complex models" used to track channel inventory and forecast supplies business).)  Plaintiff therefore cannot contend that the Defendants' opinions based on those reports lacked a reasonable basis.  *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 544 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (opinions with "ample basis in fact" are not actionable); *In re Duane Reade*, 2003 WL 22801416, at *10 (management's

---

[5]     *See* Ex. L at 16.

[6]     *See* Ex. C at 37.

reviewing interim sales data was insufficient to plead defendants' awareness that "predictions for the entire quarter would prove false").

Moreover, in evaluating whether an opinion is actionable, courts also look to its context and whether it was accompanied by cautionary language.  *See In re Fairway Grp.*, 2015 WL 4931357, at *20 (dismissing under *Omnicare* claims based on belief statements where offering materials "identified numerous risks").  Here, Defendants repeatedly warned that they could neither measure channel inventory directly, nor control intermediaries' and end-users' consumption behavior.  *See* p. 5, *supra*.  This cautionary language underscores that Defendants' opinions concerning the reasons behind Lexmark's growing laser supplies revenues were not actionable.  *In re Fairway Grp.*, 2015 WL 4931357, at *20; *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016) (defendants' optimistic statements about FDA approval were not misleading in light of statements' context and investors' knowledge of FDA approval process).

> ### 2.  *Other Companies' Slackening Demand Does Not Undermine Defendants' Opinion that Lexmark Was Experiencing Growing End-User Demand.*

Plaintiff fares no better alleging that Defendants' opinions concerning Lexmark's end-user demand were inaccurate because competitor Hewlett Packard ("HP") disclosed decreased product demand.  Indeed, "there is little basis to assume that a decline in projected revenue for [the defendant's] competitors would necessarily lead to a decline in [the defendant's] projected revenues as well," especially "where companies are competing with each other for market share."  *See Steinberg v. Ericsson LM Tel. Co.*, No. 07 CV. 9615, 2008 WL 5170640, at *15 (S.D.N.Y. Dec. 10, 2008).  Based on the information available, it was just as reasonable for Defendants to conclude that Lexmark was enjoying increased revenues because it was increasing its market share at HP's expense.  (*See* Ex. K at 6 (noting that "a lot of what we're taking" are "share gains" from HP and Xerox)); *Steinberg*, 2008 WL 5170640, at *15.   After all, corporate

executives are not expected to take a "gloomy, fearful, or defeatist view of the future." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

### B.    The Complaint Pleads No Actionable Omissions.

While the Complaint also alleges that Defendants improperly omitted a laundry list of information from their public statements, these alleged omissions all boil down to the meritless suggestion that Lexmark allegedly was experiencing increases in EMEA channel inventory so profound that they would inevitably cause material deterioration in the entire company's future financial results. *See* p. 6, *supra*. "Silence, absent a duty to disclose, is not actionable under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Such a disclosure duty may arise either "as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts," or "expressly pursuant to an independent statute or regulation." *Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010). Here, the Complaint tries to conjure a disclosure duty by (i) suggesting that Defendants' statements about worldwide channel inventory somehow required them to speak about one particular region; and (ii) contending that increasing EMEA channel inventories were a "known trend or uncertainty" that Defendants must have expected to have a "material . . . unfavorable impact on net sales or revenues or income from continuing operations" under Regulation 303 of Item S-K. Neither duty applies.

### 1.    None of the Alleged Omissions Rendered Any of Defendants' Challenged Statements Misleading.

"[A] corporation is not required to reveal all facts on a subject just because it reveals a single fact." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 581–82 (S.D.N.Y. 2013). Applying this rule, courts have rejected attempts to parlay "[b]road statements

about a company's business" into actionable omissions.  *See Billhofer v. Flamel Techs., S.A.*, No. 07 Civ. 9920, 2012 WL 3079186, at *10 (S.D.N.Y. July 30, 2012).

Plaintiff contends that Defendants omitted the following four facts from their public statements, allegedly rendering those statements misleading:

1.  Market demand for laser printer toner was decreasing;[7]

2.  Lexmark EMEA price harmonization actions in the last two quarters of 2014 and first quarter of 2015 had caused Lexmark's customers to buy ahead, increasing EMEA channel inventories;[8]

3.  Lexmark's laser supply channel inventory for the single EMEA region exceeded the Company's alleged ten-week guideline;[9]

4.  Efforts Lexmark had undertaken to reduce its EMEA channel inventory were unsuccessful.[10]

As shown below, none of these alleged omissions rendered any of the Defendants' challenged statements misleading.[11]

---

[7]   *See* SAC ¶ 75 ("Defendants failed to disclose that the market demand for toner, Lexmark's largest, most profitable laser supply, was decreasing, contrary to Defendants' statements that the Company was experiencing 'increased end-user demand.'").

