UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

OKLAHOMA FIREFIGHTERS PENSION
AND RETIREMENT SYSTEM, Individually
and on Behalf of All Others Similarly Situated,

                     Plaintiff,

    vs.

LEXMARK INTERNATIONAL, INC., PAUL
A. ROOKE, DAVID REEDER, GARY
STROMQUIST and MARTIN S. CANNING,

                  Defendants.

——————————————————— x

Civil Action No. 1:17-cv-05543-WHP

CLASS ACTION

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF THE FRAUD..................................................1

II.   ARGUMENT ..............................................................................................................2

    A.    Plaintiff Adequately Pleads Materially Misleading Statements and
        Omissions.........................................................................................................3

        1.    The Complaint adequately pleads material misstatements regarding
                Lexmark's channel inventory levels, laser supplies revenues, and
                price harmonization actions ..........................................................3

                a.    Defendants made demonstrably false statements concerning
                        channel inventory levels ...............................................4

                b.    Defendants misrepresented the reason that laser supplies
                        revenue increased..........................................................7

                c.    Defendants misrepresented the impact of Lexmark's price
                        harmonization actions ...................................................8

                  d.    Defendants' statements regarding end-user demand were
                        not statements of opinion ...............................................9

               2.    The Complaint adequately pleads actionable omissions .........................11

                a.    Defendants had a duty to ensure their statements about
                        current inventory levels were not misleading ...............................11

                  b.    Defendants had a duty to disclose unusual inventory levels
                        under Item 303 of SEC Regulation S-K .......................................15

                      (1)    Plaintiff sufficiently alleges that elevated EMEA
                          inventory levels constituted an "unusual event" or
                          "trend" under Item 303 ................................................15

                      (2)    Defendants Had Knowledge of the Trend in EMEA
                          Inventory.......................................................................18

                      (3)    The EMEA laser supplies inventory build-up was
                          reasonably likely to be material .........................................19

    B.    Plaintiff Adequately Pleads a Strong Inference of Scienter................................20

    C.    Plaintiff Properly States a Claim Under Section 20(a) .........................................25

III.   CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Basic v. Levinson*,
    485 U.S. 224 (1988)..................................................................................11

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
    No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010)............................18

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002).................................................................8

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)........................................................20

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
    No. 12-cv-0256 (LAK), 2016 WL 6652731 (S.D.N.Y. Nov. 10, 2016)................................10

*Cortec Indus., Inc. v. Sum Holdings L.P.*,
    949 F.2d 42 (2d Cir. 1991)..................................................................6

*Emps.' Ret. Sys. of Gov't of the V. I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)..............................................................6, 19

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...........................................4, 6, 14, 15, 21

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)..........................................................4

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004).........................................................24

*In re Braskem S.A. Sec. Litig.*,
    No. 15 Civ. 5132 (PAE), 2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017) ...........................6

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)........................................................8, 9

*In re Carter-Wallace, Inc., Sec. Litig.*,
    220 F.3d 36 (2d Cir. 2000).................................................................22

*In re Coty Inc. Sec. Litig.*,
    No. 14-cv-919 (RJS), 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016)......................18

**Page**

*In re CPI Card Grp., Inc. Sec. Litig.*,
   No. 16-cv-4531 (LAK), 2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017)............................16, 17

*In re Delcath Sys., Inc. Sec. Litig.*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014)..................................................................................22, 25

*In re Duane Reade Inc. Sec. Litig.*,
   No. 02 Civ. 6478(NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ............................10

*In re Focus Media Holding Ltd. Litig.*,
   701 F. Supp. 2d 534 (S.D.N.Y. 2010)....................................................................................18

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012)...................................................................................7, 8

*In re Hardinge, Inc. Sec. Litig.*,
   696 F. Supp. 2d 309 (W.D.N.Y. 2010) ...................................................................................14

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   No. 12 Civ. 8557(CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013).......................................8

*In re MBIA, Inc., Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010)......................................................................................4

*In re Mylan N.V. Sec Litig.*,
   No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)...................................12

*In re Nevsun Res. Ltd.*,
   No. 12 Civ. 1845(PGG), 2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013) ................................21

*In re Revlon, Inc. Sec. Litig.*,
   No. 99 Civ. 10192(SHS), 2001 WL 293820 (S.D.N.Y. Mar. 27, 2001) .................................22

*In re Salix Pharm., Ltd.*,
   No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ...................... *passim*

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015) .....................................................................................11

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).....................................................................................................24

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)...................................................................................................12

**Page**

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016) ........................................................................15, 19

*Kapps v. Torch Offshore, Inc.*,
   379 F.3d 207 (5th Cir. 2004) .....................................................................17, 18

*Kleinman v. Elan Corp.*,
   706 F.3d 145 (2d Cir. 2013) ..............................................................................3

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011) .......................................................15, 17, 19, 20

*Matrixx Initiatives v. Siracusano*,
   563 U.S. 27 (2011) ......................................................................................3, 22

*McKenna v. SMART Techs.*,
   No. 11 Civ. 7673(KBF), 2012 WL 3589655 (S.D.N.Y. Aug. 21, 2012) ...............20

*Meyer v. JinkoSolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014) ............................................................................11

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
   455 Fed. App'x. 10 (2d Cir. 2011) ...............................................................13, 23

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ................................................................20, 21, 22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ......................................................................................9

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*,
   595 F.3d 86 (2d Cir. 2010) ..............................................................................13

*Pearlstein v. BlackBerry Ltd.*,
   93 F. Supp. 3d 233 (S.D.N.Y. 2015) ...............................................................17

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
   Commerce*,
   694 F. Supp. 2d 287 (S.D.N.Y. 2010) .........................................................22, 23

*Podany v. Robertson Stephens, Inc.*,
   318 F. Supp. 2d 146 (S.D.N.Y. 2004) ...............................................................10

Page

*SEC v. Gabelli*,
653 F.3d 49 (2d Cir. 2011), *rev'd on other grounds*, *Gabelli v. SEC*, 133 S. Ct.
1216 (2013) ............................................................................................................3

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008)...................................................................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..............................................................................2, 3, 20, 21

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§78j(b)...................................................................................................................1, 3
§78t(a)......................................................................................................................25

Federal Rules of Civil Procedure
Rule 9(b) ...................................................................................................................3
Rule 12(b)(6)............................................................................................................2

17 C.F.R.
§229.303(a)(3) .......................................................................................................15
§240.10b-5 ................................................................................................................3

Lead Plaintiff District No. 9, I.A. of M. & A.W. Pension Trust ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss the Complaint ("Motion" or "Mot.") [ECF Nos. 65, 66].[1]

## I.   INTRODUCTION AND SUMMARY OF THE FRAUD

This securities fraud action seeks to recover damages resulting from Defendants' false and misleading statements and omissions regarding a critical source of Lexmark's revenue, laser printer supplies, and related channel inventory levels.  Defendants concede that the Complaint sufficiently pleads materiality, reliance, economic loss and loss causation as required by Section 10(b) and the PSLRA, only arguing it fails to plead falsity or scienter.  *See* Mot. at 2, 4.  Defendants are wrong.

