UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                                    :
OKLAHOMA FIREFIGHTERS PENSION                       :
AND RETIREMENT SYSTEM,                               :
*Individually and on Behalf of All Others*          :
*Similarly Situated*,                               :
                                                    :        17cv5543
                    Plaintiff,                      :
                                                    :        OPINION & ORDER
                                                    :
          -against-                                 :
                                                    :
LEXMARK INTERNATIONAL, INC.,                        :
PAUL A. ROOKE, DAVID REEDER, *and*                  :
GARY STROMQUIST,                                    :
                                                    :
                    Defendants.                     :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM H. PAULEY III, Senior United States District Judge:

           Defendants Lexmark International, Inc. ("Lexmark" or "the Company"), Paul A.

Rooke, David Reeder, and Gary Stromquist (the "Individual Defendants," and collectively with

Lexmark, the "Defendants") move pursuant to Federal Rule of Civil Procedure 12(b)(6) to

dismiss the Second Amended Complaint ("Complaint") in this putative securities fraud class

action.  For the reasons that follow, Defendants' motion is denied.

<u>BACKGROUND</u>

           The allegations in the Complaint are presumed true on this motion.  The putative

class includes all persons and entities ("Plaintiffs") who acquired Lexmark's publicly traded

stock between August 1, 2014 and July 20, 2015 (the "Class Period").  Lexmark is a global

manufacturer of printers and related supplies.  (Second Am. Compl., ECF No. 63 ("Compl."),

¶ 34.)  The Individual Defendants were Lexmark senior executives during the Class Period.

(Compl. ¶¶ 35–37.)

Plaintiffs allege that Defendants made materially false or misleading statements and omissions in SEC filings, press releases, earnings calls, and investor conferences between August 1, 2014 and May 28, 2015 in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Plaintiffs also bring a Section 20(a) claim against the Individual Defendants for control person liability.

I.    Lexmark's Laser Printer Supplies Business and "Channel Inventory"

In the years leading up to the Class Period, Lexmark shifted its emphasis from inkjet printers to higher-end laser printers and printing software.  (Compl. ¶¶ 2, 46.)  To fund its nascent software development, Lexmark relied heavily on its printer supplies business, which was the Company's "primary profit engine."  (Compl. ¶¶ 5–6, 44–45.)  Sales to Lexmark's Europe, Middle East, and Africa ("EMEA") segments were particularly important, generating between 35 and 37% of the Company's total revenue in 2014-2015.  (Compl. ¶¶ 7, 49.)

Lexmark sold laser printer supplies to its channel of distributors and resellers (i.e., "selling in"), who would then sell the supplies to end-user customers (i.e., "selling through").  (Compl. ¶ 8.)  However, Lexmark recorded sales as revenue when it shipped supplies to distributors and resellers and not when those supplies were sold to end users.  (Compl. ¶¶ 48, 52.)  These supplies were referred to as "channel inventory," which was measured in the number of weeks it would take for the distributors and resellers to sell the supplies to end users.  (Compl. ¶ 8.)  Because channel inventory was no longer on Lexmark's shelves, the Company used models to estimate channel inventory levels.  (Compl. ¶ 19.)  Lexmark did not publicly report its estimated channel inventory levels during the Class Period.  (Compl. ¶ 8.)

II.    Lexmark's Alleged "Channel Stuffing"

Plaintiffs allege that Defendants engaged in a process known colloquially as

"channel stuffing."  Specifically, Plaintiffs claim that in 2014 and early 2015, Lexmark flooded

the EMEA channel with printer supplies.  (Compl. ¶¶ 48, 52.)  Because Lexmark's accounting

practices recognized revenue when Lexmark "sold" those supplies into the channel to

distributors, and <u>not</u> when distributors resold them out of the channel to end users, the effect of

aggressive channel sales was to inflate present revenues at the expense of future revenues.

(Compl. ¶ 57.)  Inevitably, distributors reached a saturation point and needed to "sell through"

the inventory glut before they could accept additional printer supplies from Lexmark.  (Compl.

¶ 57.)  And while that offloading occurred, Lexmark's ability to "sell into" the inventory channel

and generate new revenue was impaired.  (Compl. ¶ 57.)

          According to Plaintiffs, excess channel inventory was exacerbated by two

circumstances.  First, beginning in mid-2014 and into 2015, the euro declined relative to the U.S.

dollar.  (Compl. ¶¶ 15, 51.)  To reduce the risk of arbitrage, Lexmark raised printer supplies

prices worldwide—including in EMEA—incrementally in the third and fourth quarters of 2014

and the first quarter of 2015 ("3Q14," "4Q14," and "1Q15").  (Compl. ¶ 51.)  In turn, this price

harmonization incentivized distributors and resellers to stock up on printer supplies inventory to

lock in lower prices.  (Compl. ¶ 52.)  Second, the declining euro coincided with a tapering end-

user demand for laser printer toner, one of Lexmark's most profitable products.  (Compl. ¶ 58.)

Lower end-user demand made it more difficult for Lexmark's distributors and resellers to offload

Lexmark's already bloated channel inventory.  (Compl. ¶¶ 16, 21, 58.)

