UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------

OKLAHOMA FIREFIGHTERS PENSION
AND RETIREMENT SYSTEM,
*Individually and on Behalf of All Others
Similarly Situated*,

               Plaintiff,

-against-

LEXMARK INTERNATIONAL, INC.,
PAUL A. ROOKE, DAVID REEDER, *and*
GARY STROMQUIST,

               Defendants.

----------------------------------------

17cv5543

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

      Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Lead Plaintiff"), on behalf of itself and the other members of the class, moves for final approval of its proposed settlement with Defendants (the "Proposed Settlement") and the proposed Plan of Allocation. (ECF No. 136.) In addition, Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and Labaton Sucharow LLP ("Labaton," together with Robbins Geller, "Lead Counsel") move for an award of attorneys' fees and expenses. (ECF No. 138.) For the reasons that follow, the motion for final approval of settlement is granted and the motion for an award of attorneys' fees and expenses is granted in part and denied in part.

BACKGROUND

      This putative class action was filed on July 20, 2017. (ECF No. 1.) Thereafter, the parties briefed—and this Court resolved—a motion to dismiss the amended consolidated complaint. See Okla. Firefighters Pension & Retirement Sys. v. Lexmark Int'l, 367 F. Supp. 3d

16 (S.D.N.Y. 2019).  The parties conducted extensive document discovery, and in August 2019, Lead Plaintiff moved for class certification, (ECF No. 99).  After engaging in mediation, the parties reached an agreement to resolve this litigation.  (ECF No. 122.)  On June 17, 2020, this Court preliminarily approved the settlement and permitted notice to the class.  (ECF No. 126.)  The settlement funds were deposited into a Court Registry Investment System ("CRIS") account.  (ECF No. 128.)

The Proposed Settlement resolves the entire litigation for a cash payment of $12 million. (ECF No. 122.)  No objections have been lodged.  (ECF No. 147.)  In addition, Lead Counsel seeks attorneys' fees in the amount of 25% of the settlement fund ($3 million), plus $201,357.78 in litigation expenses, as well as a $2,500 reimbursement to Lead Plaintiff as class representative.  (ECF No. 139.)

## DISCUSSION

### I. Settlement Approval

There is a "strong judicial policy in favor of settlements, particularly in the class action context." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005) (quotation marks omitted).  However, a court must "carefully scrutinize the settlement to ensure its fairness, adequacy and reasonableness, and that it was not the product of collusion." D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001) (citation omitted).  Under this two-part inquiry, a court "must determine whether both the negotiating process leading to a settlement and the settlement itself are fair, adequate, and reasonable." In re Currency Conversion Fee Antitrust Litig., 263 F.R.D. 110, 122 (S.D.N.Y. 2009).  In other words, the settlement must be both procedurally and substantively fair. In re Virtus Inv. Partners, Inc. Sec. Litig., 2018 WL 6333657, at *1 (S.D.N.Y. Dec. 4, 2018).

With respect to procedural fairness, the "[n]egotiation of a settlement is presumed fair when the settlement is 'reached in arm's length negotiations conducted by experienced, capable counsel after meaningful discovery.'" Dial Corp. v. News Corp., 317 F.R.D. 426, 430 (S.D.N.Y. 2016) (quoting Wal-Mart, 396 F.3d at 116). Indeed, "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." In re PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 125 (S.D.N.Y. 1997); accord City of Providence v. Aeropostale, Inc., 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014). Moreover, where a settlement is reached "under the supervision and with the endorsement of a sophisticated institutional investor," it "is entitled to an even greater presumption of reasonableness." In re Hi-Crush Partners L.P. Sec. Litig., 2014 WL 7323417, at *5 (S.D.N.Y. Dec. 19, 2014) (quotation marks omitted). Given that the Proposed Settlement was the product of arm's length negotiations between experienced counsel and created under the supervision of a sophisticated investor, the Proposed Settlement is procedurally fair.

To determine substantive fairness, courts consider the factors set forth in City of Detroit v. Grinnell Corp.:

> (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of the litigation.

Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp., 318 F.R.D. 19, 24 (S.D.N.Y. 2016) (citing City of Detroit v. Grinnell, 495 F.2d 448, 463 (2d Cir. 1974), abrogated on other grounds by Golberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000)); accord Wal-Mart, 396 F.3d at

3

1  117. "[N]ot every factor must weigh in favor of settlement, rather the court should consider the

2  totality of these factors in light of the particular circumstances." Dial Corp., 317 F.R.D. at 431

3  (quotation marks omitted) (alteration in original).

4       A.  Complexity, Expense, and Likely Duration of the Litigation

5       "As a general rule, securities class actions are notably difficult and notoriously

6  uncertain to litigate." In re Facebook, Inc. IPO Sec. & Derivative Litig., 2015 WL 6971424, at

7  *3 (S.D.N.Y. Nov. 9, 2015); see also Bank of Am. Corp., 318 F.R.D. at 24.  Such is the case

8  here, where expert testimony would have been required with respect to falsity, materiality,

9  scienter, loss causation, and damages.  As such, this factor strongly counsels in favor of

10  approval.

11       B.  Reaction of the Class to the Settlement

12       It is well settled that "the reaction of the class to the settlement is perhaps the

13  most significant factor to be weighed in considering its adequacy." In re Facebook, Inc., IPO Sec.

14  & Derivative Litig., 343 F. Supp. 3d 394, 410 (S.D.N.Y. 2018) (quotation marks omitted).  And

15  "the absence of objections by the class is extraordinarily positive and weighs in favor of

16  settlement." Dial Corp., 317 F.R.D. at 431 (quotation marks omitted); accord Bank of Am. Corp.,

17  318 F.R.D. at 24.  Here, no class members objected or opted out, which strongly favors approval.

18       C.  Stage of the Proceedings and the Amount of Discovery Completed

19       The parties briefed—and this Court decided—a motion to dismiss.  (ECF Nos. 66,

20  71, 78.)  They also completed document discovery, and Plaintiff moved for class certification,

21  (ECF No. 99.).  Thus, "a substantial amount of work had been completed" prior to settlement

22  negotiations.  Wal-Mart, 396 F.3d at 118.  The significant litigation prior to the proposed

23  settlement favors approval.

### D. Risks of Establishing Liability and Damages and of Maintaining the Class Through Trial

"Courts generally consider the fourth, fifth, and sixth Grinnell factors together." Dial Corp., 317 F.R.D. at 432. With respect to establishing liability, there was a substantial question regarding whether Plaintiffs could prove misrepresentation, loss causation, and scienter. While Lead Plaintiff submitted a damages expert report on its motion for class certification, (ECF No. 100, Ex. C), Defendants would have likely offered an expert of their own. Accordingly, the risk in establishing damages was real and counsels in favor of approving the settlement. See Dial Corp., 317 F.R.D. at 432 ("Plaintiffs would have encountered additional challenges to proving damages given the parties' dueling expert reports."). Moreover, "[a]s with any complicated securities action, the class faced the very real risk that a jury could be swayed by experts . . . who could minimize or eliminate the amount of Plaintiffs' losses." Bank of Am. Corp., 318 F.R.D. at 24 (quotation marks omitted). Finally, the fact that Lead Plaintiff's motion for class certification had not been fully briefed—let alone decided—presented additional risks to Lead Plaintiff and the proposed class. Overall, these factors counsel in favor of approving the settlement.

### E. Ability of Defendants to Withstand a Greater Judgment

Lead Plaintiff concedes that Defendants can withstand a greater judgment in excess of the settlement amount. (ECF No. 137, at 14.) However, Lead Plaintiff also avers that Defendant's liability insurance policy was diminishing throughout the course of the litigation. (ECF No. 137, at 14–15.) Defendants have not confirmed this fact and, at this stage, have no incentive to deny it. See Hart v. BHH, LLC, 2020 WL 5645984, at *4 (S.D.N.Y. Sept. 22, 2020).

Nevertheless, "while relevant to settlement approval, the ability of defendants to

withstand greater judgment does not alone suggest the settlement is unfair or unreasonable." In re Facebook, 2015 WL 6971424, at *5; see also D'Amato, 236 F.3d at 86 ("[T]his factor, standing alone, does not suggest that the settlement is unfair.").