[8]   *See* SAC ¶¶ 77 ("Defendant Rooke failed to disclose that as a result of price harmonization actions in 3Q14, Lexmark sold laser supplies inventory to its EMEA distributors and channel partners in excess of normal levels, causing Lexmark's weeks of laser supplies channel inventory to be elevated beyond acceptable levels."); 87 (same); 90 (alleging price harmonization in 3Q14 and 4Q14 resulted in excess channel inventory); 99 (same); 102 (noting price harmonization in 3Q14, 4Q14, and 1Q15 resulting in excess channel inventory); 113 (same); 117 (same).

[9]   *See* SAC ¶¶ 75 (alleging that Defendants failed to disclose increase in EMEA channel inventory levels); 77 (same); 90 (alleging that Lexmark had experienced two consecutive quarters of EMEA laser supplies inventory above 10 weeks by December 2014); 99 (alleging EMEA channel inventory was 12.7 weeks in 4Q14); 102 (same); 113 (alleging EMEA channel inventory was at "approximately 12.8 weeks" by the end of 1Q15).

[10]  *See* SAC ¶¶ 24 (alleging that EMEA channel inventory levels remained above 10 weeks after targeted efforts to reduce levels); 117 (alleging that "targeted efforts" to reduce channel inventory were "unsuccessful"); 121 (same); 123 (same).

[11]  While the Complaint also alleges that the statements were misleading for failing to disclose that Lexmark's increased revenues were the product of laser-supplies channel-inventory

### a.    Market Demand

As discussed above, the mere fact that one competitor was experiencing decreased market demand did not mean that Lexmark executives should have known—much less disclosed—that Lexmark was likewise experiencing weak demand.  *See* pp. 12–13, *supra*.  Since this allegedly omitted "fact" was not a known fact at all, there was no duty to disclose it.  *Scibelli v. Roth*, No. 98 CIV. 7228, 2000 WL 122193, at *3 (S.D.N.Y. Jan. 31, 2000) ("Since it cannot be reasonably inferred that the defendants had the allegedly omitted data at the time the prospectus was issued, it is not even necessary to determine whether the defendants were even *required* to disclose such information.") (emphasis in original).  *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690–91 (S.D.N.Y. 2004) (later revision of loan loss reserves provided no reasonable basis to conclude defendants earlier believed reserves were inadequate).

### b.    Effects of EMEA Price Harmonization

Defendants explicitly disclosed that Lexmark was taking steps to harmonize prices in the EMEA region and that those measures could affect channel inventory.  For example, during an October 21, 2014 call Mr. Rooke disclosed, "[w]e always look to harmonize supplies prices, particularly with the volatility and the currency here.  We will do that as needed."  (SAC ¶ 85, *see also id.* ¶¶ 88, 114.)  The market understood that "channel inventory often increases ahead of price harmonization."  (*See* Ex. H at 7 (noting increase in channel inventory as a result of price harmonization).)  And Defendants expressly disclosed in SEC filings the risks of currency fluctuations on its financial results.  (*See, e.g.*, Ex. A at 15 (warning that foreign currency

---

growth, and not strong end-user demand, this is merely the mirror-image of its misrepresentation allegations discussed above and fails for the same reasons.  *See* pp. 9–13, *supra*.  *City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10 Civ. 2835, 2011 WL 4357368, at *19 (S.D.N.Y. Sept. 19, 2011) (dismissing failure-to-disclose allegations because they were the "mirror image" of inadequately pleaded misstatements about capital adequacy).

changes could "adversely impact" financial results); Ex. C at 26 (same).)  After making these appropriate disclosures, Defendants had no further obligation to provide additional information about the potential effect of price harmonization on channel inventory.  *See, e.g., Silsby*, 17 F. Supp. 3d at 361 (energy company had no further obligation to disclose particulars of asset transfer after issuing public statements about refinancing and restructuring plans); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 583–84 (no duty to disclose imminence and magnitude of potential mortgage-backed security lawsuit after generally disclosing litigation risks from sales of mortgage-backed securities).