Defendants' own exhibits demonstrate why their arguments for dismissal fall short.  In support of their Motion, Defendants submitted two non-public, internal presentations that Defendants utilized as part of their monthly CEO Calls.[2]  In particular, Exhibit L establishes that Lexmark's worldwide ("WW") and Europe, Middle East, and Africa ("EMEA") laser supplies channel inventory levels rapidly and substantially increased throughout the Class Period, at points swelling 45% (WW) and 70% (EMEA) higher than the prior year's inventory levels.  Despite having actual knowledge of clear data demonstrating that laser supplies channel inventory levels were growing at a breakneck and unsustainable pace, including in the critical EMEA market, Defendants repeatedly and falsely assured investors that laser supplies channel inventory levels were "flat" or

---

[1]   Defendants are Lexmark International, Inc. and "Individual Defendants" Paul A. Rooke, David Reeder, and Gary Stromquist.  The "Complaint" is ECF No. 63 and is cited as "¶__."

[2]   *See* ECF No. 67, Exh. J (Jan. 21, 2015, EMEA CEO Review presentation), Exh. L (July 2015 "EMEA CEO Review" presentation); *see also* ¶¶17-18, 54-56 (describing the monthly CEO Calls).  Although the CEO Calls occurred on a monthly basis, Defendants submitted only two presentations to the Court.  Plaintiff challenges Defendants' factual interpretation of Exhibits J and L, but asks that the Court consider both documents insofar as they reflect data that was available to the Defendants each month throughout the Class Period, support the Complaint's allegations, and directly contradict Defendants' public statements about channel inventory levels.

"neutral," and that any year-to-year elevation was "slight."  ¶¶9-10, 59.

As Defendants concealed the truth from investors, Lexmark's laser supplies channel inventory levels grew exponentially during the Class Period.  But because Lexmark booked revenue from laser supplies sales upon shipment to channel partners, the reported increase in laser supplies revenue made it appear publicly that Lexmark was experiencing sustainable growth in its critical, high-margin laser supplies business.  ¶¶77, 87, 90, 99, 102, 113, 117, 138-141.  Defendants encouraged this misimpression, persistently attributing increased sales to strong end-user demand.  ¶¶59, 74, 76, 78-86, 88-89, 91-98, 100-101, 103-112, 114-116.  Their false statements and omissions concealed that Lexmark's EMEA channel partners were stockpiling excess laser supplies inventory in advance of price increases resulting from Lexmark's "price harmonization" strategy and, as a result, Lexmark was inflating its reported quarterly revenue at the expense of the Company's future financial performance.  ¶¶59, 77, 87, 90, 99, 102, 113, 117, 138-141.

Defendants' fraud caught up to them.  On July 21, 2015, Defendants disclosed surprisingly negative financial results for 2Q15 and forecasted materially lower revenue and EPS for the remainder of the year, pointing to the need to "drawdown" excess laser supplies channel inventory by as much as $50-$70 million, primarily in EMEA.  ¶¶118-129.  Analysts called the magnitude of the surprising inventory reduction "staggering," questioned management's credibility, and noted that the drawdown suggested that Lexmark's 2014 supplies growth may have been inflated "by as much as 5%."  ¶126.  In the wake of Defendants' unexpected announcement, Lexmark stock dropped more than 20%, causing substantial losses to Plaintiff and the putative class.  ¶¶125, 129.

## II.   ARGUMENT

Under Rule 12(b)(6), the Court must consider the Complaint in its entirety, "accept all factual allegations . . . as true," and construe them in the light most favorable to Plaintiff.  *Tellabs, Inc. v.*

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).[3]  In order to establish a violation of Section 10(b) and Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *See Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 37-38 (2011). Defendants contest only the first and second elements.

      **A.**      **Plaintiff Adequately Pleads Materially Misleading Statements and Omissions**

       Under Rule 10b-5, it is unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. §240.10b-5.  A fact is material under Section 10(b) "when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Matrixx*, 563 U.S. at 38.  The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."  *Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013).  Indeed, "the law is well settled . . . that so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud."  *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, *Gabelli v. SEC*, 133 S. Ct. 1216 (2013).

      **1.**      **The Complaint adequately pleads material misstatements regarding Lexmark's channel inventory levels, laser supplies revenues, and price harmonization actions**

       To adequately plead a false statement under Rule 9(b), a plaintiff must: (1) specify the statements that the plaintiff contends were false; (2) identify the speaker; (3) state where and when

---

[3]   Internal citations are omitted, and emphasis is added, unless otherwise noted herein.

the statements were made; and (4) explain why the statements were false. *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 577-78 (S.D.N.Y. 2010). Falsity may be established by allegations of contemporaneous facts inconsistent with the defendant's public statements. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010). Statements are actionably false if they "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005).

The Complaint satisfies these standards by identifying false statements made during the Class Period and explaining why those statements were false when made. Defendants' materially false statements fall into the following three categories: (1) statements regarding changes in channel inventory levels (¶¶82-83, 87, 92-94, 99-100, 102, 105, 113, 116-117); (2) statements regarding Lexmark's laser supplies revenue growth in 2Q14, 3Q14, 4Q14, and 1Q15 (¶¶74-81, 85-92, 94-99, 105, 107-108, 112-113); and (3) statements regarding price harmonization actions taken by the Company (¶¶85, 87-88, 90, 101-102, 105, 111, 113).

These statements of current and historical fact are actionable because, as detailed in the Complaint, Defendants: (1) expressly stated that channel inventory levels were flat or only slightly elevated when, in fact, WW levels were rapidly growing and EMEA levels were inflated to unacceptable levels that threatened Lexmark's financial performance as a whole (¶¶87, 99, 102, 117); (2) touted end-user demand as the primary driver of current revenue growth when demand was actually decreasing and channel inventories were rising (¶¶75, 77, 87, 90, 99, 113.); and (3) engaged in significant price harmonization actions in 3Q14, 4Q14, and 1Q15 while downplaying the scope and impact of such efforts (¶¶87, 90, 102, 113).