          Lexmark normally endeavored to keep its channel inventory levels between 6 and

10 weeks.  (Compl. ¶¶ 8, 65.)  Plaintiffs claim that Individual Defendants attended monthly calls

during which they received updates on Lexmark's estimated printer supplies channel inventory

levels ("CEO Calls").  (Compl. ¶ 53.)  Moreover, internal slide decks detailing historical, current,

and future forecasts of Lexmark's EMEA printer supplies channel inventory by weeks and dollar
amount were distributed and discussed during the CEO Calls.  (Compl. ¶ 54.)  Plaintiffs allege
that these CEO Call presentations depict a sequential increase in EMEA printer supplies channel
inventory levels throughout the Class Period above the acceptable threshold of 10 weeks.
(Compl. ¶¶ 54–56.)  Specifically, EMEA channel inventory levels were: (1) 6.5 weeks at the end
of 2012; (2) 8.4 weeks at the end of 1Q14; (3) 10 weeks at the end of 2Q14; (4) 10.1 weeks at the
end of 3Q14; (5) 12.7 weeks at the end of 4Q14; and (6) 12.8 weeks at the end of 1Q15.
(Compl. ¶¶ 54–56 (emphases added).)

III.    Lexmark's Alleged Misrepresentations and Omissions and Plaintiffs' Losses

Channel inventory was a subject of concern for investors because of its possibility
for abuse and Lexmark's general silence on the topic.  (Compl. ¶ 9.)  According to Plaintiffs,
between August 1, 2014 and May 28, 2015, Defendants made a series of materially misleading
statements and omissions in SEC filings, press releases, earnings calls, and investor conferences
about Lexmark's channel inventory levels and their impact on Lexmark's financial health.  These
misstatements and omissions, which span 24 pages of the Complaint, can generally be
categorized as follows: (1) misstatements and omissions regarding changes in Lexmark's
channel inventory levels; (2) misstatements and omissions regarding the underlying driver of
Lexmark's printer supplies revenue; and (3) misstatements and omissions regarding the scope
and impact of Lexmark's price harmonization efforts.  (See Compl. ¶¶ 74–117.)

Plaintiffs allege that these misstatements and omissions artificially inflated
Lexmark's stock price to $51.17 on August 14, 2014.  (Compl. ¶¶ 11, 159.)  On July 21, 2015,
Lexmark revealed in an earnings call that its dismal 2Q15 performance was attributable to a
decline in printer supplies revenue stemming from the need to reduce elevated channel inventory,

especially in EMEA.  (See Compl. ¶¶ 118–125.)  Following these corrective disclosures,

Lexmark's stock price plummeted 20% from $47.32 per share on July 20, 2015 to $37.75 per

share on July 21.  (Compl. ¶ 161.)  Following further post-Class Period disclosures

acknowledging decreasing demand for Lexmark's printer supplies and elevated channel

inventory, Lexmark was sold to a group of Chinese investors in November 2016, at which time

its stock ceased trading on the NYSE.  (See Compl. ¶¶ 71–73, 130–136.)

DISCUSSION

I.      Standard

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a

complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim is facially plausible 'when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(citation omitted).  The plausibility standard is "not akin to a 'probability requirement,' . . . [but]

it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S.

at 678.  In deciding a Rule 12(b)(6) motion, the court construes all reasonable inferences in a

plaintiff's favor.  Gonzalez v. Hasty, 802 F.3d 212, 219 (2d Cir. 2015).

A.      Documents Considered

In determining whether dismissal is warranted, a court may "consider any written

instrument attached to the complaint, statements or documents incorporated into the complaint

by reference, legally required public disclosure documents filed with the SEC, and documents

possessed by or known to the plaintiff and upon which it relied in bringing the suit."  Kleinman

v. Elan Corp., plc, 706 F.3d 145, 152 (2d Cir. 2013).

5

As relevant here, Defendants attach 24 exhibits to their motion papers. Plaintiffs do not object to the Court's consideration of any of those materials. But irrespective of Plaintiffs' consent, this Court may not properly consider materials outside the Complaint without treating the motion as one for summary judgment. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). As this Court declines to convert Defendants' Rule 12(b)(6) motion into one for summary judgment, further discussion is warranted as to which documents this Court considers in determining whether Plaintiffs have stated a claim.

Exhibits A–F are SEC filings and can be considered on this motion. Exhibits G, H, I, K, S, T, U, V, and W are transcripts of earnings calls or investor conferences that are explicitly quoted in the Complaint, and Plaintiffs do not dispute their authenticity. Accordingly, the Court may also consider these documents when analyzing the Complaint. See Pehlivanian v. China Gerui Advanced Materials Grp., Ltd., 153 F. Supp. 3d 628, 643 (S.D.N.Y. 2015) (incorporating by reference and considering transcripts of earnings and results conference calls where plaintiff heavily cited and quoted them throughout the complaint).

Exhibits J and L warrant a more extended discussion. Those exhibits are internal slide decks that accompanied the CEO Calls for January 2015 and July 2015. Plaintiffs argue that the slide decks support their argument that Defendants acted with scienter because the exhibits demonstrate that Defendants had access to data showing that EMEA channel inventory levels were swollen. Defendants cite these exhibits to bolster their own arguments and contend that they undercut the alleged falsity of their statements regarding channel inventory because the slide decks demonstrate that worldwide channel inventory levels were under Lexmark's 10-week threshold.