      F.   The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of the Litigation

"The final two Grinnell factors are typically considered together." Dial Corp., 317 F.R.D. at 432. Here, the $12 million settlement is approximately 10% of $116.8 million, which is Lead Plaintiff's estimated damages consistent with the Plan of Allocation. Moreover, if this Court were to credit Defendants' anticipated attempt to reduce the class period by moving the start date from August 1, 2014 to June 16, 2015, the maximum potential recovery would be $31.5 million. Under this formulation, $12 million would be approximately 38% of the potential recovery. But "[t]he fact that the settlement amount may equal but a fraction of potential recovery does not render the settlement inadequate. Dollar amounts are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." In re Facebook, 2015 WL 6971424, at *6. Given the risks of proving loss causation, the recoverable damages were unlikely to be anywhere close to $116.8 million. See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 339 (2005).

While this settlement is hardly a windfall for Plaintiffs, it is within the range previously approved by judges in this District. See, e.g., In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig., 909 F. Supp. 2d 259, 269 (S.D.N.Y. 2012) (approving settlement amounting to 11% of estimated damages); In re Canadian Superior Sec. Litig., 2011 WL 5830110, at *4 (S.D.N.Y. Nov. 16, 2011) (approving settlement worth 8.5% of maximum amount of estimated damages); In re Merrill Lynch Tyco Research Sec. Litig., 249 F.R.D. 124, 135 (S.D.N.Y. 2008) (approving settlement worth approximately 3% of total estimated

6

damages). Ultimately, there is no indication that the Proposed Settlement is anything but the result of an arm's length negotiation. In view of the risk of litigation and the estimated recovery, the $12 million settlement fund is reasonable.

### G. Aggregation of All Factors

Overall, the Grinnell factors counsel in favor of approving the Proposed Settlement. No one has objected or opted out, and this action was contested at each stage of the litigation. And Plaintiffs faced substantial risk in proving misrepresentation, scienter, and loss causation. Accordingly, this Court approves the Proposed Settlement.

## II. Plan of Allocation

"The standard for approval of a plan of allocation is the same as the standard for approving a settlement: namely, it must be fair and adequate." In re Top Tankers, Inc. Sec. Litig., 2008 WL 2944620, at *11 (S.D.N.Y. July 31, 2008) (quotation marks omitted). "[I]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel." In re Giant Interactive Grp., Inc. Sec. Litig., 279 F.R.D. 151, 163 (S.D.N.Y. 2011) (quotation marks omitted); see also In re Top Tankers, 2008 WL 2944620, at *11 ("If the plan of allocation is formulated by competent and experienced class counsel, an allocation plan need only have a reasonable, rational basis." (quotation marks omitted)). Here, the Plan of Allocation—which was developed by Lead Counsel—is based on the level of artificial inflation in Lexmark's common stock price during the Class Period. Moreover, the Plan of Allocation apportions the net settlement fund among Authorized claimants based on the claims alleged. Because the Plan of Allocation appears fair and adequate and comes by the recommendation of experienced Class Counsel, it is approved.

III.     Notice

"The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." Wal-Mart, 396 F.3d at 113. The Second Circuit explains that:

> There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings. Notice is adequate if it may be understood by the average class member.

Wal-Mart, 396 F.3d at 114 (quotation marks and citation omitted).

The Settlement Notice is reasonable. The Court preliminarily approved the notice plan. (ECF No. 126, at 4.) As of December 5, 2020, more than 32,500 copies of the Notice Packet were mailed to all class members who could be identified with reasonable effort. (Decl. of Eric Nordskog in Supp. Of Mot. for Attorneys' Fees, ECF No. 142 ("Nordskog Decl."), at 3.) Additionally, Summary Notice was published in The Wall Street Journal and over PR Newswire on July 13, 2020. (Nordskog Decl., at 3.) Finally, the Notice Packet and other important documents were posted on the website maintained for the Settlement: www.LexmarkSecuritiesSettlement.com. (Nordskog Decl., at 3.) The Settlement Notice also set forth the amount of settlement, maximum amount of attorneys' fees and expenses sought, rights to object, dates and deadlines, and the Plan of Allocation. (Nordskog Decl., Exhibit A, at 3.) This Court approves the Settlement Notice.