Notably, the Complaint nowhere alleges that Defendants breathed a word to investors about EMEA channel inventory during the putative class period.  Rather, Defendants' channel inventory remarks concerned *worldwide* channel inventory, not region-specific information. Defendants nevertheless disclosed during the proposed class period (in April 2015) that Lexmark "estimate[d] that the laser supplies channel inventory increased slightly" because "as experienced in the first quarter, channel inventory often increases ahead of price harmonization." (*See* SAC ¶ 105.)  Having made this accurate and timely disclosure, Defendants had no obligation to say more.  *See Silsby*, 17 F. Supp. 3d at 361; *In re Bank of Am. AIG Discl. Sec. Litig.*, 980 F. Supp. 2d at 583.

### c.    EMEA Channel Inventories Exceeded Ten Weeks

As discussed above, Defendants' statements to investors concerning laser supplies channel inventory solely concerned worldwide—not EMEA—channel inventories.  *See* pp. 6–7, *supra.*  As the Monthly Reports show, Lexmark's laser supplies channel inventory levels varied widely by region.  (*See* Ex. L at 16.)  For example, in January 2015, channel inventory (measured in weeks) was 3.7 in the United States, 5.0 in Asia Pacific and Latin America regions, 6.1 in Canada, and 9.3 in EMEA, while worldwide channel inventory was only 5.9 weeks—

below the six- to ten-week guideline that Plaintiff alleges Lexmark adopted for worldwide

channel inventory.  *See id.*

Defendants' statements about worldwide channel inventory did not obligate them to

speak about EMEA channel inventory because, when a company speaks about one region, it has

no obligation to speak about others.  In *In re Hardinge*, for example, the plaintiff argued that a

company's statements that it was transitioning to direct sales in three regions was misleading

because it falsely implied that the transition was limited to those three regions.  696 F. Supp. 2d

309, 322 (W.D.N.Y. 2010).   The district court rejected this argument, holding that "no

reasonable investor would have been misled by the press release to believe that [the company]

would not seek to increase direct sales capacity in other regions."  *Id.*  To hold otherwise would

violate the long-established rule that revealing one fact does not obligate one to reveal "all others

that, too, would be interesting."  *Id.*

> ### d.     Ineffective Efforts to Reduce Laser Supplies Channel Inventory

Plaintiff also attempts to manufacture an actionable omission based on Defendants'

allegedly ineffective efforts to reduce channel inventory.  But the Second Circuit has long held

inadequate such fraud-by-hindsight pleading.  *See In re Sierra Wireless, Inc. Sec. Litig.*, 482 F.

Supp. 2d 365, 367 (S.D.N.Y. 2007); *Denny*, 576 F.2d at 470.   The Complaint nowhere alleges

that Defendants suspected, much less knew, that their planned channel inventory reduction

efforts would not work, and makes no attempt to explain why it was unreasonable for Defendants

to believe that they would.  Indeed, the planned reduction did occur in North America, Latin

America, and Asia Pacific.  (*See* Ex. I at 8.)  When it first became apparent that the planned

reduction left EMEA "inventory levels above expectation," Defendants promptly disclosed this

fact.  (SAC ¶ 121.)  Simply because Defendants' experienced-based "expectation" that EMEA

17

channel inventory would fall into line did not ultimately hold does not allow Plaintiff "to assert serious allegations of fraud based on the perfect hindsight afforded by the passage of time." *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d at 367.

### 2. *Defendants Had No Statutory or Regulatory Disclosure Duty.*

The Complaint also alleges that Item 303 of Regulation S-K supplies a disclosure duty. But that regulation requires companies to disclose only "*known* trends or uncertainties" that "*have had* or that the registrant reasonably expects *will have* a *material* . . . unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303. There is no duty to disclose under Item 303 unless there is "[1] a trend, demand, commitment, event or uncertainty [that] is both [2] presently known to management and [3] reasonably likely to have material effects on the registrant's financial condition or results of operations." Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Release No. 6835, 43 S.E.C. Docket 1330, 1989 WL 1092885, at *4 (May 18, 1989). Here, Plaintiff fails on all three counts—there was no trend, there was no knowledge, and there was no reasonable expectation of a material adverse effect.