### a. Defendants made demonstrably false statements concerning channel inventory levels

Throughout the Class Period, Defendants represented that Lexmark's year-to-year laser

supply channel inventory levels were "neutral" or "slightly" changed, assuring investors that any increases were immaterial to the Company's finances.  *See* ¶¶59, 82-84, 92, 100, 105-106.  For example, during Lexmark's 3Q14 earnings call, Defendant Stromquist reassured investors that 3Q14 laser supplies inventory had grown only by about "1 percentage point," which was expected to have a "minimal impact" on year-to-year growth rates in the 4Q14.  ¶¶82-84.  Defendant Rooke also confirmed the channel was "neutral."  *Id.*  The next quarter, Defendant Reeder similarly stated that "the change in channel inventory had a minimal impact on year-to-year laser supplies revenue growth."  ¶92.  On May 28, 2015, Defendant Rooke stated Lexmark had "a bit of a supplies channel build" in 1Q15.  ¶116.

But as shown by the Complaint and Defendants' own non-public documents filed with their Motion, Defendants' inventory statements were materially false and misleading.  During the monthly CEO Calls, Defendants were informed of the exact levels of surging laser supplies channel inventory.  ¶¶53-57, 124.  Despite this, Defendants now argue that their statements cannot be false because WW channel inventory levels did not exceed a ten week threshold and because "laser-supplies revenues were outpacing channel inventory[.]"  Mot. at 3, 16.  Defendants are wrong.

Data from the CEO Calls shows that laser supplies channel inventory levels increased by large amounts both in the EMEA and WW throughout the Class Period.  Although the severity of the situation was particularly obvious in EMEA, where inventory levels remained at or above Lexmark's highest risk tolerance (ten weeks) during the Class Period and jeopardized Lexmark's financial condition and outlook (¶¶7, 12-14, 16, 54-56), significant problems were equally evident in the Company's WW inventory levels, which far outpaced revenue growth:[4]

---

[4]    The percentages in this table are either taken directly from Defendants' alleged misstatements or derived from the data in Defendants' Exhibit L at 16.  Because Defendants submitted Exhibit L in support of their Motion (*see* Mot. at 4 n.2), and because it relates to and directly supports the CEO

| Quarter | Reported % Change in Laser Supplies Revenues (YTY) (¶¶74, 78, 91, 104, 121) | % Increase in WW Channel Inventory in Weeks (YTY) | % Increase in EMEA Channel Inventory in Weeks (YTY) |
|---------|---------|---------|---------|
| 2Q14 | 5% | 13% | 20% |
| 3Q14 | 2% | 16% | 35% |
| 4Q14 | 5% | 17% | 48% |
| 1Q15 | 5% | 45% | 70% |
| 2Q15 | (3%) | 20% | 37% |

The disconnect between Defendants' public statements regarding revenue levels and channel inventory (*e.g.,* "minimal impact" and a "bit" of "channel build") and the true state of affairs during the Class Period (WW increases between 13%-45% and EMEA increases between 20%-70%), is sufficient to plead falsity. *See Freudenberg*, 712 F. Supp. 2d at 192; *In re Braskem S.A. Sec. Litig.*, 2017 WL 1216592, at *17 (S.D.N.Y. Mar. 30, 2017). Lexmark's subsequent $50-$70 million channel inventory drawdown is also indicative of the Company's false "growth story" during the Class Period. *See Emps.' Ret. Sys. of Gov't of the V. I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (reversing dismissal and finding "a significant gap in fourth quarter sales tends to support Plaintiffs' claim that inventory was misleadingly characterized throughout the Class Period" and that the company's "explanation for the revenue gap and inventory spike . . . is entitled to little weight at this stage of litigation . . .").

Defendants argue they made cautionary statements "that they could [not] measure channel inventory." Mot. at 12. This argument is a red herring. Not only do Exhibits J and L include detailed spreadsheets confirming the allegations that Lexmark executives meticulously tracked inventory at least monthly using three different metrics (pages, weeks, and dollars) (*see* ¶¶17, 54),

Call allegations in the Complaint, Plaintiff has relied on its contents. *See, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008); *Cortec Indus., Inc. v. Sum Holdings L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). If the Court is not inclined to consider Exhibit L, or Exhibit J, in conjunction with the Complaint's existing allegations, Plaintiff respectfully requests leave to file an amended complaint that will expressly incorporate the data contained in Exhibits J and L.

but Defendants also admit that "the models Lexmark used to estimate its laser supplies channel inventories were sophisticated tools that provided reasonably accurate results." *Compare* Mot. at 11-12 *with* Exh. L (showing channel inventory levels dating back to December 2011 and bearing the internal note "Q3/15 inventory not sustainable") *and with* ¶¶121, 124, 133-134.

> **b.    Defendants misrepresented the reason that laser supplies revenue increased**

Throughout the Class Period, Defendants persistently attributed Lexmark's year-over-year increases in laser supplies revenue to increased end-user demand.  *See* ¶74 (reporting that "laser supplies revenue increas[ed] 5% YTY primarily due to increased end-user demand . . ."); ¶86 (stating that "laser supplies revenue increase[ed] 5% YTY primarily due to strong end-user demand" and that "[r]evenues in EMEA increased compared to the same period in 2013 primarily due to increased laser supplies revenue . . ."); ¶92 ("[r]eflecting robust end-user demand, laser supplies revenue was quite strong . . .").

The Complaint, however, plausibly alleges that Defendants sold excess laser supplies to channel partners, which concealed weakening end-user demand at the same time Defendants touted strong end-user demand as a revenue driver.  Even assuming that Lexmark did experience an increase in end-user demand in one region of the world, such that the above statements could be literally correct (*see* Mot. at 11), Defendants' price harmonization actions in EMEA, which inflated channel inventory levels, were by far the larger cause of the apparent revenue increases during the Class Period as evidenced by Defendants' disclosures at the end of the Class Period that Lexmark would be drawing down laser supplies inventory by $50-$70 million.  Courts regularly find similar statements, where the defendant failed to disclose important facts that investors needed to assess a situation, to be actionable.  *See, e.g.*, *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 401-02 (S.D.N.Y. 2012) (statements that "GE has performed well during the recent market volatility," and

"we successfully meet our commercial paper needs," held actionable where there were "serious difficulties in GE Capital's access to short-term financing"); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, *13-*14 (S.D.N.Y. Dec. 2, 2013) (positive statements discussing a business relationship made misleading by failure to disclose material risk to that relationship).