But before the Court can reach these arguments, it must address whether these

two exhibits were incorporated by reference or relied on in drafting the Complaint.  The Complaint references the slide decks that accompanied the CEO Calls in the aggregate as well as revenue and channel inventory figures in those slide decks.  (See Compl. ¶¶ 53–57.)  However, a general allusion to these documents is insufficient to deem them incorporated by reference.  See Helprin v. Harcourt, Inc., 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003) ("To be incorporated by reference, the [c]omplaint must make a clear, definite, and substantial reference to the documents."); see also Looney v. Black, 702 F.3d 701, 716 n.2 (2d Cir. 2012) ("Limited quotation does not constitute incorporation by reference."); Ward v. TheLadders.com, Inc., 3 F. Supp. 3d 151, 163 (S.D.N.Y. 2014) ("[V]ague allusion[s] to general classes of documents" are insufficient for incorporation by reference.).

Plaintiffs also assert that they rely on the contents of these documents because Defendants submitted them in support of their motion and because they "relate[] to and directly support the CEO Call allegations in the Complaint."  (Pl.'s Opp. to Mot. to Dismiss, ECF No. 71 ("Pl.'s Opp."), at 5 n.4.)  However, Plaintiffs' contention that they rely on the contents of Exhibits J and L simply because the exhibits relate to and support the allegations in the Complaint misapprehends the relevant standard.  Contrary to Plaintiffs' assertion, it is not sufficient that they knew of or possessed the CEO Call presentations—rather, they must have "relied heavily upon [their] terms and effect" in drafting the Complaint such that the document is integral.  See Chambers, 282 F.3d at 153 (quotation marks omitted); accord Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) ("[A] document 'upon which [the complaint] solely relies and which is integral to the complaint' may be considered by the court." (emphasis in original and citation omitted)).  Plaintiffs' reliance on Staehr v. Hartford Financial Services Group, Inc., 547 F.3d 406 (2d Cir. 2008), to justify consideration of Exhibits J and L is misplaced.  Staehr stands

for the narrow proposition that a court may take judicial notice of press coverage, litigation documents, and regulatory filings to establish the fact of such litigation and filings.  Staehr, 547 F.3d at 425.

Moreover, taking judicial notice of Exhibits J and L would be inappropriate where both parties seek to use the exhibits for the truth of the matters asserted therein.  Notably, Plaintiffs represent that they disagree with Defendants' factual interpretation of Exhibits J and L and they request that this Court consider the documents only to the extent that they support Plaintiffs' allegations and contradict Defendants' public statements about channel inventory levels.  (Pl.'s Opp., at 1 n.2.)  But it is long-settled in this circuit that a court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  Schwab v. E*Trade Fin. Corp., 285 F. Supp. 3d 745, 749 (S.D.N.Y. 2018) (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)).  Accordingly, this Court will not consider Exhibits J and L in its evaluation of Defendants' Rule 12(b)(6) motion.[1]

Exhibits M–R are compilations of the Company's statements as alleged in the Complaint.  These exhibits incorporate calculations of channel inventory's impact on revenue growth based on figures in Exhibit L.  To the extent that these exhibits are based on allegations in the Complaint or documents incorporated therein, this Court refers instead to the underlying source material.  See Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 134 (D. Conn. 2007) (considering summaries only by reference to the underlying documents).  And as this Court has

---

[1]    Because this Court declines to consider Exhibits J and L on this motion to dismiss, they pose no risk that this Court might draw inferences from them in Plaintiffs' favor.  However, defense counsel in class action securities litigation might think twice before introducing documents on a motion to dismiss that would not otherwise be available to plaintiffs, given the Private Securities Litigation Reform Act of 1995 ("PSLRA") automatic discovery stay.  As demonstrated by counsel's arguments in this case, such documents can spawn potentially competing inferences that may tend to bolster plaintiffs' claims.

excluded Exhibit L, it will not consider any summaries based on figures contained in that exhibit. Finally, this Court declines to consider Exhibit X—slide excerpts from Lexmark's July 21, 2015 earnings presentation—as it was not attached to the Complaint, incorporated by reference, or integral to the Complaint.

B.        Section 10(b) and Rule 10b-5 Claims

Section 10(b) makes it unlawful for "any person, directly, or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" in contravention of rules and regulations promulgated by the SEC for the protection of investors.  15 U.S.C. § 78j(b).  In turn, Rule 10b-5 makes it unlawful to, in connection with the purchase or sale of any security, "employ any device, scheme, or artifice to defraud"; to "make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made . . . not misleading"; or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. 240.10b-5.

To prevail on a securities fraud claim, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008).  Defendants contest the first two prongs.

A securities fraud complaint must also satisfy "the heightened pleading requirements of the [PSLRA] and [Federal Rule of Civil Procedure] Rule 9(b) by stating with particularity the circumstances constituting fraud."  ECA, Local 134 IBEW Joint Pension Tr. of

Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).  "This pleading constraint [provides] a defendant with fair notice of a plaintiff's claim [and] safeguard[s] [its] reputation from improvident charges of wrongdoing."  ATSI Commc'ns, Inc v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).