IV.     Attorneys' Fees

In a class action settlement, courts must carefully scrutinize lead counsel's application for attorneys' fees to "ensure that the interests of the class members are not subordinated to the interests of . . . class counsel." Maywalt v. Parker & Parsley Petroleum Co.,

8

67 F.3d 1072, 1078 (2d Cir. 1995). A court's role in this context is "to act as a fiduciary who must serve as a guardian of the rights of absent class members." McDaniel v. Cty. Of Schenectady, 595 F.3d 411, 419 (2d Cir. 2010). The trend in the Second Circuit is to assess a fee application using the "percentage of the fund" approach, which "assigns a proportion of the common settlement fund toward payment of attorneys' fees." Dial Corp., 317 F.R.D. at 433. As a "cross-check on the reasonableness of the requested percentage," however, courts also look to the lodestar multiplier, which should be a reasonable multiple of the total number of hours billed at a standard hourly rate. Goldberger, 209 F.3d at 53. And regardless of which method is used, courts rely on the factors set forth in Goldberger to determine whether fees are reasonable. Wal-Mart, 396 F.3d at 121.

### A. Percentage of the Fund

Here, Class Counsel seeks 25% of the settlement fund ($12 million) in attorneys' fees. In assessing reasonable percentages of settlement funds, courts have "cabined awards to between 12% and 28%" for "class action settlements ranging from $15 million to $336 million." Dial Corp. 317 F.R.D. at 436, 438 (awarding fees representing 20% of a $244 million settlement fund); see also In re Facebook, 343 F. Supp. 3d at 418 (approving 25% of a $35 million settlement fund); Bank of Am. Corp., 318 F.R.D. at 27 (allowing fees representing 12% of a $335 million settlement fund); In re Platinum & Palladium Commodities Litig., 2015 WL 4560206, at *5 (S.D.N.Y. July 7, 2015) (awarding fees representing 22.5% of the $72.5 million fund); In re Bayer AG Sec. Litig., 2008 WL 5336691, at *2, *6 (S.D.N.Y. Dec. 15, 2008) (approving 12% of an $18.5 million settlement fund); In re Polaroid ERISA Litig., 2007 WL 2116398, at *3 (S.D.N.Y. July 19, 2007) (approving 28% of a $15 million settlement fund). While a fee award of 25% of the settlement fund is within the range of awards previously

approved by courts in this District, it is on the higher end.

        B. <u>Lodestar Cross Check</u>

The lodestar is "the product of a reasonable hourly rate and the reasonable number of hours required by the case." <u>Millea v. Metro-North. R. Co.</u>, 658 F.3d 154, 166 (2d Cir. 2011). Here, Lead Counsel spent about 4,581 attorney and professional support hours on this litigation, leading to a lodestar of $3,011,766.00. (Decl. of Robert Robbins in Supp. of Mot. for Attorneys' Fees, ECF No. 143 ("Robbins Decl."), Ex. A; Decl. of Christine Fox in Supp. of Mot. for Attorneys' Fees, ECF. No. 144 ("Fox Decl."), Ex. A.) This amounts to a lodestar multiplier of 0.996, which is below multipliers previously approved by this Court. <u>See</u> <u>Bank of Am. Corp.</u>, 318 F.R.D. at 27 (1.2 lodestar multiplier); <u>Dial Corp.</u>, 317 F.R.D. at 437 (1.75 lodestar multiplier); <u>In re Platinum & Palladium</u>, 2015 WL 4560206, at *3 (1.4 lodestar multiplier).

However, Lead Counsel's lodestar raises several issues. First, the allocation of time is heavily weighted toward partners. Of the 32 attorneys who billed, 16 were partners. (Robbins Decl., Ex. A; Fox Decl., Ex. A.) Those 16 partners accounted for nearly 47% of the hours billed by Lead Counsel. (Robbins Decl., Ex. A; Fox Decl., Ex. A.) Moreover, the hourly rates for some partners were higher than any hourly rates this Court has previously seen. Specifically, 5 of the 16 partners who billed had hourly rates exceeding $1,000, and the rate for two of them exceeded $1,300 per hour. (Robbins Decl., Ex. A; Fox Decl., Ex. A.) Lead Counsel asserts that the more expensive partners were used primarily in an advisory role, but this explanation is insufficient.[1] (Tr. of Fairness Hearing, ECF No. 156, at 8–9.) Further, the hourly