### a. No trend

As the Monthly Reports make clear, Plaintiff cannot demonstrate there was an identifiable trend at any time until the third quarter of 2015. Even though monthly EMEA inventory levels may have been volatile, they never exceeded alleged target levels for two consecutive months. (*See* Ex. L at 16 (showing monthly laser channel inventory for EMEA was in the alleged optimal range for 10 out of 14 quarters from 2014 through February 2015 and never above the alleged optimal range for more than two consecutive months).) And worldwide channel inventory levels *never* exceeded that alleged optimal range. (*See id.*) Where, as here, there necessarily is volatility in the market place, even a five-month period is insufficient to

establish a trend.  *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015) ("The

two- and five-month periods preceding defendants' public filings were insufficient to establish a

reportable trend in device performance given the pleaded volatility of the smartphone market.");

*Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 218 (5th Cir. 2004) (in volatile market, five-month

"decline in natural gas prices [did] not yet constitute[] a trend" requiring disclosure).  Indeed,

courts have recognized that a system of "instantaneous disclosure" would be "unworkable and

potentially misleading."  *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 540

(S.D.N.Y. 2010); *see also Blackmoss Inv. Inc. v. ACA Capital Holdings, Inc.*, No. 07 Civ. 10528,

2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a two-month period of

time does not establish a 'trend' for purposes of the disclosures required by Item 303.").  Thus,

the short-term EMEA inventory fluctuations reflected in those reports did not, as a matter of law,

constitute a trend for purposes of Item 303.  *Pearlstein*, 93 F. Supp. 3d at 245; *Blackmoss Inv.

Inc.*, 2010 WL 148617, at *10.

### b.   No knowledge

Nor does the Complaint point to any source from which Defendants could have detected

a trend; the Monthly Reports affirmatively *refute* that contention.  For the independent reason

that the facts known to Defendants were inconsistent with the alleged trend, there can be no

disclosure duty under Item 303.  *In re Coty Inc. Sec. Litig.*, No. 14-CV-919, 2016 WL 1271065,

at *6 (S.D.N.Y. March 29, 2016) (no known trend when company's revenue was actually

increasing until sharp downturn just before IPO).

### c.   No reasonable expectation of a material adverse effect

A complaint must also plead facts separately demonstrating that the known trend was

"reasonably likely to have material effects on the registrant's financial condition or results of

operations."  Management's Discussion and Analysis of Financial Condition and Results of

Operations, Exchange Act Release No. 6835, 1989 WL 1092885, at *4.  Where, as here, the disclosure would require "anticipating a future trend or event or anticipating a less predictable impact of a known event, trend or uncertainty," Item 303 does not require disclosure.  *Id.*  Courts have therefore dismissed cases where the speculative nature of a future loss would make it difficult to determine whether "any loss would ever be material."  *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 585; *see also In re Francesca's Holdings Corp. Sec. Litig.*, No. 13-CV-6882, 2015 WL 1600464, at *18 (S.D.N.Y. Mar. 31, 2015) (plaintiffs did not "plausibly allege a change of circumstance that the Company should have reasonably expected would have a material impact on its financials" for purposes of Item 303).

The Complaint's exclusive focus on EMEA laser-supplies channel inventory levels is not enough to demonstrate a reasonable likelihood that any increases in that one sub-segment would materially affect the Company as a whole.  In fact, the Complaint tellingly omits what the Monthly Reports make clear—that Lexmark experienced offsetting laser-supply channel-inventory *decreases* in its other regions, such that the Company's worldwide channel inventory remained relatively flat—and at all relevant times well within the range that Plaintiff alleges was optimal for Lexmark.  (*See* Ex. L at 16.)  It was therefore reasonable to expect that EMEA channel inventory would come back into line without materially inflating worldwide channel inventory.  As Defendants disclosed during the putative class period, Lexmark was taking "a long list of actions … to improve laser profitability," including price actions on supplies.  (SAC ¶ 111; *see also* ¶ 88.)  This was also consistent with the projections in the Monthly Reports showing that Lexmark set steady goals to reduce EMEA channel inventory.  (*See* Ex. J at 15 (noting goal to reduce EMEA channel inventory to 10.9 weeks).)  Simply put, Defendants' public statements, as catalogued in the Complaint, demonstrate their reasonable belief that any

20

EMEA channel inventory issues could be resolved without materially adversely affecting the Company's overall financials and therefore "it could not be determined that any loss would ever be material." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 585; *see also In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *18.