### c.      Defendants misrepresented the impact of Lexmark's price harmonization actions

The Complaint alleges with particularity numerous misstatements regarding price harmonization actions taken by Lexmark. ¶¶85, 88, 101-102, 105, 111. These statements were false because Defendants downplayed and insufficiently explained the impact that pricing actions would have on EMEA channel inventory levels. Because the Company was not experiencing increasing demand (¶¶49-58) and because Defendants knew channel partners would stock up on laser supplies in anticipation of price increases, Defendants' statements failed to disclose that the price increases would exacerbate an already untenable channel inventory situation.

At the start of the Class Period, EMEA laser supplies channel inventory sat at ten weeks. ¶¶12, 55. After price increases went into effect in Euro-denominated countries, EMEA inventory levels stayed inflated at 10.1 weeks in 3Q14 and then grew even more, reaching 12.7 weeks in 4Q14 and 14.3 weeks in 1Q15. *See* ¶¶55-56; Exh. L. Because end-user demand was not increasing to offset this inventory growth, Lexmark was leveraging laser supplies sales during the Class Period against the Company's future financial performance – a fact Defendants failed to disclose. ¶¶87, 90, 102, 113. The CEO Call presentations confirm the Complaint's allegations, and make clear that Defendants had real-time information contradicting their Class Period statements.

With respect to statements concerning demand, when Defendants chose to speak on the subject of price increases, they had a duty to "speak truthfully about material issues." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Bristol Myers Squibb Co. Sec. Litig.*,

586 F. Supp. 2d 148, 159-60 (S.D.N.Y. 2008) ("Once a corporation has elected to speak . . . Rule 10b-5 mandates that its speech must be truthful, accurate, and complete.").  They failed to do so.

<blockquote>

**d.      Defendants' statements regarding end-user demand were not statements of opinion**

</blockquote>

When discussing Lexmark's historical increases in laser supplies revenue with investors and analysts, Defendants repeatedly pointed to increased end-user demand and made clear that channel inventory changes were not the cause.  *See, e.g.*, ¶74 ("laser supplies revenue increas[ed] 5% YTY primarily due to increased end-user demand"); ¶86 ("[r]evenues in EMEA increased . . . primarily due to increased laser supplies revenue"); ¶92 ("the change in channel inventory had a minimal impact on year-to-year laser supplies revenue growth").  Now, Defendants try to label their revenue and channel inventory statements as subjective opinions for which they cannot be held liable.  *See* Mot. at 9-11.  Defendants' efforts to recast their unambiguous statements fail.

First, Defendants' statements were not "opinion" because they represented the then-current state of affairs at the Company.  Information presented to Defendants in the monthly CEO Calls shows that the statements were knowingly false at the time they were made because year-over-year WW and EMEA inventory levels were steadily increasing at all times during the Class Period, in direct contrast to Defendants' statements.  *See* ¶¶53-56; Exhs. J, L.

Second, under the applicable standard for statements of opinion or belief, a plaintiff must plead facts that "call into question the [speaker's] basis for offering the opinion."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015).  Specifically, a plaintiff must "identify particular (and material) facts going to the basis for the [speaker's] opinion – facts about the inquiry the [speaker] did or did not conduct *or* the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Id.*  The Complaint readily meets this standard.

The Complaint and Defendants' Exhibits J and L make clear that the data included in the monthly CEO Calls demonstrated that year-over-year WW and EMEA laser supply channel inventories were growing by extraordinary amounts during the Class Period.  Specifically, WW inventories increased approximately 13%, 16%, 17%, and 45% in 2Q14, 3Q14, 4Q14, and 1Q15, respectively.  The trend was even more exaggerated in EMEA, with increases of approximately 20%, 35%, 48%, and 70% in 2Q14, 3Q14, 4Q14, and 1Q15, respectively.  Defendants' argument that the CEO Calls establish that "[WW] laser supplies channel inventories were flat or only slightly increasing throughout virtually the entire putative class period" is simply wrong and belied by Defendants' own contemporaneous data.  *Compare* Mot. at 11 *with* Exh. L.

Moreover, had robust end-user demand been driving increased laser supplies revenues during the Class Period, channel inventory levels would not have increased by outsized amounts because the laser supplies would have been in the hands of customers rather than on the shelves of Lexmark's channel partners.  ¶¶55-56; Exh. L.  "That is sufficient to plead that [Lexmark] did not actually believe the implicit representations it made to investors."  *See City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2016 WL 6652731, *10 (S.D.N.Y. Nov. 10, 2016); *see In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *12 n.10 (S.D.N.Y. Apr. 22, 2016) ("Even if the projections regarding future inventory levels are statements of opinion, those opinions either (1) are predicated upon untrue supporting statements of fact regarding current inventory levels, or (2) omit material facts about the speaker's inquiry into or knowledge of facts that would support the stated opinion.  Therefore, the statements are actionable."); *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004) (material misstatements of opinion are false statements).

Unlike the "unsupported claims" in the pre-*Omnicare* case *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *10 (S.D.N.Y. Nov. 25, 2003) relied on by Defendants, the Complaint

- 10 -

here is bolstered by the existence of monthly CEO Calls, which Defendants concede provided Lexmark's top executives with exact detail on, among other things, laser supply channel inventory data. *In re Sanofi Sec. Litig.*, is distinguishable because it involved interpretations of clinical trial results, including "personal reactions," over which "[r]easonable persons may disagree. . . ." 87 F. Supp. 3d 510, 544 (S.D.N.Y. 2015). Here, by contrast, Defendants' statements attributing laser supplies revenue growth to strong end-user demand were objectively undermined by specific data that Defendants reviewed each month during the Class Period. That data unequivocally showed that channel inventory increases far outpaced revenue growth. Likewise, Lexmark's main competitors reported softening demand at that time. ¶58. So, even if Defendants' statements contained opinions, those opinions were not honestly held.

### 2.      The Complaint adequately pleads actionable omissions

An omission is actionable when the defendant is subject to a duty to disclose the omitted facts. *Basic v. Levinson*, 485 U.S. 224, 239, n.17 (1988). "This duty can arise in one of two ways: either (1) expressly pursuant to an independent statute or regulation – *i.e.*, an affirmative legal disclosure obligation; or (2) as a result of the ongoing duty to avoiding rendering existing statements misleading by failing to disclose material facts." *Salix*, 2016 WL 1629341, at *5; *see also Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."). Here, the omissions of material fact are actionable under either test.