To meet this standard, "[a] securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  ATSI, 493 F.3d at 99.  Moreover, under the PSLRA, "the complaint . . . [must] specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [the complaint must] state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  The complaint must "do more than say that the statements . . . were false and misleading; [it] must demonstrate with specificity why and how that is so."  Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).

1.      Material Misstatements or Omissions

Plaintiffs contend that their claims rest on both misstatement and omission theories.  This Court addresses each in turn.  See In re Express Scripts Holding Co. Sec. Litig., 2017 WL 3278930, at *11–13 (S.D.N.Y. Aug. 1, 2017) (analyzing misstatement and omissions theories separately).

a.      Affirmative Misrepresentations and "Half Truths"

"[H]alf-truths—representations that state the truth only so far as it goes, while omitting crucial qualifying information—can be actionable misrepresentations [under Section 10(b) and Rule 10b-5]."  Univ. Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1994

(2016).  Even if "literally true," affirmative statements may be rendered false by what they fail to disclose.  In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 240 (2d Cir. 2016) (citation omitted).

Such misleading statements are actionable if there is a "substantial likelihood that a reasonable investor would find the . . . [omitted information] important in making an investment decision."  United States v. Litvak, 808 F.3d 160, 175 (2d Cir. 2015).  Whether an alleged misstatement meets this materiality requirement is a fact-specific inquiry that "necessarily depends on all relevant circumstances" of that specific case.  ECA, 553 F.3d at 197.  However, to allege a material misrepresentation at the pleading stage, the plaintiff need only offer sufficient evidence of "a statement or omission that a reasonable investor would have considered significant in making investment decisions."  Litwin v. Blackstone Grp., 634 F.3d 706, 716–17 (2d Cir. 2011) (citation omitted).  Indeed, materiality is a fact-intensive inquiry more appropriate for summary judgment or trial, and courts are loath to dismiss a securities fraud complaint on materiality grounds unless the omitted material is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000).

The Complaint includes an extensive 24-page catalogue of alleged misstatements, explanations as to why they are misleading, and careful identification of the speaker and date for each statement.  For the sake of economy, this Court groups the alleged false or misleading statements into three general categories.

First, Plaintiffs claim that Defendants misrepresented Lexmark's printer supplies channel inventory levels by claiming that (1) channel inventory levels were "flat," "neutral," or that they only increased "a bit"; and (2) the estimated change in printer supplies channel inventory was expected to have a "minimal impact" on revenue growth rates.  (Compl. ¶¶ 59, 94,

100.)  Plaintiffs allege that these statements were misleading or presented an incomplete picture because Defendants failed to disclose that (1) Lexmark's EMEA channel inventory remained at elevated levels; (2) Lexmark's printer supplies revenue growth was impacted by the elevated channel inventory; and (3) Lexmark's distributors and resellers stocked up on printer supplies inventory ahead of price increases.

Defendants contend that their statements regarding Lexmark's channel inventory were accurate because Defendants only spoke to <u>worldwide</u> channel inventory.  Defendants also argue that their statements were literally true because they addressed channel inventory growth's contribution to revenue <u>growth rates</u> year-to-year, rather than pure revenue, and that inventory bloat alone would not actually affect the revenue <u>growth rate</u>.  In doing so, Defendants rely extensively on Exhibits J and L, which as explained earlier, this Court will not consider.  And a determination of how channel inventory precisely affects revenue growth is a factual inquiry inappropriate at the pleading stage.

But more fundamentally, even if literally true, Defendants' statements may have been misleading by what they failed to mention—the true nature of Lexmark's EMEA channel inventory levels and that revenue reports reflected excessive "sales" into channel inventory.  And the central allegations in the Complaint—specifically, the importance of EMEA to Lexmark's revenue, analysts' and investors' concerns about channel inventory levels, the degree to which those alleged levels exceeded Lexmark's target threshold, and investors' shock when they learned about the channel inventory discrepancies—amply suggest that investors would have wanted to know that Lexmark's EMEA channel inventory had swollen to unusual levels during the Class Period.  <u>See, e.g.</u>, <u>In re Revlon, Inc. Sec. Litig.</u>, 2001 WL 293820, at *10 (S.D.N.Y. Mar. 27, 2001) ("[T]he Court cannot say that Revlon's customers' allegedly ballooning

12

inventories . . . are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the issue of materiality." (quotation marks omitted)).

Second, Plaintiffs aver that Defendants misrepresented the impetus behind Lexmark's printer supplies revenue growth during the Class Period by attributing the growth to "robust," or "good," or "strong" end-user demand and describing end-user demand as the "primary driver" of year-to-year growth.  (Compl. ¶¶ 59, 81, 105.)  Plaintiffs contend that these statements were false because end-user demand for laser printer toner was actually decreasing. Moreover, Plaintiffs claim that the statements were misleading because Defendants did not disclose the outsize impact of increased channel inventory levels on revenue growth.

As an initial matter, in claiming that end-user demand was decreasing, Plaintiffs rely only on the allegation that Lexmark's competitors—HP and Xerox—were experiencing waning end-user demand.  (Compl. ¶¶ 75, 153.)  This alone is insufficient to suggest that Defendants' statements were false.  See Steinberg v. Ericsson LM Tel. Co., 2008 WL 5170640, at *15 (S.D.N.Y. Dec. 10, 2008) ("[T]here is little basis to assume that a decline in projected revenue for [the defendant's] competitors would necessarily lead to a decline in [the defendant's] projected revenues as well.").