---

[1]     It is generally helpful for counsel to submit contemporaneous, detailed time records as part of their initial motion for attorneys' fees. <u>See</u> William B. Rubenstein, 5 <u>Newberg on Class Actions</u> § 15:6 (5th ed. 2020). A court should not have to request billing records.

rates for Lead Counsel's associates were high, and the rates for 5 associates exceeded $600 per hour. (Robbins Dec., Ex. A; Fox Decl., Ex. A.) Finally, Lead Counsel billed a summer associate on the litigation, which is a practice this Court has never seen. (Robbins Decl., Ex. A.)

Given the partner-heavy billing, the high rates for several partners and associates, and the billing of a summer associate, a modest reduction of Lead Counsel's requested attorneys' fee is warranted. See In re Platinum & Palladium Commodities Litig., 2015 WL 4560202, at *4 ("Courts have reduced the fee percentage requested where, as here, the lodestar value reflects an over-allocation of work to more expensive partners.").

C. Goldberger Test

Regardless of which method is used, courts rely on the factors set forth in Goldberger to determine whether fees are reasonable: (1) the time and labor expanded by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. Wal-Mart, 396 F.3d at 121 (citing Goldberger, 209 F.3d at 50). There is no "one-size-fits-all 'benchmark' in determining the appropriate fee"—in fact, courts should avoid that practice because it "could easily lead to routine windfall where the recovered fund runs into the multi-millions." In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 521 (E.D.N.Y. 2003).

i. Time and Labor Expanded by Counsel

While many class actions are filed on the heels of a government investigation, the claims in this case were formulated entirely from the findings of a private investigation. See In re Gulf Oil/Cities Serv. Tender Offer Litig., 142 F.R.D. 588, 597 (S.D.N.Y. 1992) ("[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the

11

scene after some enforcement or administrative agency has made the kill. They did all the work on their own."). Here, Lead Counsel worked through a motion to dismiss, document discovery, a motion for certification, mediation, and settlement negotiations.

However, as discussed previously, Lead Counsel's time charges were partner-heavy and at the top of hourly rates charged in securities actions in this District. Accordingly, this factor militates in favor of some reduction of the requested award.

### ii. Magnitude and Complexities of the Litigation

Courts have recognized that shareholder actions are notoriously complex and difficult to prove. See Mathes v. Roberts, 85 F.R.D. 710, 713 (S.D.N.Y. 1980). This action involved a number of difficult and complex questions concerning loss causation and damages.

### iii. Risk of Litigation

"Perhaps the foremost . . . factor[] is the attorney's risk of litigation, i.e., the fact that, despite the most vigorous and competent of efforts, success is never guaranteed." Grinnell Corp., 495 F.2d at 471 (quotation marks omitted). Courts in this district have noted that significant litigation risks, including the difficulty of establishing loss causation in light of the Supreme Court's decision in Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005), and the difficulty in proving that Defendants acted with scienter, militate in favor of fee awards. See In re Veeco Instruments Inc. Sec. Litig., 2007 WL 4115808, at *6 (S.D.N.Y. Nov. 7, 2007). Although Lead Counsel withstood a motion to dismiss, it faced substantial risk in establishing scienter, as well as proving causation and damages at trial.

### iv. Quality of Representation

The results achieved through the efforts of Lead Counsel are a "critical element in determining the appropriate fee to be awarded," and the settlement here will undoubtably have

widespread benefits to the class. <u>Maley v. Del Global Techs. Corp.</u>, 186 F. Supp. 2d 358, 373 (S.D.N.Y. 2002). Lead Counsel provided high-quality representation in securing an advantageous settlement for the class.

    v. <u>Requested Fee in Relation to Settlement</u>

As discussed previously, the proposed fee of 25% of the Settlement, while within the wide range of fee awards in this District, is on the higher end. See, e.g., <u>Sakiko Fujiwara v. Sushi Yasuda Ltd.</u>, 48 F. Supp. 3d 424 (S.D.N.Y. 2014) (awarding 20% of $2.4 million settlement as fees); <u>McGreevy v. Life Alert Emergency Response, Inc.</u>, 258 F. Supp. 3d 380 (S.D.N.Y. 2017) (awarding 21.5% of a $3.3 million settlement fund); <u>In re Platinum & Palladium Commodities Litig.</u>, 2015 WL 4560206 (awarding 22.5% of a $72.5 million fund).

    vi. <u>Public Policy Considerations</u>

While public policy favors "the award of reasonable attorney's fees," courts must also "guard against providing a monetary windfall to class counsel to the detriment of the plaintiff class." <u>In re NTL Inc. Sec. Litig.</u>, 2007 WL 1294377, at *8 (S.D.N.Y. May 2, 2007) (quotation marks omitted).