## III.    THE COMPLAINT FAILS ADEQUATELY TO PLEAD SCIENTER.

To plead securities fraud, a complaint also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4. "A complaint will survive [dismissal] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The required state of mind is an intent "to deceive, manipulate, or defraud." *ECA & Local 134 IBEW Joint Pension Trust of Chi.*, 553 F.3d at 193, 198. Scienter can be established by alleging facts showing either (1) that Defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *See id.* While courts typically draw inferences in favor of plaintiffs, they must not do so with regard to allegations of scienter in a federal securities fraud case. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (dismissing complaint because it failed to raise an inference of scienter "at least as compelling" as the competing one).

### A.    The Complaint alleges no motive to defraud.

Plaintiff alleges no motive for Defendants' alleged misrepresentations, such as suspiciously timed or sized trades that could lead to a "strong inference" of scienter needed to survive a motion to dismiss under the PSLRA. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1131 (2d Cir. 1994) (absent insider trading allegations, "stock ownership does not provide sufficient motive" to support allegation that defendants concealed and misrepresented company's

financial condition to protect their executive positions and compensation); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600–01 (S.D.N.Y. 2016) ("Absent allegations of insider sales during the period of stock-price inflation, there would be no concrete benefit to defendants."). And where, as here, defendants actually *lost* significant sums as a result of the alleged fraud, it undermines any scienter inference because Defendants "share[d] the pain when the company failed." *Rombach*, 355 F.3d at 177. And Defendants' voluntary mid-quarter adjustment of guidance further undermines any scienter inference. *In re WEBMD Health Corp. Sec. Litig.*, No. 11 Civ. 5382, 2013 WL 64511, at *13 (S.D.N.Y. Jan. 2, 2013) ("That Defendants repeatedly adjusted the revenue guidance as the year progressed further evinces a nonfraudulent intent.").

### B.  The Complaint Does Not Allege "an Extreme Departure from the Standards of Ordinary Care."

Given its failure to allege a motive and opportunity to commit fraud, Plaintiff must rely on allegations of conscious misbehavior or recklessness, which imposes a "correspondingly greater" burden. *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). "To survive dismissal under the 'conscious misbehavior' theory," Plaintiff must allege conduct that is "highly unreasonable and [that] represents an extreme departure from the standards of ordinary care." *In re Carter-Wallace, Inc., Sec. Litig.,* 220 F.3d 36, 39 (2d Cir. 2000). The requisite state of mind is one "approximating actual intent and not merely a heightened form of negligence." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 297 (S.D.N.Y. 2010). The Complaint does not come close to meeting this exacting standard.

Aside from the Monthly Reports—which as shown above actually disprove Plaintiff's theory—the Complaint does not rely on a single witness (much less a knowledgeable one) or other source to plead that Defendants actually knew that their statements were false. Indeed, as

demonstrated above, the Monthly Reports were entirely consistent with Defendants' statements, reflecting flat to only slightly increasing worldwide channel inventory.  *See* pp. 5–7, *supra*. Thus, the reports raise no inference of scienter, let alone the strong one the PSLRA requires. *Kalnit*, 264 F.3d at 144 (affirming dismissal of complaint for failing to allege strong circumstantial evidence of recklessness).

## IV.    THERE IS NO CONTROL PERSON LIABILITY.

Because the Complaint fails to allege a primary violation, its control-person claims against the individual defendants should be dismissed.  *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d at 382.

## V.    THE COURT SHOULD DISMISS WITH PREJUDICE.

This is Plaintiff's third fruitless attempt to state a claim for securities fraud.  Thus, as the Court warned plaintiff at the pre-motion conference, dismissal should be with prejudice.  *Denny*, 576 F.2d at 471 (disallowing amendment because court's prior ruling gave plaintiff "the plainest notice of what was required" and defects in amended complaint were either "the fault of counsel or because there was simply no basis for a proper complaint").

**CONCLUSION**

Three times is not the charm.  The only particularized fact Plaintiff musters in the latest iteration of the Complaint to support falsity or scienter is the existence of the Monthly Reports. Because those reports refute, not support, the Complaint's theory, Plaintiff fails to state a claim, and the Complaint should be dismissed with prejudice.

Dated: April 2, 2018                         Respectfully submitted,
      New York, NY

                                  /s/ *William J. Sushon*
                                  William J. Sushon
                                  Stuart Sarnoff
                                  O'MELVENY & MYERS LLP
                                  7 Times Square
                                  New York, New York  10036
                                  (212) 326-2000

                                  *Attorneys for Defendants*