### a.      Defendants had a duty to ensure their statements about current inventory levels were not misleading

Defendants claim their statements about current laser supplies inventory levels referred only to WW inventory levels, so they had no obligation to disclose elevated inventory levels in EMEA. Mot. at 16-17. Not so. First, as set forth above, Defendants' comments about slight or minimal

year-to-year changes in WW inventory were objectively false in light of the 13%, 16%, 17%, and 45% Class Period increases in WW laser supplies inventory presented to Defendants during the Class Period. *See* Exh. L at 16. Second, fluctuations in EMEA laser supplies channel inventory levels were so important they had the ability to impact the entire Company's financial performance. ¶7. Third, Defendants did, in fact, comment on the status of laser supplies and revenue generated therefrom in EMEA and Lexmark's "core" geography of Europe. *See* ¶¶74, 86, 98, 105, 107, 114.

Regardless, once Defendants undertook to make statements about laser supplies inventory, whether WW or EMEA-specific, they had a duty to disclose any other facts necessary to ensure those statements were not misleading. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth, [e]ven when there is no existing independent duty to disclose information on the issue or topic"). That duty persisted even if Defendants' statements were literally correct (they were not) because the omitted information made the statements materially misleading. *See In re Mylan N.V. Sec Litig.*, 2018 WL 1595985, at *4 (S.D.N.Y. Mar. 28, 2018). In short, Defendants had a duty not to tell investors "half-truths." *Vivendi*, 838 F.3d at 240.

Defendants affirmatively misrepresented the state of Lexmark's laser supplies channel inventory. But even accepting Defendants' proposed interpretation of their statements, Defendants still told "half-truths" by repeatedly reassuring the market that the Company's laser supplies inventory levels were under control. ¶¶59, 80, 82-84, 89, 92, 94-96, 100, 105-110, 116. Defendants' assurances that inventory was increasing only "slightly," and that the channel was "neutral," or "flat," were materially misleading in the context of the market's concern about Lexmark's possible laser supplies build-up, the potential vulnerability of the laser supplies segment as a result of fluctuations in the Euro, and analysts' stated interest in Lemark's competitor HP's reduction of laser

supplies inventory in Europe.   ¶¶58, 65, 83, 85, 89, 93-95, 101, 107-109, 115-116, 153-154; *see*

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir.

2010) ("Some literally accurate statements can, through their context and manner of presentation,

[become] devices which mislead investors."); *Salix*, 2016 WL 1629341, at *10 ("The omission of

any information with respect to current inventory levels is material and misleading, because that

omission led analysts to believe that inventory levels were merely slightly outside of the range that

Defendants described as 'normal' and could be returned to that level within about three months.").

That Defendants' statements about WW laser supplies inventory did, in fact, mislead the

market is also evident from analysts' reaction when Defendants announced the truth, which included

significant financial impacts from the inventory drawdown:

> *Last quarter, you talked about a channel inventory build only adding about 1% to reported supplies inventory.  That's about $5 million.  Now you're talking about a $50 million to $75 million drawdown in supplies inventory for the year because it was elevated,* and you're talking about the actions this quarter being targeted.  *So to me, your comments last quarter implied that channel inventory was fine to slightly elevated.*  Today, you're talking about massively elevated channel inventories that still need to come down to the tune of $50 million to $75 million.

¶122. Still others directly questioned Defendants' credibility.  ¶¶67, 126-127.  The allegation that

several analysts understood that there were no significant inventory build-ups occurring in

Lexmark's laser supplies markets, and that its revenue "growth" was not based on pull-forward

sales, supports a finding that the omitted facts were necessary to make Defendants' statements not

misleading.  *See Salix*, 2016 WL 1629341, at *11.

Defendants' suggestion that they disclosed the impact of EMEA price harmonization actions

in their SEC filings is unpersuasive.  A generic warning regarding the possibility of adverse impacts

caused by possible currency fluctuations is insufficient to disclose the likely specific impacts of

*ongoing* actions taken by the Company in response to *actual* known currency trends.  *See New*

*Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x. 10, 15 (2d Cir. 2011); *Salix*, 2016 WL

1629341, at *11-*12; ¶¶168-169.  Likewise, Defendants' reliance on *In re Hardinge*, *Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 322 (W.D.N.Y. 2010) is misplaced.  There, the Court found there was no duty to disclose an isolated fact – that other regions were also increasing direct sales capacity – that could not have misled a reasonable investor, because the statements were made in the context of a press release **solely** about Canadian operations.

Defendants also contend that their "statements about [WW] channel inventory did not obligate them to speak about EMEA channel inventory" (Mot. at 17) and attempt to downplay the financial impact of the EMEA region on the Company as a whole.  But the Company's EMEA region made up 37% of Lexmark's total revenues and, contrary to Defendants' assertion, the build-up of laser supplies inventory in the EMEA region did materially affect the Company's financial results.  Indeed, Defendants reported disappointing 2Q15 results and were forced to reduce 3Q15 and FY15 guidance as a result of "laser supplies channel optimization, particularly in EMEA." ¶22. Because EMEA laser supplies channel inventory could, and in fact did, impact the Company's financial results, Defendants had a duty to disclose the truth about the inventory levels in EMEA when they spoke about the Company's WW channel inventory levels.

Defendants' statements regarding laser supplies revenue growth during the Class Period were equally misleading, even if literally true, because they failed to disclose that the increased sales were largely due to overselling in the channel, exacerbated by Lexmark's price harmonization actions. ¶¶77, 87, 90, 99, 102, 113, 117, 138-141.  Instead of being truthful, the only "cause" for the revenue growth proffered by the Defendants was increased end-user demand, improperly misleading the market to believe that Lexmark's revenue figures represented sustainable growth, rather than temporary, inflated numbers.  *Freudenberg*, 712 F. Supp. 2d at 180 ("If a company . . . puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning

the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.").

### b. Defendants had a duty to disclose unusual inventory levels under Item 303 of SEC Regulation S-K

Item 303 of SEC Regulation S-K ("Item 303") required Lexmark's quarterly and annual filings with the SEC to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011). Violations of Item 303 constitute actionable omissions for purposes of Rule 10b-5, so long as the element of materiality is also satisfied. *See Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 (2d Cir. 2016).