Turning to whether these statements were misleading, Defendants argue that they were nonactionable opinions that had a reasonable foundation.  From the outset, Defendants' blanket characterization of the statements as mere opinions strains credulity.  "[S]tatements of opinion include subjective statements that reflect judgments as to values that [are] not objectively determinable."  In re Aratana Therapeutics Inc. Sec. Litig., 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018) (quotation marks omitted) (alteration in original).  Some of the alleged misstatements purport to state historical facts.  (See, e.g., Compl. ¶ 59 ("Strong end-user demand

was the primary driver of year-to-year growth, but we estimate that the laser supplies channel inventory increased slightly."), ¶ 98 ("Laser supplies revenue increased 5% YTY primarily due to strong end user demand . . . .").)  While channel inventory projections were rooted in estimates and inherently less determinable, there was very little equivocation in Defendants' statements on the reasons for increased <u>revenue</u> that would suggest they were merely subjective judgments.

But even if these disclosures were statements of opinion, they may still be actionable.  Under <u>Omnicare</u>, the plaintiff must identify "particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." <u>Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund</u>, 135 S. Ct. 1318, 1325 (2016).  Defendants insist that their opinions are nonactionable because they were reasonably based on the facts that: (1) <u>worldwide</u> laser printer supplies channel inventories were relatively flat and (2) laser printer supplies revenues remained strong during that period.  Again, these arguments depend on Exhibits J and L.  In any event, opinion statements may also be actionable if "[although] sincerely held and otherwise true as a matter of fact . . . the speaker omits information whose omission makes the statement misleading to a reasonable investor."  <u>Tongue v. Sanofi</u>, 816 F.3d 199, 209 (2d Cir. 2016).

The Second Circuit has cautioned that courts should resist "an overly expansive reading of this standard" because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts, and . . . do[] not expect that every fact known to an issuer supports its opinion statement. . . . [Thus, a] statement of opinion is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  <u>Tongue</u>, 816 F.3d

at 210 (quotation marks and citation omitted) (alterations in original).  Moreover, a court must

consider relevant "hedges, disclaimers, or qualifications" that accompany the opinion statement.

Omnicare, 135 S. Ct. at 1333.

Here, Plaintiffs do not allege some ancillary fact "cutting the other way"—rather,

they assert that Defendants misattributed the source of Lexmark's revenue.  See In re Cannavest

Corp. Sec. Litig., 307 F. Supp. 3d 222, 239 (S.D.N.Y. 2018) (finding actionable misstatement

where corporate defendants misattributed the source of their revenue); cf. Tongue, 816 F.3d at

212 (plaintiffs had not adequately alleged a claim where there was no "serious conflict" between

defendants' opinion statements and allegedly omitted facts).  And a reasonable investor would

likely have found it significant that printer supplies revenues were driven by inflated channel

inventory and not increased end-user demand because those forces fundamentally differ in

sustainability.

Defendants also argue that their statements of opinion were accompanied by

meaningful cautionary language and risk disclosures such that no liability can attach.  That

contention is not precisely on point, as the "bespeaks caution" and meaningful cautionary

language safe harbors apply to forward-looking statements.  See Gregory v. ProNAi

Therapeutics Inc., 297 F. Supp. 3d 372, 397 (S.D.N.Y. 2018) ("The PSLRA amended the

Exchange Act to provide a safe harbor for forward-looking statements." (citing 15 U.S.C. § 78u-

5(c))).  Defendants' statements as to the reasons for increased revenue in recently ended quarters

cannot fairly be characterized that way.  See, e.g., In re Salix Pharm., 2016 WL 1629341, at *10

(S.D.N.Y. Apr. 22, 2016) (declining to apply safe harbor analysis to representations of present

fact).

Moreover, the language "must convey substantive information about factors that

realistically could cause results to differ materially from those projected . . . ."  Slayton v. Am. Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010).  Defendants spoke generally in their disclosures and public statements about Lexmark's inability to control what its distributors and resellers do with channel inventory, as well as a vague warning that "excessive inventory . . . for [the] reseller channel . . . may adversely affect sales . . . or other elements of the Company's operating results."  (Decl. of William J. Sushon, Esq. in Supp. of Defs.' Mot. to Dismiss ("Sushon Decl."), ECF No. 67, Ex. A, at 16; see also Sushon Decl., Ex. G, at 14 ("We don't control the channel. We do our best to make these judgments.").)  But in arguing that such language was sufficient, Defendants "fundamentally mischaracteriz[e]" Plaintiffs' claims because this language expressly fails to disclose the risk at issue—that the Company's revenue numbers would be inflated by unsustainable channel inventory sales by the Company itself.  See In re Salomon Analyst Level 3 Litig., 350 F. Supp. 2d 477, 494 (S.D.N.Y. 2004) (rejecting "cautionary language" defense where Defendants mischaracterized Plaintiffs' claims by pointing to risk factors that did not address the risk at issue).