Applying the <u>Goldberger</u> factors and recognizing that a modest adjustment is appropriate, this Court awards a total attorneys' fee of $2,880,000, which represents 24% of the Settlement Fund. These attorneys' fees may be disbursed from the CRIS account once 75% of the net settlement fund[2] has been distributed. See <u>Bank of Am.</u>, 318 F.R.D. at 28; <u>Beane v. Bank of N.Y. Mellon</u>, 2009 WL 874046, at *9 (S.D.N.Y. Mar. 31, 2009).

---

[2]  The estimated net settlement fund is $8,743,641.22, which represents the remainder after attorneys' fees of $2,880,000, litigation expenses of $201,358.78, reimbursement award of $2,500, 2020 tax filing fee of $2,500, and the Claims Administrator's estimated fees and expenses of approximately $170,000.

V. <u>Litigation Expenses</u>

"In class action settlements, [a]ttorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients.  When the 'lion's share' of expenses reflects the typical costs of complex litigation such as experts and consultants, trial consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses, courts should not depart from the common practice in this Circuit of granting expense requests."  <u>Bank of Am. Corp.</u>, 318 F.R.D. at 27 (quotation marks omitted).

Here, Lead Counsel seeks $201,358.78 in litigation expenses, which is below the $300,000 Lead Counsel informed the class they might apply for in the Settlement Notice. (Nordskog Decl., Ex. A, at 3.)  The bulk of expenses were for Plaintiffs' damage expert, accounting for over $126,000.  (Robbins Decl., Ex. B.)  This Court finds Lead Counsel's expense request reasonable and approves it.

VI. <u>Reimbursement for Class Representative</u>

Under 15 U.S.C. § 78u-4(a)(4), a class representative may be reimbursed for "reasonable costs and expenses (including lost wages) directly relating to the representation of the class."  "These awards compensate lead plaintiffs for the substantial time and effort the class representatives incurred, including written discovery, being disposed, reviewing and editing submissions, and attending hearings."  <u>Bank of Am. Corp.</u>, 318 F.R.D. at 27 (quotation marks omitted).  Courts typically require an affidavit demonstrating a "thorough accounting of hours dedicated to the litigation and a statement that these hours constituted lost work time."  <u>In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.</u>, 772 F.3d 125, 133 (2d Cir. 2014).

Lead Plaintiff's request for reimbursement of $2,500 represents 0.02% of the Settlement Fund, which is well within the range of reasonableness. See <u>Bank of Am. Corp.</u>, 318 F.R.D. at 27 (awarding expenses amounting to 0.01% of the fund); see <u>In re Currency Conversion</u>, 263 F.R.D. at 131 (award representing approximately 0.1% of the fund). Accordingly, this Court approves that request.

## CONCLUSION

For the foregoing reasons, the motion for final approval of the settlement is granted and the motion for an award of attorneys' fees and expenses is granted in part and denied in part. The Proposed Settlement, the Plan of Allocation, and the Settlement Notice are approved. In addition, Lead Counsel is awarded attorneys' fees in the amount of $2.88 million, representing 24% of the Settlement Fund. These attorneys' fees may be disbursed from the CRIS account once 75% of the net settlement fund has been distributed. Moreover, Lead Counsel may be reimbursed $201,357.78 in litigation expenses forthwith. Finally, Lead Plaintiff may be reimbursed $2,500 forthwith. The Clerk of Court is directed to terminate all pending motions and to mark this case closed.

Dated: January 7, 2021　　　　　　　　　SO ORDERED:
　　　　　New York, New York

_____
WILLIAM H. PAULEY III
U.S.D.J.