Item 303 also required Lexmark's Form 10-K and Forms 10-Q to disclose events that it knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii); ¶¶141-144. The Complaint alleges Lexmark had an independent obligation to disclose its inventory build-up in the EMEA channel, both: (i) as an unusual event in 2Q14; and (ii) as a known trend once Lexmark had experienced multiple quarters of laser supplies inventory build-up in the EMEA channel. ¶¶142-147. Defendants' Exhibit L confirms that WW inventory levels experienced a similar trend.

### (1) Plaintiff sufficiently alleges that elevated EMEA inventory levels constituted an "unusual event" or "trend" under Item 303

For several quarters, Lexmark's laser supplies inventory in EMEA was unsustainably elevated due to Lexmark selling more stock to channel partners than they needed. As a result of

- 15 -

these "pull-forward sales," the Company's Class Period revenues were inflated at the foreseeable expense of later quarters' revenue. ¶¶138-141, 145-147. This is precisely the type of unusual event (in 2Q14, the first significant elevation in inventory) or trend (beginning in 3Q14 and continuing through the Class Period) that the SEC requires companies like Lexmark to disclose. *See* ¶142 (citing SEC instruction that "[c]hanges in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease"); ¶145 (SEC requires disclosure where shipments of product for the quarter "reasonably might be expected to result in lower shipments and revenue in the next period"); *see also In re CPI Card Grp., Inc. Sec. Litig.*, 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017) (plaintiffs adequately pleaded Item 303 trend by alleging company's largest customers were significantly over-inventoried and that initial rise in sales was unsustainable). Lexmark's WW numbers correlate, with the Company experiencing outsized year-over-year inventory growth of approximately 13%, 16%, 17% and 45% in 2Q14 through 1Q15. *See* Exh. L.

Defendants incorrectly claim that a trend could not have existed until 3Q15. Mot. at 18-19. First, while Defendants direct the Court to variations in monthly inventory levels, it is clear from the Complaint and Exhibit L that end-of-quarter inventory levels were always higher in EMEA than in the first two months of the quarter, suggesting that Lexmark ***regularly*** sold the most laser supplies in the final month of the quarter. *See* Exh. L at 16. Sequential variations in inventory month-to-month, contrasted with large year-over-year increases, therefore, do not suggest the absence of a trend.

Second, Defendants claim that any increases in EMEA channel inventory levels were "almost completely offset by decreases in inventory in its other regions." Mot. at 3. But if this was true, Lexmark's WW laser supplies channel inventory levels would not have increased by 13%, 16%, 17%, 45%, and 20% year-over-year during each respective quarter of the Class Period. This too

indicated an unusual event and trend under Item 303.

Third, it is evident from the Complaint and Exhibit L that quarterly inventory levels in EMEA were unsustainable at the start of the Class Period (*i.e.*, at or above ten weeks), and, therefore, placed future revenues at risk.  ¶¶54-56; Exh. L.  EMEA laser supplies inventory at the end of 2Q14 was 20% higher than the prior year and marked the first time levels hit the ten-week threshold.  *Id*.  This was plainly an "unusual event" under Item 303.  EMEA laser supplies channel inventory exceeded ten weeks for the next ***four quarters***, climbing 35%, 48%, and 70% over prior year periods.  *Id.*  These allegations are sufficient at the pleadings stage to allege a trend or uncertainty under Item 303.  *See Litwin*, 634 F.3d at 716 (trend sufficiently pleaded where plaintiff alleged that downward trend in real estate market was presently known at time of alleged omission).

Finally, Defendants' contention regarding how long a trend must exist before requiring disclosure under Item 303 is a red herring.  "Whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage."  *CPI*, 2017 WL 4941597, at *3.  Defendants' authorities are also distinguishable.  *See* Mot. at 19.  In *Pearlstein v. BlackBerry Ltd.*, it was unclear whether Item 303 applied "to foreign private issuers at all."  93 F. Supp. 3d 233, 244-45 (S.D.N.Y. 2015).  If it did apply, the court found any trend "implausible" because the two- and five-month periods between the two SEC filings at issue were insufficient to determine performance trends for a brand new product released only one month prior to the first filing.  *Id.* at 245.  *Pearlstein*, however, "did ***not*** find that a five-month period was insufficient to establish a trend."  *CPI*, 2017 WL 4941597, at *3, n.38.  Here, in contrast, laser supplies were a critically important revenue source, channel inventory was meticulously tracked, and any level exceeding ten weeks was excessive.  ¶¶24, 124.

Defendants' other cases fare no better.  *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 218

(5th Cir. 2004) (five-month decline in natural gas prices did not constitute a trend where first two months of decrease followed several months of dramatic increases, and metric at issue (revenues) was practically identical to year prior); *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 540 (S.D.N.Y. 2010) (company not required to disclose lower margins for quarter three days before that quarter closed where company had not previously provided any guidance as to likely margins); *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) (public articles containing data showing two months of increased foreclosure rates insufficient to establish a known trend of subprime foreclosures and delinquencies at time of IPO); *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016) (no requirement under Section 11 of Securities Act of 1933 to reflect a drop in sales that began only two weeks before a Registration Statement for IPO became effective).

### (2)   Defendants Had Knowledge of the Trend in EMEA Inventory

Defendants concede they knew about the information in the internal CEO Calls. Mot. at 11. Contrary to their Motion, Exhibits J and L affirm and strengthen the Complaint's allegations by further establishing that Defendants meticulously tracked all aspects of laser supplies channel inventory during the Class Period. Put simply, Defendants knew channel inventory was increasing dramatically throughout the Class Period. *See* Exhs. J, L; ¶¶55-56, 149-156.

Defendants were also aware of the effects of Lexmark's successive EMEA pricing actions because they looked "at it regularly," and – as they acknowledge in the Motion – inventory build-up was a well-known risk of price harmonization actions. Mot. at 15; ¶¶101, 121. Shortly after the Class Period, Defendants confirmed that "weakness in demand" and "decreased consumption of supplies" contributed to elevated laser supplies inventory in 2015, and that the Company regularly had "dialogues" with channel partners "around how much inventory they have; how much inventory

they think they need; why they think they need to have that level of inventory or not." ¶¶134, 136, 148-150.  Taking Plaintiff's allegations as true, it is implausible that Defendants were unaware of the trend in rising EMEA laser supplies inventory levels or the likely impact such "pull-forward" sales would have on later periods' revenues at the time they made the alleged omissions.