Third, Plaintiffs claim that Defendants misrepresented the scope and impact of Lexmark's price harmonization efforts.  Specifically, Plaintiffs allege that Defendants disclosed to investors that they sought to harmonize prices and that "channel inventory often increases ahead of price harmonization" but that it was expected to decline in the second quarter "as the harmonization activity work[ed] its way through the channel."  (Compl. ¶ 105.)  However, according to Plaintiffs, Defendants concealed the frequency of their price harmonization actions during the Class Period and the compounding effect it had on printer supplies channel inventory.

Defendants point to these very same statements as providing adequate warning about the effects of price harmonization.  Defendants also argue that they had no obligation to

take a "gloomy, fearful or defeatist view of the future." Rombach, 355 F.3d at 174.  But

Plaintiffs' allegations suggest that the general disclosure of a phenomenon's existence, without

describing its outsize rate of occurrence or the potential impact on an important source of

revenue (here, EMEA), could be materially misleading.  See, e.g., In re MF Glob. Holdings Ltd.

Sec. Litig., 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) ("Vague disclosures of general risks will

not protect defendants from liability.").

        Ultimately, Defendants' arguments that Plaintiffs failed to allege any actionable

misstatements of material fact are not persuasive.  Thus, Plaintiffs satisfy the first prong of a

Section 10(b) and Rule 10b-5 claim.

        b.    Omissions

        "[A]n omission is actionable under the securities laws only when the [defendant]

is subject to a duty to disclose the omitted facts." Stratte-McClure v. Morgan Stanley, 776 F.3d

94, 101 (2d Cir. 2015) (citation and quotation marks omitted).  "[I]n and of themselves, [Section]

10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material

information." Vivendi, 838 F.3d at 239.  "Such a duty may arise when there is a statute or

regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate,

incomplete, or misleading." Stratte-McClure, 776 F.3d at 101 (citation and quotation marks

omitted).

        First, Plaintiffs allege that Defendants had a duty to disclose omitted information

about channel inventory, end-user supply, and price harmonization to make their corporate

statements accurate or not misleading.  However, this argument simply reframes Plaintiffs'

misstatement theory.  Importantly, "[p]ure omissions, of course, must be distinguished from

'half-truths'—statements that are misleading under the second prong of Rule 10b-5 by virtue of

what they omit to disclose." Vivendi, 838 F.3d at 239–40 (citation omitted).  And "[b]ecause a 'pure omission' theory is relatively uncommon in securities litigation, and also not strictly within the letter of Rule 10b-5, courts often, to some confusion, use the term 'omission' when referring to statements that fall under the second prong of Rule 10b-5." Vivendi, 838 F.3d at 240 n.9 (citation omitted).  Accordingly, as this Court concludes that Plaintiffs adequately alleged actionable misstatements that omitted material information, it need not devote further time to Plaintiffs' flipside omissions theory.

Plaintiffs' second omissions theory rests on a purported violation of Item 303 of Regulation S-K under the Securities Act of 1933, which "gives rise to specific duties to disclose." Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008).  Item 303 imposes "the obligation to '[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations.'" Stratte-McClure, 776 F.3d at 101 (quoting 17 C.F.R. § 229.303(a)(3)(ii)).  "[D]isclosure is necessary where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations." Stratte-McClure, 776 F.3d at 101 (citation and quotation marks omitted).

The parties' arguments largely depend on consideration of Exhibits J and L, and so this Court does not address those points in evaluating Plaintiffs' allegations.  At bottom, the Complaint itself claims that from September 30, 2014 until March 31, 2015, at the close of 3Q14, 4Q14, and 1Q15—a collective period of nine months—Defendants' EMEA levels steadily rose above the preferred 6-10 week range.  Plaintiffs claim that by virtue of the importance of EMEA to the Company's printer supplies business, that business segment's significance as

18

Lexmark's "primary profit engine," and the changes in the value of the euro and resultant price harmonization, Defendants knew of a trend likely to have a material effect on the Company's current and future financial condition.

These allegations are sufficient to plead an actionable Item 303 omission with respect to 1Q15. The length of this alleged nine-month trend is sufficiently distinguishable from Defendants' cited authorities, where plaintiffs' allegations concerned time periods as brief as two to five months or would have required near-instantaneous disclosure. See, e.g., Pearlstein v. BlackBerry Ltd., 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015) ("The two- and five-month periods preceding defendants' public filings were insufficient to establish a reportable trend. . . ."); Blackmoss Inv. Inc. v. ACA Capital Holdings, Inc., 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a two-month period of time does not establish a trend . . . [under] Item 303." (citation and quotation marks omitted)). And in any event, "whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage." In re CPI Card Grp. Inc. Sec. Litig., 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017).

Plaintiffs also satisfy the Item 303 knowledge requirement by "plead[ing], with some specificity, facts establishing that defendant[s] had actual knowledge of the purported trend." In re Jumei Int'l Holding Ltd. Sec. Litig., 2017 WL 95176, at *4 (S.D.N.Y. Jan. 10, 2017). Here, Plaintiffs specifically allege that Defendants used models to track the changes in EMEA inventory levels and the numbers reflecting 3Q14, 4Q14, and 1Q15 inventory were in fact presented to Individual Defendants at monthly meetings. Finally, with respect to materiality, this Court must "balanc[e] . . . both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." Stratte-

McClure, 776 F.3d at 102–03.  Plaintiffs have sufficiently alleged that an increasing glut of distributor and reseller inventory would inevitably require a drawdown in future quarters.  And though Defendants contend that such drawdown could not have been reasonably anticipated to affect the Company's revenues as a whole, that argument hinges on Exhibits J and L, which this Court declines to consider.