The timing and size of Lexmark's inventory drawdown of laser supplies channel inventory also supports a plausible inference that the inventory build-up trend was known to Defendants.  On May 28, 2015 – *after* experiencing 70% EMEA inventory growth and 45% WW inventory growth in 1Q15 – Defendants assured investors there was only "a bit" of supplies channel build in the first quarter, worth only "about a point" year-to-year in the Company's growth.  ¶¶114-116.  Yet just two months later, Defendants admitted that the Company's laser supplies channel inventory in EMEA was more than 50% above targeted levels, and that the Company would be drawing down approximately $70 million in inventory.  ¶¶118-124, 155-156.  As the CEO Calls establish, such a massive build-up did not happen overnight.  Defendants' belated disclosure that bloated EMEA channel inventory was the primary cause of the drawdown, which significantly hurt Lexmark's 2Q15 and future revenues and financial performance, supports an inference that Defendants were aware of the problem all along.  *See Blanford*, 794 F.3d at 306-07.

### (3)   The EMEA laser supplies inventory build-up was reasonably likely to be material

Materiality is a mixed question of law and fact.  Courts do not dismiss a complaint unless the omissions alleged "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *See Litwin*, 634 F.3d at 717; *SAIC*, 818 F.3d at 96.  Plaintiff's Complaint easily meets this low threshold.

The Complaint alleges that supplies were critical to Lexmark, generating over 60% of its revenue in 2014 and 2015.  ¶¶45, 137, 148, 152.  Laser supplies in particular were crucial because

Lexmark was phasing out its inkjet printers in favor of laser printers.  ¶¶2 n.1, 46.  At the same time, the EMEA market generated approximately 37% of Lexmark's revenue during 2014, and 80%-85% of that revenue was from Euro-denominated areas.  ¶¶49-50.  The importance of the laser supplies market in Euro-denominated countries to the Company's financial results made it very likely that surges in channel inventory levels, coupled with declining end-user demand, would have a material impact on future periods' revenue.  ¶¶140, 145-147; *see McKenna v. SMART Techs.*, 2012 WL 3589655, at *4 (S.D.N.Y. Aug. 21, 2012) (allegations of uncertainty over demand for company's "core" product sufficient to establish likely material impact).

Defendants' ultimate admission that Lexmark would take a $50-$70 million inventory drawdown because of efforts to reduce excess laser supplies channel inventory, primarily in EMEA, further demonstrates materiality.  ¶¶122-129.  Indeed, the drawdown resulted in significantly lowered revenue and EPS guidance for the rest of 2015 and, worse still, analysts estimated that the drawdown indicated that the Company's reported laser supplies revenue had been inflated by as much as 5% during 2014.  ¶126; *see Litwin*, 634 F.3d at 720 (omission's significance to a particularly important segment of a business tends to show materiality).

## B.    Plaintiff Adequately Pleads a Strong Inference of Scienter

The PSLRA's "strong inference" of scienter standard is satisfied when, accepting the allegations as true and considering them collectively, a reasonable person would deem the inference of scienter at least as strong as an opposing inference.  *Tellabs*, 551 U.S. at 324.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most plausible of competing inferences. . . ."  *Id.*  "[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."  *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

In this Circuit, scienter can be established via motive and opportunity allegations *or* facts

"constitut[ing] strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). Thus, allegations of "motive" are not necessary to show scienter. *Tellabs*, 551 U.S. at 325. For this reason, Defendants' argument that scienter is lacking because the Complaint does not allege "suspiciously timed or sized trades" of Lexmark stock is irrelevant, as are the cases cited. *See* Mot. at 21-22.

Where, as here, the plaintiff alleges that defendants knew facts or had access to information suggesting that their public statements were not accurate, "[s]uch allegations alone are enough to satisfy the pleading requirement for scienter." *Freudenberg*, 712 F. Supp. 2d at 197; *see also In re Nevsun Res. Ltd.*, 2013 WL 6017402, at *14 (S.D.N.Y. Sept. 27, 2013) (plaintiffs alleged strong circumstantial evidence of conscious misbehavior or recklessness where "information contrary to the alleged misrepresentations [was] alleged to have been known by defendants at the time the misrepresentations were made").

Considered in context with the Complaint's allegations regarding the CEO Calls, Exhibits J and L bolster the allegations that Defendants knew of rapidly rising inventory levels during the Class Period, as well as the unsustainability of inventory levels in EMEA. Defendants concede that the Individual Defendants participated in monthly CEO Calls that included the presentation of Exhibits J and L and the slide decks referenced in the Complaint, all of which tracked WW and EMEA laser supplies channel inventory levels throughout the Class Period in terms of weeks, dollar amount, and pages. ¶¶55-57, 149. And Defendants admit they used "very complex models . . . to forecast the supplies business" with reasonable accuracy and that channel partners reported to Lexmark on inventory levels and end-user demand. ¶150; Mot. at 11. Courts in this Circuit have found substantially similar allegations sufficient to plead scienter. *See Novak*, 216 F.3d at 311-12 (allegations of repeated statements to investment community that inventory levels were under

control or giving false explanations for inventory growth, despite knowing the true reasons for rising inventory levels were sufficient to plead scienter); *In re Revlon, Inc. Sec. Litig.*, 2001 WL 293820, at *7 (S.D.N.Y. Mar. 27, 2001) (allegations that defendants closely monitored inventories at the same time as alleged failure to disclose that inventories were "ballooning to extraordinary levels" sufficient to plead a strong inference of fraudulent intent).

Defendants' argument that they could not have acted with scienter because the monthly CEO Calls showed that WW channel inventory was "flat to only slightly increasing" is demonstrably wrong.  *See* Mot. at 23.  With WW and EMEA year-over-year inventory levels trending upwards for several quarters, Defendants' statements to the market regarding Lexmark's inventory levels were, at a minimum, extremely reckless as to adverse facts in Defendants' possession regarding a critical revenue stream.  ¶¶122-124, 139-141, 147-153; Exh. L at 16.  That "egregious refusal to see the obvious, or to investigate the doubtful" in itself supports an inference of scienter.  *Novak*, 216 F.3d at 308; *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 335-36 (S.D.N.Y. 2014) (rejecting defendants' argument that they did not have the requisite state of mind in making alleged misstatements regarding results of its drug trials because "management honestly believe[d] its positive view of the data" and finding that the "extreme negativity" of the data at issue supported allegations of recklessness).  Defendants' authorities do not change this result.  *See* Mot. at 22-23 (citing *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36,42 (2d Cir. 2000) (failure to disclose reported adverse side effects in SEC filing not reckless because "there was no statistical link between [company's drug] and any adverse side effect" until ***after*** the filing); *but see Siracusano*, 563 U.S. at 48-50 (scienter and materiality alleged and statistical significance not required); *see also Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010) (scienter allegations insufficient where plaintiff did not identify any internal reports

or statements in which defendants received forward-looking information contrary to public statements and instead relied solely on objective incorrectness of metric).