2.   Scienter

Under the PSLRA, a securities fraud plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  A strong inference is shown "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference" of nonfraudulent intent that can be drawn from the allegations.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314, 324 (2007).  In assessing whether allegations give rise to a strong inference of scienter, a court must "'tak[e] into account plausible opposing inferences' and consider[] 'plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.'"  Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015) (quoting Tellabs, 551 U.S. at 323–24).  Nevertheless, the inference need not be "irrefutable" or of the "smoking-gun genre," or even the "most plausible of competing inferences."  Tellabs, 551 U.S. at 324.  Further, "the court's job is not to scrutinize each allegation in isolation," but to consider whether the allegations holistically raise a strong inference.  Tellabs, 551 U.S. at 326.

To plead the appropriate state of mind under the PSLRA, a plaintiff must show that the defendant acted with the "intent to deceive, manipulate, or defraud," ECA, 553 F.3d at 198, or with recklessness, Blanford, 794 F.3d at 305.  In this circuit, scienter may be alleged

20

either by "(1) showing that defendants had the motive and opportunity to commit fraud; or (2) furnishing circumstantial evidence of conscious misbehavior or recklessness." Nguyen v. New Link Genetics Corp., 297 F. Supp. 3d 472, 492 (S.D.N.Y. 2018) (citing ATSI, 493 F.3d at 99).

   Here, the Individual Defendants are high-level corporate insiders, which gives rise to the presumption of an opportunity to commit fraud.  Nguyen, 297 F. Supp. 3d at 493.  To demonstrate motive, "[the plaintiff] must allege that the corporate defendant or its officers 'benefitted in some concrete and personal way from the purported fraud,'" typically by alleging that corporate insiders "ma[de] a misrepresentation in order to sell their own shares at a profit." ECA, 553 F.3d at 198 (citing Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000)).  Plaintiffs do not contend that the Individual Defendants had any motive to commit the alleged fraud—there are no allegations that they sold any shares while Lexmark's share price was artificially inflated.

   Rather, to allege scienter, Plaintiffs focus on a theory of conscious misbehavior or recklessness.  "Conscious misbehavior or recklessness" is a "state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014).

   "It is the actual facts . . . that provide the most concrete guidance as to the types of allegations required" to demonstrate conscious misbehavior or recklessness.  Novak, 216 F.3d at 308.  Such factual circumstances include where defendants (1) "engaged in deliberately illegal behavior"; (2) "knew facts or had access to information suggesting that their public statements were not accurate"; or (3) "failed to check information they had a duty to monitor." Blanford, 794 F.3d at 306 (quotation mark and citations omitted).  Moreover, because Plaintiffs have not

alleged a motive to commit fraud, "the strength of the circumstantial allegations must be correspondingly greater." ECA, 553 F.3d at 198–99 (citation and quotation marks omitted).

To determine whether a plaintiff has "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements . . . Second Circuit cases uniformly rely on allegations that [1] specific contradictory information was available to the defendants [2] at the same time they made their misleading statements." In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (emphases in original). And "[i]n most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008).

Plaintiffs' scienter allegations focus predominantly on the monthly CEO Calls. Plaintiffs argue that because the Individual Defendants attended meetings where estimated rising EMEA levels were discussed, the Individual Defendants had information belying the accuracy of their public statements about "flat" channel inventory levels. Thus, Plaintiffs allege that the Individual Defendants were reckless in ignoring those spiraling inventory levels in one of their key markets. Viewing these allegations holistically, this Court concludes that they raise a strong inference of scienter based on circumstantial evidence of recklessness.

To be sure, "bare assertions [that the defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports], without any further facts or details" will not suffice to create a strong inference of scienter. PXRE, 600 F. Supp. 2d at 538 (citation and quotation marks omitted) (alteration in original). But here, Plaintiffs have pointed to specific numbers in CEO Call slide decks throughout the Class Period and alleged that Defendants reviewed them.

Moreover, Plaintiffs enumerate statements by each Individual Defendant regarding channel inventory.  (See, e.g., Compl. ¶¶ 59 (Reeder and Stromquist), 93 (Rooke).)  These allegations mirror other cases in this district where judges found the allegations sufficient to plead scienter. See Galestan v. OneMain Holdings, Inc., 348 F. Supp. 3d 282, 300–301 (S.D.N.Y. 2018) (finding sufficient particularized facts where plaintiffs relied on confidential witnesses to allege defendants' participation in "numerous meetings and conference calls during which the negative effects of [corporate activities] were discussed" and identified "specific reports that were circulated during the class period"); In re Salix, 2016 WL 1629341, at *14 (emphasizing that plaintiffs had "identified specific reports and statements containing information about Salix's true wholesale inventory level" and defendants had made statements "confirming they had accurate knowledge" of those levels (emphasis added)).