Plaintiff also alleges that Defendants' misstatements and omissions concerned one of Lexmark's core businesses and largest revenue sources. ¶¶45, 48, 89, 148. The Complaint explains that Lexmark's laser supplies business was the Company's "primary profit engine," which helped fund Lexmark's new technology investments. ¶45. In 2015, *Forbes* estimated that Lexmark's laser printer and cartridge division comprised 83% of Lexmark's estimated value, and EMEA accounted for approximately 35% of Lexmark's WW sales. ¶¶49-50, 148. Defendants knew that laser supplies channel inventory was a key metric by which the market measured Lexmark's financial prospects because analysts regularly asked Defendants to comment on it during the Company's conference calls. ¶¶59-60, 65, 67-69, 83-85, 89, 94-97, 107-111, 116.

Indeed, analysts estimated that each week of laser supplies inventory Lexmark sold into the channel was worth approximately $40 million in revenue for the Company, so even one week of increased inventory had significant financial implications for the Company and its investors. ¶140. In light of the centrality of the laser supplies business, and its channel inventory levels, to Lexmark's overall financial success, the inference that Defendants acted with scienter when making the alleged misstatements and omissions is at least as plausible as any competing inference. *See Celestica*, 455 Fed. App'x. at 14 ("plaintiffs properly pleaded scienter where inventory levels were key to measuring Celestica's financial performance and [were] a subject about which investors and analysts often inquired"); *Salix*, 2016 WL 1629341, at *16 ("the fact that [the alleged fraud] involved the core operations . . . also support[s] a strong inference of scienter").

Plaintiff also alleges numerous facts that undermine any competing non-culpable inference. First, the sheer scale of the approximately $70 million inventory drawdown Lexmark conceded it

needed to take in order to get inventory back to sustainable levels – and its concession that the drawdown was primarily caused by EMEA – makes it exceedingly unlikely that Defendants were unaware of the significance of the inventory build-up or decreased end-user demand during the Class Period. ¶¶118-129, 156-157; *see Salix*, 2016 WL 1629341, at \*16 (magnitude of the alleged fraud supports strong inference of scienter); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488-89 (S.D.N.Y. 2004) ("the mere fact that the company had to make a large correction is some evidence of scienter"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) (magnitude of eventual special charges taken by defendant company "undermine[d], at the pleading stage, the argument that defendants were unaware of the sharp increase in [inventory] returns until shortly before [defendant's] press release" and so supported finding of recklessness).

In fact, after Defendants disclosed the drawdown, experienced analysts severely doubted Defendants' suggestion that they did not know of the issue in prior analyst calls. *See* ¶126 (Bernstein analyst calling drawdown "staggering" and "given that it came with limited warning, [it] is likely to undermine management's credibility"); ¶127 (Credit Suisse analyst questioning "why [severe deterioration in sales] has come as a surprise to management given the continuous concern around the possible build-up in the channel of supplies").

Second, Plaintiff alleges that two of Lexmark's main competitors in laser supplies, HP and Xerox, had been decreasing channel inventory since 2Q14. ¶¶58, 153-154. HP expressly stated in May 2014 that toner demand was declining in Europe, and that it expected toner, one of Lexmark's most profitable laser supplies, to "remain under pressure for the rest of [2015]." ¶¶58, 154. These public actions by Lexmark's competition, considered in conjunction with Defendants' own monthly CEO Calls and their post-class period admissions that "decreased consumption of supplies" and "weakness in demand" had contributed to the elevated laser supplies channel inventory, undermine

the plausibility of any inference that Defendants did not know end-user demand for laser supplies was weakening at the same time they issued statements reassuring investors about the Company's "strong" or "increased" end-user demand for those supplies.  ¶¶58, 130-136, 156-157.

Defendants seek to avoid this argument by claiming Lexmark "was increasing its market share at HP's expense."  Mot. at 12.  For support, Defendants point to the September 3, 2014 Citi Global Technology Conference.  ECF No. 67, Exh. K at 6.  Defendants' statements about taking share, however, are outside the Complaint's allegations and related to "Managed Print Services," which involved large volume hardware sales, service contracts, and consumables.  *See id.*  This case is not about managed print services contracts and these statements necessarily do not provide an apple-to-apples comparison regarding the state of end-user demand for laser supplies in the EMEA market.  They also do nothing to counter the actual data showing that Lexmark experienced large inventory increases both in EMEA and WW during the Class Period.

### C.    Plaintiff Properly States a Claim Under Section 20(a)

Defendants' sole argument regarding Section 20(a) is that Plaintiff fails to sufficiently plead a primary securities fraud claim.  *See* Mot. at 23.  Because Plaintiff adequately pled its primary violations, and because Plaintiff adequately alleged a control person violation, the Motion to dismiss should be denied.  *See Delcath*, 36 F. Supp. 3d at 336.

## III.    CONCLUSION

Plaintiff pleads each element of Defendants' fraud with particularity and alleges that Defendants acted with scienter.  Because Defendants fail to demonstrate that the allegations in the Complaint are insufficient in any respect, Defendants' Motion should be denied.

DATED:  May 14, 2018

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD


*s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE
ROBERT J. ROBBINS
MAUREEN E. MUELLER
BAILIE L. HEIKKINEN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
rrobbins@rgrdlaw.com
mmueller@rgrdlaw.com
bheikkinen@rgrdlaw.com

*Lead Counsel for Plaintiff*

LABATON SUCHAROW, LLP
JONATHAN GARDNER
MICHAEL CANTY
CHRISTOPHER L. MOONEY
140 Broadway
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
jgardner@labaton.com
mcanty@labaton.com
cmooney@labaton.com

*Additional Counsel*

- 26 -

## <u>CERTIFICATE OF SERVICE</u>

I, David A. Rosenfeld, hereby certify that on May 14, 2018, I authorized a true and correct copy of the Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint for Violations of the Federal Securities Laws, to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.


*s/ David A. Rosenfeld*
DAVID A. ROSENFELD

- 27 -