The inference of scienter is also buttressed by Plaintiffs' "core operations" allegations.  "Under the core operations theory, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." In re Supercom Inc. Sec. Litig., 2018 WL 4926442, at *31 (S.D.N.Y. Oct. 10, 2018) (citation and quotation marks omitted).  "[W]hile allegations regarding core operations may factor into a court's holistic assessment of scienter allegations, they are not independently sufficient to raise a strong inference of scienter." In re Ferrellgas Partners, L.P., Sec. Litig., 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018) (citation and quotation marks omitted); see also In re Barrick Gold Corp. Sec. Litig., 341 F. Supp. 3d 358, 374 (S.D.N.Y. 2018) (same) (citations omitted).

Here, the EMEA channel accounted for 35% of revenue for the printer and

cartridge division that comprised 83% of Lexmark's business and was its "primary profit engine." (Compl. ¶¶ 7, 44–45, 49.) While not dispositive, the importance of EMEA channel inventory to Lexmark's business moves the needle in Plaintiffs' favor. See New Orleans Emp. Ret. Sys. v. Celestica, Inc., 455 F. App'x 10, 14 & n.3 (2d Cir. 2011) (summary order) (plaintiffs adequately alleged scienter where, among other allegations, "inventory levels [were] key to measuring Celestica's financial performance and [were] a subject about which investors and analysts often inquired"); Supercom, 2018 WL 4926442, at *31 (finding that the "core operations" doctrine "bolsters the strength of the inference of scienter when plaintiffs have adequately alleged facts indicating that defendants might have known their statements were false [or inaccurate]" (citation and quotation marks omitted)).

Moreover, the cumulative effect of Lexmark's channel stuffing was an inventory drawdown between $50 million and $70 million as Lexmark subsequently endeavored to reduce excess channel inventory levels, especially in EMEA. (See Compl. ¶¶ 122–129.) Simply put, the magnitude of the aftershock suggests more than a careless mistake or trivial miscalculation by Lexmark and its executives. See In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) ("Although the size of the fraud alone does not create an inference of scienter, the enormous amounts at stake coupled with the detailed allegations [of the fraud] create a strong inference that [defendants were] reckless in not knowing that [their public statements] materially misrepresented [the company's] financial state." (citation and quotation marks omitted) (fourth alteration in original)); see also Katz v. Image Innovations Holdings, Inc., 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (holding that the "magnitude of the fraud" may "provide[] some additional circumstantial evidence of scienter.").

24

And other judges in this district have concluded that similar factual allegations raise strong inferences of scienter.  See, e.g., In re Salix, 2016 WL 1629341, at *13–16 (finding scienter where plaintiffs alleged an inventory "channel stuffing" scheme, plaintiffs identified specific reports and statements showing that defendants were aware of or could access Salix's true inventory levels, and the inventory backlog caused a $500 million reduction in revenue); Revlon, 2001 WL 293820, at *7 (finding scienter where plaintiffs alleged that "defendants continually monitored and helped maintain Revlon's customers' inventories of Revlon products during the period of time those inventories were ballooning to extraordinary levels").

None of Defendants' arguments are availing.  Plaintiffs do not rely on any confidential witnesses, but this Court is aware of no authority requiring confidential witness allegations.  While Plaintiffs do not allege any motive—a matter entitled to some weight, see Martrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 48 (2011)—the "motive and opportunity" and "circumstantial evidence" theories are separate strategies for pleading scienter.  Failure to plead one does not preclude a plaintiff from pleading the other.  See, e.g., Gruber v. Gilbertson, 2018 WL 1418188, at *11–12 (S.D.N.Y. Mar. 20, 2018) (finding that plaintiffs had adequately pleaded circumstantial evidence of scienter even though they fell short on alleging motive and opportunity).  And on these allegations, an inference of fraudulent intent is at least as cogent and compelling as the competing nonfraudulent conclusion—that despite spiraling inventory levels in the key EMEA market, Individual Defendants did not believe there was any cause for concern meriting disclosure.  See City of Brockton Ret. Sys. v. Shaw Grp. Inc., 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) ("[C]ourts since Tellabs have concluded that even if the plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the

defendant's conduct, the tie . . . goes to the plaintiff."  (citation and quotation marks omitted) (alteration in original)).

For all of these reasons, Plaintiffs have adequately alleged scienter for the Individual Defendants, and by extension, Lexmark.  Thus, Defendants' motion to dismiss the Section 10(b) and Rule 10b-5 claims is denied.

C.    Section 20(a) Claim

"It is axiomatic that liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation."  Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014).  Section 20(a) of the Exchange Act provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of [the 1934 Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Accordingly, "[t]o establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  In re NQ Mobile, Inc. Sec. Litig., 2015 WL 1501461, at *2 (S.D.N.Y. Mar. 27, 2015).

Defendants' argument that the Section 20(a) claim should be dismissed rests entirely on Plaintiffs' presumptive failure to plead a claim under Section 10(b) and Rule 10b-5.  And Defendants concede that if Plaintiffs meet their burden to allege a primary violation, the Section 20(a) claim should survive as well.  For this reason, Defendants' motion to dismiss the Section 20(a) claim is denied.

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Second Amended

Complaint is denied.  The Clerk of Court is directed to terminate the motion pending at ECF No.

65.

Dated: March 19, 2019                         SO ORDERED:
      New York, New York

 

 

_____
WILLIAM H. PAULEY III
U.S.D.J.

27